UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION- DETROIT

H&H WHOLESALE SERVICES, INC.,
HOWARD GOLDMAN and DAVID GULAS

    Plaintiffs,

vs.

Case No.

KAMSTRA INTERNATIONAL, B.V.
d/b/a HOLLAND TRADING GROUP and/or
B&S HOLLAND TRADING GROUP, B.V.

    Defendants.

___

Ethan R. Holtz (P71884)
Jaffe, Raitt, Heuer & Weiss, P.C.
Attorneys for Plaintiffs
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000

___

## COMPLAINT

Plaintiffs H&H Wholesale Services, Inc. ("H&H"), Howard Goldman ("Goldman") and David Gulas ("Gulas") (collectively "Plaintiffs"), by their attorneys, Jaffe, Raitt, Heuer & Weiss, P.C., for their Complaint against Defendants Kamstra International, B.V. d/b/a Holland Trading Group and/or B&S Holland Trading Group B.V. (collectively "HTG"), allege as follows:

## PARTIES

1. H&H, a Michigan Corporation, whose registered office and principal place of business is located at 1099 Rochester Road, Troy, Michigan, is a specialty distribution company.

2. Goldman is a Michigan resident, who is a shareholder and founder of H&H.

3. Gulas is an employee of H&H.

4. HTG is a Netherlands-based distribution company which operates on 6 continents and in over 110 countries, which contends that it is the largest wholesale company in Europe and whose principal place of business is located at Rondeboslaan 35, 9936 BJ Delfzijl, Netherlands.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and pursuant to the parties' contract.

6. Venue is proper in this Court pursuant to 28 U.S.C. 1391 and pursuant to the parties' contract.

## FACTS COMMON TO ALL COUNTS

**The Parties' Contract**

7. Sometime in 2012, Gulas was attending the annual FIMA conference in Miami, Florida, where he was introduced to Harmen Haaijer ("Haaijer"), HTG's Area Sales Manager.

8. At the conference, Gulas and Haaijer discussed entering into a business relationship between HTG and HH and the two continued to discuss a business relationship thereafter.

9. The result of those discussions, was the execution by HTG on February 20, 2014 of a Vendor Agreement between H&H and HTG (the "Contract"). A copy of the contract is attached as Exhibit 1.

10. Pursuant to paragraph 9 of the Agreement, with respect to "Any product offered for sale, sold and/or shipped to H&H" (the "Products"), (Ex. 1, ¶2), HTG represented and warranted that

> ...all Products offered for sale and/or sold to H&H by Vendor shall be (1) genuine and authentic and comply with all federal, state, and local laws, ordinances, rules and regulations, including without limitation, the Food, Drug and Cosmetics Act (21 U.S.C. 301 et seq.), and the rules, regulations and guidelines promulgated thereunder (collectively the "FDA Act"); the Lanham Act (15 USC 1051 et seq), and the Fair Packaging and Labeling Act (15 USC 1451 et seq); and any other applicable federal, state, or local law rule or ordinance, all as may now or hereafter be amended (collectively, the "Laws"); (2) original manufacturer's product and in original manufacturer's packaging that will not have (or at any time have had) any alterations of any kind, and (3) in original factory packaging and case packs, and contain the manufacturer's original instructions and inserts.

3

11. HTG also further warranted that,

> None of the Products is or will be adulterated or misbranded, nor shall any of the Products be a product or article that under any of the Laws may not be introduced into commerce, sold to a wholesale distributor or pharmacy or otherwise offered for sale to H&H for any reason whatsoever, or that otherwise may not be sold in its current condition.

Ex. 1, ¶11.

12. In the event of a breach of any terms of the Contract, HTG agreed:

> Vendor shall indemnity and hold H&H harmless from and against any and all claims, judgments, lawsuits, damages, proceedings, debts, demands, costs, expenses and losses of any nature whatsoever relating to or arising out of Vendor's breach, violation or failure to comply with the provisions of this Agreement, including but not limited to court costs, fines, penalties and attorneys fees.

Ex. 1, ¶13.

**The Business Relationship**

13. After entry of the Contract, H&H placed several purchase orders with HTG over the course of the next 2 years, but HTG had not been able to fill them.

14. In 2016, H&H placed a purchase order that HTG was finally able to fill.

15. H&H then placed a purchase order for a shipment of Abbott Laboratories ("Abbott") "FreeStyle Lite RET 50's" blood glucose monitoring test strips (the "Strips"), which are used by people with diabetes to monitor their blood sugar to enable them to regulate their diet and medication.

4

16. HTG, through legal channels (so it told H&H), had access to and had purchased authentic Abbott Strips in authentic retail packaging, which HTG in turn re-sold to H&H, who could then in turn, re-sell them at profit in the United States.

17. It was critical to H&H that the Strips and packaging HTG was re-selling to H&H be authentic Abbott Strips as described in H&H's purchase order and as represented orally by HTG's employees in all respects.

18. Accordingly, H&H, in purchasing the Strips from HTG, relied on both the warranties in paragraphs 9 and 11 of the Contract that the Strips and packaging HTG was selling were legal and authentic and as described in H&H's purchase order, as well as oral representations from HTG's employees of the same and that the proper origins of all Strips was documented.

19. Based upon those warranties, between November 2016 and April 2017, H&H purchased from HTG approximately 24,000 boxes of strips for re-sale in the United States having a resale value of approximately $1,433,000.

20. However, unbeknownst to H&H, strips and packaging that HTG sold H&H were, likely in fact, not compliant and not as described in H&H's purchase order, with disastrous consequences.

**The Abbott Action**

21. On or about May 23, 2017, Abbott commenced an action in the United States District Court for the Eastern District of New York, captioned, *Abbott Laboratories et al., v H&H Wholesale Services, Inc., et al*, Case No. 1:17-cv-

5

03095-CBA-LB (the "Abbott Action"), alleging claims against H&H, Goldman and Gulas, including but not limited to trademark infringement, false description and designation of origin in commerce, federal false advertising, federal dilution of trademark, unfair competition, fraud, and a scheme to facilitate improper insurance billing. It was also alleged by Abbott that Goldman and Gulas were each a "moving, conscious, active force behind H&H's unlawful conduct."

22. In the Abbott Action, Abbott has made allegations, including but not limited to the following, *inter alia*,

    a. In March of 2017, investigators retained by Abbott purchased Strips from a pharmacy that had been re-sold by H&H which had a counterfeit carton, counterfeit instructional insert and counterfeit vial label, and which had been repackaged in a counterfeit box.

    b. In April of 2017, investigators retained by Abbott purchased Strips from a nursing home that had been re-sold by H&H which had a counterfeit carton, counterfeit instructional insert and counterfeit vial label, and which had been repackaged in a counterfeit box.

    c. In April of 2017, investigators retained by Abbott purchased Strips from three pharmacies in New York that had been re-sold by H&H which had a counterfeit carton, counterfeit instructional

6

    insert and counterfeit vial label, and which had been repackaged in a counterfeit box.

   d. In May of 2017, investigators retained by Abbott purchased Strips from two pharmacies in New York that had been re-sold by H&H which had a counterfeit carton, counterfeit instructional insert and counterfeit vial label, and which had been repackaged in a counterfeit box.

  23. Based upon affidavits submitted by Abbott's investigators referenced above, on May 23, 2017, the Court in the Abbott action issued an Ex Parte Seizure Order, permitting, among other things, *inter alia*, Abbott to enter H&H's facility and confiscate documents and product to test for authenticity (the "Seizure Order").

  24. That same day, the Court in the Abbott Action also entered an Order to Show Cause, among other things, *inter alia*, immediately restraining, H&H from further sales of the all glucose test strips of any kind manufactured by Abbott (the "Restraining Order").

  25. On May 24, 2017, Abbott executed the Abbott Court's Seizure Order and, using law enforcement, confiscated several hundred thousand dollars worth of Abbott Strips from H&H, all of which H&H had purchased from vendors other than HTG except for approximately 12 open boxes that were not for sale.

7

26. H&H, both through counsel and directly, reached out to HTG and demanded an explanation and that HTG indemnify it for all losses sustained, and that HTG assist H&H in defending itself.

27. At that time, HTG agreed and assured H&H that all product and packaging it had sold H&H was legal and authentic, that HTG had documentation to prove as much, and that HTG would "of course" stand behind its product, stand behind H&H, and assist with H&H's defense.

28. During the seizure, Abbott realized that, out of the thousands of Strips found on H&H's premises, only a small number of Strips, approximately 12 open boxes not for sale but, if legal for sale, would have had a resale value of approximately $720, had been re-packaged prior to their sale to H&H into counterfeit cartons containing a counterfeit instructional insert, and/or counterfeit vial label.

29. Four months later, Abbott returned approximately $351,000 of the approximately $383,000 worth of Strips it had seized from H&H, all of which it had determined were authentic except for the 12 boxes described in Paragraphs 25 and 28. However, H&H has been and remains prohibited from selling the vast majority of legal Strips due to the wording of the Restraining Order, which remains in place while the seized Strips continue to decline in value due to shortened expiration dates, all of which is due to the alleged counterfeit Strips sold by HTG which Abbott claims to have seized.

8

**The Abbott Dutch Action**

30. Subsequent to the execution of its Seizure Order against H&H, Abbott commenced legal proceedings against HTG in the Netherlands, before the Court of the Netherlands, Private Law Division, Groningen, Case No. C/18/178606/KG ZA 17-209 (the "Netherlands Action").

31. Upon information and belief, among other things, Abbott sought an injunction against HTG preventing further sale of Strips.

32. According to an unofficial translation, the Court in the Netherlands held an injunction hearing on September 5, 2017 and issued a judgment dated September 22, 2017, in favor of Abbot and against HTG and awarding Abbott costs, including the payment of Abbott's attorney's fees.

33. As reflected in the unofficial translation, during the course of the Netherlands Action, HTG admitted and asserted as a defense to Abbott's claims that the Strips HTG had sold to H&H did include Strips containing counterfeit packaging and that HTG had unknowingly purchased such Strips from another supplier.

34. HTG's foregoing admission in the Netherlands Action establishes a clear and unequivocal breach of paragraphs 9 and 11 of the Contract, which has caused significant damage to H&H, Goldman and Gulas.

**H&H's Damages and Demand For Indemnity**

9

35. After execution of the Seizure Order, as result of Abbott's alleged discovery of counterfeit product sold to H&H by HTG, H&H was required in or about May and June 2017, to notify by letter each of the pharmacies that H&H sold Strips it purchased from HTG and advise that such Strips may be improper for sale, and to quarantine that product.

36. That letter resulted in the return of product H&H had sold for approximately $126,500.

37. Moreover, the sending of that letter caused severe and irreparable damage to H&H's reputation, evidenced by a continuing decline in sales to those pharmacies receiving the letter.

38. H&H has been further damaged by its inability to sell the approximately $351,000 worth of Strips that were seized and then returned by Abbott, which are nearer their date of obsolescence and currently are not allowed to be sold at all per the Restraining Order.

39. Further, as a result of HTG's admitted breaches of paragraphs 9 and 11 of the Contract, H&H, Goldman and Gulas have been forced to incur in excess of $500,000 in legal fees and costs defending the Abbott Action.

40. Finally, the publicity and damage to H&H's reputation associated with the Abbott Action has caused a dramatic decline in the value of H&H.

41. Accordingly, on or about October 12, 2017, following up on earlier oral demands, H&H sent HTG a formal demand for indemnity pursuant to paragraph 13 of the Contract.

42. In further breach of the Contract, HTG has failed and/or refused to indemnify H&H as required by paragraph 13 of the Contract.

## COUNT I
## Breach of Contract

43. Plaintiffs incorporate the preceding paragraphs as if fully restated herein.

44. The Contract is valid and enforceable contract between H&H and HTG.

45. Pursuant to paragraphs 9 and 11 of the Contract, HTG warranted, inter alia, that all Products it sold to H&H were authentic and genuine.

46. Pursuant to paragraph 13 of the Contract, HTG agreed, among other things, to indemnify H&H for all damages, costs and attorney's fees incurred as a result of any breach of the Contract, including, but not limited to, breach of the warranties contained in paragraphs 9 and 11.

47. HTG breached the Contract by its sale of Strips as described in paragraphs 20 to 34 above.

48. HTG further breached the Contract by its failure and/or refusal to indemnify H&H as required by the Contract.

11

49.   Goldman and Gulas are intended third-party beneficiaries of the indemnity obligations contained in the Contract.

50.   H&H, Goldman and Gulas have been damaged by HTG's breach of the Contract in an amount to be determined at trial, but believed to be in excess of $75,000.

WHEREFORE, H&H, Goldman and Gulas request and are entitled to judgment against HTG and in their favor:

(a)   Awarding damages in an amount to be determined at trial, but believed to be in excess of $75,000, plus prejudgment interest, costs and attorney's fees; and

(b)   Such other and further relief as the Court deems just and proper.

## COUNT II
### Breach of UCC Warranty of Title and Against Infringement

51.   Plaintiff incorporates the preceding paragraphs as if fully restated herein.

52.   HTG sold boxes of Strips to H&H that are alleged by Abbott to infringe Abbott's trademark, and to violate the law in other ways.

53.   If Abbott's allegations are true, which H&H denies, then HTG violated Michigan's Uniform Commercial Code, MCL 400.2312.

54.   As a direct and consequential result of HTG's sale of Strips and packaging that are alleged to be not authentic and not as described in H&H's purchase order, Plaintiffs were named as Defendants in the Abbott Action.

55. H&H, Goldman and Gulas have been damaged by HTG's breach of warranty in an amount to be determined at trial, but believed to be in excess of $75,000.

WHEREFORE, H&H, Goldman and Gulas request and are entitled to judgment against HTG and in their favor:

    (a)    Awarding damages in an amount to be determined at trial, but believed to be in excess of $75,000, plus prejudgment interest, costs and attorney's fees; and

    (b)    Such other and further relief as the Court deems just and proper.

Respectfully Submitted,

JAFFE, RAITT, HEUER & WEISS, P.C.

By: /s/ Ethan R. Holtz
Ethan R. Holtz (P71884)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
*Attorneys for Plaintiffs*

Dated: October 20, 2017

13

# EXHIBIT 1

### H&H Wholesale Services, Inc. Vendor Application and Agreement

1. Name of Vendor: Holland Trading Group (Kamstra International)
   Address: Rondeboslaan 35
   9936 BJ Netherlands

2. Entity Type (corporation, LLC, etc.): B.V (Ltd)

3. Date of formation: 1979

4. State/Country of formation: Netherlands

5. Tax ID Number: NL 0093.99.343.B.01

6. Principal places of business and addresses of all other facilities which you will use to service prospective business with H&H: (use separate sheets if necessary)

7. President/Owner
   Phone:
   Email

8. Buyer contact(s):
   Phone(s): 0031 6 46 232 533
   Email(s): hhaaijer@hollandtradinggroup.com

9. AP contact:
   Phone:
   Email:

10. Subsidiaries and Affiliated Companies: Kamstra International
    (use additional sheets if necessary)

10. Listing of all d/b/a's including filing location (please attach a copy of all Fictitious Business Name Statements):

11. List all federal licenses (e.g., FDA, DEA, etc.) held by vendor (include any identification number and name and address of issuing agency) and date of expiration (please attach a copy of all Federal licenses):

12. List all state and local licenses (e.g., Board of Pharmacy, Wholesale, etc.) held by vendor (include any identification number and name and address of issuing agency) and date of expiration (please attach a copy of all state and local licenses):

By signing below, the Vendor agrees to all of the following in consideration of being considered a Vendor for H&H, sales to H&H and other good and valuable consideration:

1. H&H shall have the right to conduct any background verification and corporate credit check regarding Vendor, and Vendor hereby authorizes H&H to conduct such investigations as H&H may deem necessary to verify Vendor's creditworthiness and/or solvency, and Vendor agrees to release all persons or entities using or supplying such information, including H&H from any claims and/or losses that may result therefrom.

2. Any product offered for sale, sold and/or shipped to H&H (the "Products") must bear, upon its arrival at H&H, an effective expiration date at least 14 months following receipt by H&H of such product unless otherwise agreed to by H&H in writing. All terms contained herein shall supersede any terms contained in Vendor emails, invoices, shipping documents or other documents related to the Products. If the terms of an H&H purchase order conflict with any terms herein or with Vendor's invoice or shipping documents, the terms of H&H's purchase order shall control. Vendor must be able to fill 100% of H&H's confirmed orders. Vendor must notify and get agreement from H&H in writing if there are any shortages or variations.

3. All payment terms are to commence upon the date H&H receives Vendor's product in its warehouse and goods are checked for accuracy. Until such time as Product has been received by H&H, all risk of loss from any casualty to said goods shall be on Vendor. Goods shall be deemed received by H&H when delivered to H&H's warehouse address.

4. H&H may, at its sole option, return some or all of any Product received from Vendor and receive full credit for all returned items from Vendor. Vendor shall not back order any or all of H&H's order without H&H's written permission. No Product ordered by H&H will be pre-booked for any other customer and all Product ordered by H&H must be in Vendor's possession and available for immediate shipment when Vendor offers Product to H&H.

5. Vendor shall pay all freight charges associated with delivery of Product to H&H unless agreed in writing by H&H to other terms. H&H shall have the right to inspect all product ordered, or to be ordered by H&H, before shipment, or upon receipt, and to reject and/or revoke acceptance of some or all of a shipment at its discretion.

6. Vendor hereby agrees to comply with H&H's policy, as amended from time to time, regarding the necessity of Vendor providing H&H with proof of insurance (in the type and amounts as may be requested by H&H) and contractual indemnity in the form and content as may be specified by H&H.

7. Vendor represents and warrants that Vendor maintains all necessary licenses and permits, if any, needed to lawfully sell the Products to H&H. Vendor agrees to provide H&H with true and correct copies of all permits, licenses and other instruments or evidence that Vendor is duly authorized and permitted to do business in accordance with all applicable governments, departments, commissions, boards, courts, authorities, agencies, officials and offices. Vendor further agrees to provide H&H, upon request, with copies of any inspection reports, notices or findings concerning Vendor issued by any of the governmental entities listed above.

8. No Products will be offered for sale or sold to H&H which have been obtained by the Vendor (or its supplier) based on any promise, assurance, or representation, express or implied, to any manufacturer, distributor or wholesaler that such products will not be sold or otherwise transferred to any third party for resale, at any level of distribution. Should it be determined by H&H that any product sold to it has been obtained in violation of such an undertaking, it is agreed that H&H shall have the right to return such product directly to the vendor, manufacturer, distributor or wholesaler and to offset the value thereof and all reasonable shipping and handling charges against any amounts which are then or which may become due the Vendor,

and if such amounts are not sufficient, to bill Vendor for the balance owed to H&H, which bills must be paid within thirty (30) days of the date thereof.

9. Vendor represents and warrants that all Products offered for sale and/or sold to H&H by Vendor shall be (1) genuine and authentic and comply with all federal, state, and local laws, ordinances, rules and regulations, including without limitation, the Food, Drug and Cosmetics Act (21 U.S.C. 301 et seq.), and the rules, regulations and guidelines promulgated thereunder (collectively the "FDA Act"); the Lanham Act (15 USC 1051 et seq), and the Fair Packaging and Labeling Act (15 USC 1451 et seq); and any other applicable federal, state, or local law rule or ordinance, all as may now or hereafter be amended (collectively, the "Laws"); (2) original manufacturer's product and in original manufacturer's packaging that will not have (or at any time have had) any alterations of any kind, and (3) in original factory packaging and case packs, and contain the manufacturer's original instructions and inserts

10. Vendor has "authorized distributor" status with respect to all of the products sold to H&H. Notwithstanding the foregoing, if Vendor does not have such status for all of the Products, Vendor warrants and represents that such authorized status does not preclude Vendor's sale of those Products for which it does not have such status to H&H.

11. None of the Products is or will be adulterated or misbranded, nor shall any of the Products be a product or article that under any of the Laws may not be introduced into commerce, sold to a wholesale distributor or pharmacy or otherwise offered for sale to H&H for any reason whatsoever, or that otherwise may not be sold in its current condition.

12. All of the Products when sold to H&H shall be owned solely by Vendor free and clear of all claims, encumbrances, liens, conflicting interests and restrictions of any nature whatsoever on their title or on the right of Vendor to sell them to H&H. Vendor has the full right and authority under the Laws to offer for sale and to sell the Products. Vendor's sale of the Products to H&H does not and will not violate or conflict with any agreement, contract, settlement, court order, judgment, consent order or other restriction or limitation affecting Vendor or any of the Products. The Products are not subject to a recall, safety alert, investigation or enforcement action.

13. Vendor shall indemnity and hold H&H harmless from and against any and all claims, judgments, lawsuits, damages, proceedings, debts, demands, costs, expenses and losses of any nature whatsoever relating to or arising out of Vendor's breach, violation or failure to comply with the provisions of this Agreement, including but not limited to court costs, fines, penalties and attorneys fees.

14. Vendor has established, implemented and shall maintain for at least the term of this Agreement and three (3) years thereafter, internal controls and records to ensure compliance with the Laws and this Agreement. Vendor shall maintain appropriate paper trails for the Products, which shall be provided to H&H upon demand. Vendor shall, upon request, provide the source/pedigree of any or all Products sold to H&H.

15. The rights and remedies granted to H&H hereunder are cumulative and in addition to any other rights and remedies available to H&H at law and in equity. H&H's exercise of any of its rights or remedies herein, at law or in equity, shall not preclude H&H's simultaneous or later exercise of any other rights or remedies herein, at law or in equity.

16. H&H will not be liable for any loss, damage, incidental or consequential damages of any kind, whether based on contract or negligence, arising in connection with the Products or this Agreement. Under no circumstances shall H&H be liable for any special or consequential damages or for loss, damage, or expense (whether or not based on negligence) for any reason.

17. If H&H reasonably believes that any of the Products may (a) not be genuine, (b) have been procured by fraud, (c) violate any of the Laws, (d) be short-dated (short-dated is defined as the following: having an expiration date of less than 14 months from date of purchase) or (e) otherwise do not comply with the terms of this Agreement or with H&H's purchase order, Vendor, at Vendor's sole cost and expense, shall accept the return from H&H thereof and shall promptly refund to H&H all amounts paid by H&H for such Products. At H&H's option, H&H may offset all or part of such amount paid against past or future amounts owed to Vendor by H&H.

18. Vendor agrees that this Agreement shall be deemed entered into in the State of Michigan and will be construed and interpreted in accordance with the laws of the State of Michigan applicable to contracts made and performed in Michigan without regard to principles of conflicts of laws. In any dispute or enforcement action relating to this Agreement or the transactions contemplated hereunder, Vendor hereby agrees and consents to the exclusive jurisdiction of the tribunals of the United States of America, the State of Michigan, County of Oakland, and the U.S. District Court of the Eastern District of Michigan, and to the jurisdiction of all courts to which an appeal may be taken from such courts. Vendor hereby waives all objections to venue, including, without limitation, the inconvenience of such forum, regardless of any venue to which Vendor may be entitled by virtue of its present or future domicile. If H&H prevails on any claim in any civil or administrative action between or involving the parties hereto, arising out of this Agreement or in relation to the Products, Vendor shall be liable to H&H for all reasonable costs, expenses and attorney fees necessitated by such dispute.

19. These terms and conditions shall control with respect to any purchase order or sale of Products. No waiver, alteration or modification of these terms and conditions whether on Buyer's purchase order or otherwise shall be valid unless accepted in writing and signed by an authorized representative of H&H.

Vendor certifies that the undersigned is authorized to execute this Agreement on behalf of Vendor and that the foregoing statements are true and correct, accepted and agreeable to the undersigned Vendor and all of the Terms and Conditions contained herein are accepted and affirmed this _20_ day of _februari_, 20_14_.

By: _Harmen Haaijer_
Title: _area Sales manager_


Accepted,

_____
H&H Wholesale Services, Inc.
By:
Its: