## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION- DETROIT

H&H WHOLESALE SERVICES, INC.,
HOWARD GOLDMAN and DAVID GULAS

     Plaintiffs,                            Case No. 17-cv-13422
                                            Hon. Laurie J. Michelson
vs.                                       Mag. Judge Anthony P. Patti

KAMSTRA INTERNATIONAL, B.V.
d/b/a HOLLAND TRADING GROUP

     Defendant.

_____

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S SECOND MOTION TO DISMISS

4059348

# **TABLE OF CONTENTS**

**Page**

INDEX OF AUTHORITIES.......................................................................... iii

COUNTER STATEMENT OF ISSUES PRESENTED........................................ ix

STATEMENT OF RELEVANT FACTS ......................................................1

   I.   The Parties Meet and HTG Executes the Vendor Agreement.........................1

   II.  The Parties' Subsequent Dealings and the Unfilled Order............................2

   III. HTG is Finally Able to Fill H&H's Orders for Strips................................3

ARGUMENT ...................................................................................4

   I.   The Strips Contract is an Enforceable Agreement and Controls the Parties' Relationship ................................................................4

       A.  The Strips Contract Satisfies the Statute of Frauds ..................................5

       B.  The Strips Contract Was Not Abandoned, Terminated, or Superseded ............................................................................7

       C.  The Language on HTG's Invoices is Irrelevant .....................................11

       D.  HTG's Claimed "Disclaimer" of the Warranty of Title and Against Infringement is Meaningless.................................................13

   II.  The Court Has Jurisdiction Over HTG...........................................13

       A.  Even if Other Provisions of the Strips Contract are not Binding on HTG, the Forum Selection Clause is .................................14

       B.  Even Absent the Vendor Agreement's Forum Selection Clause, The Court has Personal Jurisdiction Over HTG .....................................16

           1.   HTG's Contacts Satisfy Michigan's Long-Arm Statute ............. 16

           2.   HTG's Contacts Satisfy the Due Process Clause ....................... 19

               a.   HTG Purposefully Availed Itself of the Privilege of Acting in Michigan ...............................................20

               b.   Plaintiffs' Causes of Action "Arise From" HTG's Activities in Michigan................................................21

               c.   HTG's Conduct is Substantially Connected with Michigan to Make the Exercise of Jurisdiction Reasonable ...................21

       C.  Under No Circumstance is HTG's Forum Selection Clause

i

      Enforceable ............................................................................22

III.  Fraud in the Inducement is an Exception to the Economic Loss Doctrine and H&H's Fraudulent Inducement Claim is Permitted ...............................23

IV.  There is no Basis for Dismissal of Goldman and/or Gulas as Plaintiffs .......24

V.  There is No Basis for Dismissal of Plaintiffs' Declaratory Judgment Claim...........................................................................................25

# INDEX OF AUTHORITIES

## Cases

*Aaronson v. Lindsay & Hauer Int'l Ltd.,*

    235 Mich. App. 259 (1999) ................................................................. 19

*Acemco, Inc. v. Olympic Steel Lafayette, Inc.,*

    2005 WL 2810716 (Mich. App. 2005) .................................................. 6

*Aleris Aluminum Canada L.P. v. Valeo, Inc.,*

    718 F. Supp. 2d 825 (E.D. Mich. 2010) ............................................ 6, 7

*Andersons, Inc. v. Horton Farms, Inc.,*

    166 F.3d 308 (6th Cir. 1998) ......................................................... 11, 12

*Ashcroft v. Iqbal,*

    556 U.S. 662 (2009) ............................................................................. 1

*Bird v. Parsons,*

    289 F.3d 865 (6th Cir. 2002) ............................................................. 13

*Bishop v. Gosiger, Inc.,*

    692 F. Supp. 2d 762 (E.D. Mich. 2010) ............................................ 10

*Burger King Corp. v. Rudzewicz,*

    471 U.S. 462 (1985) ........................................................................... 20

*Calphalon Corp. v. Rowlette,*

    228 F.3d 718 (6th Cir. 2000) ............................................................. 18

*Cedar View, Ltd. v. Colpetzer,*

    2006 WL 456482 (N.D. Ohio 2006) .................................................. 10

*Chainworks, Inc. v. Webco Indus., Inc.,*

 2006 WL 461251 (W.D. Mich. 2006) ................................................................. 12

*Challenge Mach. Comp. v. Mattison Mach. Works.,*

 138 Mich. App. 15 (1984) ................................................................................. 13

*Chrysler Corp. v. Traveleze Indus., Inc.,*

 527 F. Supp. 246 (E.D. Mich. 1981) ........................................................... 20, 21

*Compass Automotive Group, LLC v. Denso Mfg. Tennessee, Inc.,*

 2013 WL 655112 (E.D. Mich. 2013) ................................................................ 23

*CompuServe, Inc. v. Patterson,*

 89 F.3d 1257 (6th Cir. 1996) ........................................................................... 21

*Dedoes Indus., Inc. v. Target Steel, Inc.,*

 2005 WL 1224700 (Mich. App. 2005) ............................................................... 6

*FFOC Co. v. Invent A.G.,*

 882 F. Supp. 642 (E.D. Mich. 1994) ................................................................ 20

*Fisher v. Blackmore,*

 325 F. Supp. 2d 810 (E.D. Mich. 2004) ...................................................... Passim

*Flint Ink Corp. v. Brower,*

 845 F. Supp. 404 (E.D. Mich. 1994) ................................................................ 18

*Glass v. The Kellogg Co.,*

 252 F.R.D. 367 (W.D. Mich. 2008) .................................................................. 10

*Harper Woods Retirees Ass'n. v. City of Harper Woods,*

 312 Mich. App. 500 (2015) ................................................................................. 7

iv

*Hertz Corp. v. Volvo Truck Corp.,*

   210 Mich. App. 243 (1995) ................................................................. 4

*Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.,*

   209 Mich. App. 365 (1995) ............................................................... 24

*Jenkins v. U.S.A. Foods, Inc.,*

   912 F. Supp. 969 (E.D. Mich. 1996) .................................................. 5

*Johnson Controls, Inc. v. TRW Vehicle Safety Sys., Inc.,*

   491 F. Supp. 2d 707 (E.D. Mich. 2007) ........................................ 5, 6

*Jones Family Tr. v. Saginaw Co. Land Bank Auth.,*

   2017 WL 1422838 (Mich. Ct. App. 2017) ....................................... 24

*Kerry Steel, Inc. v. Paragon Indus., Inc.,*

   106 F.3d 147 (6th Cir. 1997) ........................................................... 18

*Keyes v. Scharer,*

   14 Mich. App. 68 (1968) ................................................................. 25

*Kmart Corp. v. Key Indus., Inc.,*

   877 F. Supp. 1048 (E.D. Mich. 1994) ............................................. 21

*Ky. Press Ass'n, Inc. v. Ky.,*

   355 F.Supp.2d 853 (E.D. Ky. 2005) ................................................ 10

*Langley v. Prudential Mortg. Capital Co., LLC,*

   546 F.3d 365 (6th Cir. 2008) ........................................................... 15

*Lease Acceptance Corp. v. Adams,*

   272 Mich. App. 209 (2006) ............................................................. 14

*Llewellyn-Jones v. Metro Prop. Grp., LLC,*

   22 F. Supp. 3d 760 (E.D. Mich. 2014) ................................................................. 24

*MCNIC Oil & Gas Co. v. IBEX Res. Co.,*

   23 F. Supp. 2d 729 (E.D. Mich. 1998) ................................................................. 21

*Par v. Mertes,*

   84 Mich. App. 336 (1978) ...................................................................... 16, 18, 20

*Offerdahl v. Silverstein,*

   224 Mich. App. 417 (1997) ................................................................................. 15

*Potomac Leasing Co. v. French Connection Shops, Inc.,*

   172 Mich. App. 108 (1988) ................................................................................. 14

*Quality Prod. & Concepts Co. v. Nagel Precision, Inc.,*

   469 Mich. 362 (2003) ........................................................................................... 7

*Rice v. Karsch,*

   154 F. App'x 454 (6th Cir. 2005) ....................................................................... 18

*Robert A. Hansen Family Tr. v. FGH Indus., LLC,*

   279 Mich. App. 468 (2008) ................................................................................. 14

*Robert Bosch Corp. v. ASC Inc.,*

   195 F. App'x 503 (6th Cir. 2006) ....................................................................... 12

*Rondigo, L.L.C. v. Twp. of Richmond,*

   641 F.3d 673 (6th Cir. 2011) ................................................................................ 8

*Salom Enterprises, LLC v. TS Trim Indus., Inc.,*

   464 F. Supp. 2d 676 (E.D. Mich. 2006) ....................................................... 17, 18

*Sec. Watch, Inc. v. Sentinel Sys., Inc.,*

  176 F.3d 369 (6th Cir. 1999) ................................................................. 15

*Sifers v. Horen,*

  385 Mich. 195 (1971) .......................................................................... 17

*Skinner v. D-M-E Corp.,*

  124 Mich. App. 580 (1983) .................................................................. 25

*Theunissen v. Matthews,*

  935 F.2d 1454 (6th Cir. 1991) .............................................................. 14

*Traton News, LLC v. Traton Corp.,*

  914 F. Supp. 2d 901 (S.D. Ohio 2012) ................................................. 15

*Turcheck v. Amerifund Fin., Inc.,*

  272 Mich. App. 341 (2006) .................................................................. 14

*Vanguard Ins. Co. v. Bolt,*

  204 Mich. App. 271 ............................................................................. 25

*Viches v. MLT, Inc.,*

  127 F. Supp. 2d 828 (E.D. Mich. 2000) ............................................... 16

*Widger Chem. Corp. v. Chemfil Corp.,*

  601 F. Supp. 845 (E.D. Mich. 1985) .................................................... 22

**Statutes**

M.C.L. § 400.2321(3) ............................................................. 13

M.C.L. § 440.2201 ................................................................. 4

M.C.L. § 600.705 .................................................................. 17

M.C.L. § 600.715 .................................................................. 16

M.C.L. § 600.715(1) ............................................................... 17

M.C.L. § 600.745(2) ............................................................... 14

**Rules**

Fed. R. Civ. P. 12(b)(2), 12(b)(5), and 12(b)(6) ........................... 1

## COUNTER STATEMENT OF QUESTIONS PRESENTED[1]

1. Whether the Court should dismiss Count I of the Second Amended Complaint alleging breach of contract pursuant to Fed. R. Civ. P. 12(b)(6) because Defendant incorrectly contends that the parties' contract is unenforceable pursuant to M.C.L. § 440.2201 because it allegedly lacks a quantity term despite that the parties executed an agreement that specifically refers to subsequently issued purchase orders that supply and specifically identify the quantity of goods ordered and well-settled Michigan law provides such agreements are enforceable?

Plaintiffs answer: 'No'

Defendant answers: 'Yes'

---

[1]In its Statement of Issues Presented, Defendant purports to present the Court with an "issue" regarding the sufficiency of service upon Defendant. [Dkt. 28, Statement of Issues Presented #7]. However, Defendant does not address the claimed insufficiency of service or explain why it claims service was improper anywhere in its Second Motion to Dismiss. Accordingly, Defendant has abandoned this argument and it should not be considered by the Court. *See, e.g., Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 774 (E.D. Mich. 2010) ("I therefore find that Bishop has abandoned this argument by failing to develop it with any discussion of facts or citation of authority."). Defendant's reliance "upon the facts and law … [in] its previous Motion to Dismiss" - - in an improper attempt to avoid the Court's page limit for briefs - - does not resurrect this argument because its Motion to Dismiss was mooted by Plaintiffs' filing of the Second Amended Complaint. *See Glass v. The Kellogg Co.*, 252 F.R.D. 367, 368 (W.D. Mich. 2008) (citing *Cedar View, Ltd. v. Colpetzer*, 2006 WL 456482, *5 (N.D. Ohio 2006) (the "earlier motion[s] to dismiss ... are denied as moot, as they refer to a version of the complaint that has since been replaced ....") and *Ky. Press Ass'n, Inc. v. Ky.*, 355 F.Supp.2d 853, 857 (E.D. Ky. 2005) ("Plaintiff's amended complaint supercedes the original complaint, thus making the motion to dismiss the original complaint moot.").

2.  Whether the terms provided by the parties' executed agreement were amended and/or superseded by subsequent documents issued by Defendant that were either: a) unexecuted by Plaintiffs; b) pertained to products not involved in this litigation; or c) pertained only to products that were never actually sold/purchased?

Plaintiffs answer: 'No'

Defendant answers: 'Yes'

3.  Should the Court dismiss all claims asserted by Plaintiffs Howard Goldman and David Gulas pursuant to Fed. R. Civ. P. 12(b)(6) because Defendants argue they are not intended third party beneficiaries of the parties' contract despite that Goldman and Gulas have been personally sued as a result of Defendants' breach of contract and tortious acts and intent is a question of fact?

Plaintiffs answer: 'No'

Defendant answers: 'Yes'

4.  Whether the Court should dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(2) because Defendant contends the agreement containing the parties' forum selection clause is allegedly unenforceable, which it is not, and even if it were, applicable Michigan law holds that a forum selection clause, even in an unenforceable agreement, is still enforceable unless the clause itself was procured by fraud?

Plaintiffs answer: 'No'

Defendant answers: 'Yes'

5.  Whether the Court should dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(2) where Defendant executed an agreement that includes a forum selection clause and consented to "the exclusive jurisdiction of the tribunals of … the U.S. District Court of the Eastern District of Michigan" (the "Vendor Agreement")?

Plaintiffs answer: 'No'

Defendant answers: 'Yes'

6.  Whether the Court should dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(2) where Defendant signed the Vendor Agreement and consented to jurisdiction in this Court, but argues that a subsequent unsigned and unfilled agreement controls and provides for jurisdiction in the Netherlands?

Plaintiffs answer: 'No'

Defendant answers: 'Yes'

7.  Whether the Court should dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(2) because Defendant argues that it lacks sufficient contacts with the State of Michigan to be subject to personal jurisdiction despite that Defendant continuously and systematically conducted business in Michigan, initiated emails for the purpose of conducting business with Plaintiffs in Michigan for a period of several years, initiated telephone calls for the purpose of conducting business with Plaintiffs in Michigan for a period of several years, engaged in communications and negotiations with Plaintiffs in Michigan for a period of several years, shipped goods to Michigan, visited Plaintiffs' office in Michigan on more than one occasion for the purpose of selling products to Plaintiffs in Michigan, and did in fact sell the products that are at issue in this litigation to Plaintiffs in Michigan?

Plaintiffs answer: 'No'

Defendant answers: 'Yes'

8. Should the Court dismiss H&H's Count III alleging fraud in the inducement pursuant to Fed. R. Civ. P. 12(b)(6) because Defendant contends it is barred by the economic loss doctrine despite that fraud in the inducement claim is a well-established exception to the economic loss doctrine?

Plaintiffs answer: 'No'

Defendant answers: 'Yes'

9. Should the Court dismiss Plaintiffs' request for declaratory judgment pursuant to Fed. R. Civ. P. 12(b)(6) because Defendant argues that it is "redundant" of Plaintiffs' breach of contract claim, despite that Count IV seeks a determination of the parties' rights with respect to Plaintiffs' immediate and common law indemnity?

Plaintiffs answer: 'No'

Defendant answers: 'Yes'

Plaintiffs H&H Wholesale Services, Inc. ("H&H"), Howard Goldman ("Goldman"), and David Gulas ("Gulas") (collectively, "Plaintiffs"), through their counsel, respectfully submit this Memorandum of Law in Opposition to Defendant Kamstra International, B.V. d/b/a Holland Trading Group's ("HTG") Second Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(5), and 12(b)(6). [Dkt. 28].

## STATEMENT OF RELEVANT FACTS[2]

### I.     The Parties Meet and HTG Executes the Vendor Agreement

Sometime in 2012, Gulas, an employee of H&H, was introduced to Harmen Haaijer ("Haaijer"), HTG's then Area Sales Manager. [Dkt. 22, ¶15]. Nearly two years later, the imminent possibility of a sales transaction between H&H and HTG resulted in the execution of H&H's February 20, 2014 Vendor Agreement by HTG, which provides:

- HTG represented and warranted that all products offered for sale and/or sold to H&H by HTG are genuine and authentic and comply with all federal, state, and local laws;

- HTG agreed to indemnify and hold H&H harmless from and against any and all claims, judgments, lawsuits, etc. relating to or arising from HTG's breach or failure to comply with the Vendor Agreement; and

- These terms and conditions shall control with respect to any **purchase order** or sale of Products. No waiver, alteration or modification of these terms and conditions whether on Buyer's

---

[2]When considering a motion to dismiss, a court must accept the plaintiff's adequately pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

1

purchase order or otherwise shall be valid unless accepted in writing and signed by an authorized representative of H&H. [*Id.* Ex. 1, ¶¶9,11, 13, 19 (emphasis added)].

Accordingly, pursuant to paragraph 19 of the Vendor Agreement, when H&H subsequently issued a series of purchase orders to HTG as detailed below, those purchase orders, including their price and quantity terms, were incorporated into and became part of the Vendor Agreement. *Id.* ¶22.

## II.  The Parties' Subsequent Dealings and the Unfilled Order

From 2014 until the summer of 2016, H&H placed numerous purchase orders pursuant to the Vendor Agreement, but HTG could not fill them. *Id.* ¶23. When H&H placed a purchase order, HTG would send H&H documents including confirmations of sale. For example, on July 11, 2016, HTG sent a "Sales Order Confirmation" ("SOC") seeking to sell H&H 10,000 Abbott Laboratories Freestyle Lite Blood Glucose Monitoring strips (the "Strips") at a unit price of $55 for a total of $550,000, which Gulas signed but, like previous orders, was never filled ("Unfilled Abbott SOC").[3] *Id.* ¶26.

---

[3] HTG contends that the Unfilled Abbott SOC, which refers to HTG's terms and conditions of sale, superseded and replaced the Vendor Agreement. But there is no such language in HTG's terms and conditions, which state only "The applicability of the Customer's general terms and conditions is hereby explicitly rejected" and "Any stipulations deviating from these General Terms and Conditions shall only apply in the event that and insofar as they have been accepted by the company in writing." [Dkt. 15-6, ¶¶1.2, 1.3 (emphasis added)]. The Vendor Agreement is not "General Terms and Conditions" and was signed by HTG and thus controls.

2

Gulas was requested to sign the Unfilled Abbott SOC solely to confirm the price and quantity, and was meant to and did apply, if at all, only to the specific transaction for which it was contemplated.[4] Indeed, HTG would send H&H an SOC for each contemplated transaction - - but Gulas never signed one for any transaction the parties actually completed. [Dkt. 22, ¶31].

## III.   HTG is Finally Able to Fill H&H's Orders for Strips

Beginning in or around November 2016, HTG was finally able to fill purchase orders H&H placed for the Strips. *Id.* ¶29. Specifically, HTG sent H&H the following invoices, corresponding to the following H&H purchase orders ("POs") for Strips:

| HTG Inv. # | Inv. Date | H&H PO # | PO Date | Units | Price | Amount |
|---|---|---|---|---|---|---|
| 16046882 | 11/7/16 | 071362 | 11/15/16 | 1,179 | $55 | $64,845 |
| 16046883 | 11/7/16 | 071363 | 11/15/16 | 266 | $55 | $14,630 |
| 8 | 12/8/16 | 07234 | 12/12/16 | 2,491 | $53 | $132,023 |
| 66-STD | 1/2/17 | 073331 | 1/12/17 | 4,988 | $53 | $264,364 |
| 83-STD | 1/26/17 | 074120 | 2/3/17 | 5,003 | $52 | $260,156 |
| 175-STD | 4/4/17 | 076215 | 4/4/17 | 10,004 | $51 | $510,204 |
| Total | - | - | - | 23,931 | - | $1,246,222 |

*Id.* ¶¶30, 33, 36, 40. (These POs and the Vendor Agreement are hereinafter referred to as the "Strips Contract"). H&H never signed a HTG SOC, or any other document agreeing to waive, alter, or modify any term of the Vendor Agreement for any of these Strips. *Id.* ¶¶31, 34, 37, 40.

---

[4] As explained more fully herein, there is no executed SOC referencing any Strips at issue in this litigation. *See* Section I-B.

3

That was critical because each SOC was meant and intended to apply only to each individual order referenced therein, not to function as a blanket waiver, alteration, or modification of the Vendor Agreement. *Id*. ¶38. That was made clear by a January 16, 2017 email from Jeroen Erents ("Erents") to Gulas stating, "from now on can you [*sic*] sign my sales confirmations or send me your PO? We received the request from the Auditors that prices always need to be confirmed." *Id*. But H&H never did that, instead electing the second option of sending its Purchase Order.[5]

Unbeknownst to H&H, but apparently known to HTG, thousands of Strips and packaging that HTG sold H&H were likely not as represented with disastrous consequences to H&H. *Id*. ¶49. As a direct result of HTG's malfeasances, on May 23, 2017, Abbott Laboratories commenced an action against H&H. *Id.* ¶51. The Abbott Action has brought damage and enormous expense to H&H, causing H&H to file this suit. *Id*. ¶¶52-56.

## **ARGUMENT**

## I.     **The Strips Contract is an Enforceable Agreement and Controls the Parties' Relationship[6]**

---

[5] In its Memorandum of Law, HTG <u>admits</u> each SOC is limited to a specific transaction when it says that the Aviva SOC and the Unfilled Abbott SOC were "<u>separate agreement[s]</u>." [Dkt. 28, 2 (emphasis added)].

[6] HTG argues in passing that Haaijer, its area sales manager, did not have authority to execute the Vendor Agreement. [Dkt. 28, 1]. This argument fails because Haaijer had both actual authority (as reflected in the email attached as **Exhibit 1, August 19, 2013 Email from Haaijer, "Area Sales Manager"**) and apparent authority. *See, e.g., Hertz Corp. v. Volvo Truck Corp.*, 210 Mich. App. 243, 246 (1995) ("Apparent

4

### A.     The Strips Contract Satisfies the Statute of Frauds

HTG contends that the Strips Contract does not contain a quantity term and thus is unenforceable pursuant to M.C.L. § 440.2201, Michigan's Uniform Commercial Code statute of frauds. HTG is mistaken. Pursuant to Michigan law, the Strips Contract, which includes the Vendor Agreement and H&H's six subsequent POs, is legally enforceable because the Vendor Agreement expressly references and incorporates H&H's subsequent POs, which supply the quantity term required to satisfy the statute of frauds. *Johnson Controls, Inc. v. TRW Vehicle Safety Sys., Inc.*, 491 F. Supp. 2d 707 (E.D. Mich. 2007).

In *Johnson Controls,* a seller sought dismissal of a breach of contract claim pursuant to M.C.L. § 440.2201. *Id.* 712–13. The Court denied the motion because, it held, the quantity term could be supplied from extraneous, but related agreements, specifically, the seller's later-issued material releases. *Id.* 718. The Court held,

> "[i]n this case, the quantity could be construed as simply referencing the amount of supplies indicated in the material releases. The releases are incorporated into the purchase orders via the Global Terms and JCI is not obligated to purchase anything that exceeds the amounts stated in the material releases." *Id. See also Jenkins v. U.S.A. Foods, Inc.*, 912 F. Supp. 969, 971–72 (E.D. Mich. 1996) (construing stock purchase agreement, note, and ancillary documents as one agreement because "Michigan law holds that where one writing refers to another, the two shall be construed together").

---

authority arises where the acts and appearances lead a third person reasonably to believe that an agency relationship exists ...). In any event, this is an issue of fact that cannot be resolved on a 12(b)(6) motion.

Just like the documents in *Johnson Controls*, H&H's Vendor Agreement contemplates that H&H will issue and incorporates H&H's subsequent POs - - it expressly states that its "terms and conditions shall control with respect to any purchase order or sale of Products." [Dkt. 22-1, ¶19]. Just like in *Johnson Controls*, H&H's later issued POs provide exact quantity terms, and as a matter of law, M.C.L. § 440.2201 is not a bar.

HTG's reliance on two unpublished opinions, *Dedoes Indus., Inc. v. Target Steel, Inc.*, 2005 WL 1224700 (Mich. App. 2005), *Acemco, Inc. v. Olympic Steel Lafayette, Inc.*, 2005 WL 2810716 (Mich. App. 2005), and *Aleris Aluminum Canada L.P. v. Valeo, Inc.*, 718 F. Supp. 2d 825 (E.D. Mich. 2010) is misplaced. [Dkt. 28, 7-8]. In all three of those cases, unlike here, the courts found the statute of frauds had not been satisfied because a firm quantity term could not be ascertained from *any* document.

In *Dedoes*, the purchase order merely provided that the quoted price was good "for all of 2001 and the next two years" and had no quantity. *Id*. at *2. In *Acemco*, the court again found the lack of any document specifying any "quantity whatsoever." *Id*.[7] *4. Similarly, in *Aleris*, that Court held that the parties agreement

---

[7] The *Johnson Controls* Court criticized *Dedoes* and *Acemco* because they "conflict with the UCC's goals and confuse the issue of whether the quantity term is sufficiently definite to enforce the contract with the issue of whether there is a written quantity term for the purposes of satisfying the statute of frauds ... *Acemco* and *Dedoes* minimally advance the statute of frauds' purpose to provide a

was not enforceable because "[n]one of the primary documents that Valeo cites in support of its counterclaim—the purchase order, the Purchasing Terms and Conditions, and the weekly forecasts—obligated Valeo to purchase any quantity of products, whether measured in terms of a set number or merely as some or all of Valeo's requirements." *Aleris*, at 832 (emphasis added).[8]

In this case, there is a concrete quantity term supplied by each one of H&H's POs. Those POs expressly obligated H&H to purchase specific quantities of Strips at specific prices. As a result, the statute of frauds is satisfied. *See Johnson Controls*.

## B. Even if the Strips Contract Was Barred by the Statute of Frauds, Payments Were Made and Accepted

M.C.L. § 440.2201(3)(c) provides that an agreement satisfied the statute of frauds "[w]ith respect to goods for which payment has been made and accepted or that have been received and accepted …" For each order placed by H&H, payments were made by H&H and accepted by HTG. [Dkt. 22, ¶41]. Accordingly, the Strips Contract is removed from the statute of frauds pursuant to M.C.L. § 440.2201(3)(c) and HTG's argument fails.

## C. The Strips Contract Was Not Abandoned, Terminated, or Superseded

---

basis for believing a contract exists while at the same time damaging the UCC's other substantive goals of liberally incorporating trade usage, custom and practice, course of dealing, and course of performance into parties' agreements in fact." *Johnson Controls*, at 716.

[8] The *Aleris* court also distinguished the case from *Johnson Controls* where a quantity term was supplied by later purchase orders. *Id*.

HTG first argues that the Vendor Agreement was "abandoned" by H&H. [Dkt. 28, 9-10]. Not only is that a fact issue, but it is an untrue fact issue (**Exhibit 2, Gulas Affidavit, ¶14**), as H&H has expressly alleged in its Second Amended Complaint that for a year and a half it placed purchase orders pursuant to the Vendor Agreement and continued to do so until HTG could finally fill one. [Dkt. 22, ¶¶23-27]. These allegations must be taken as true and HTG's "abandonment" argument fails.

So instead, HTG attempts to argue that the Strips Contract was superseded by what it calls the "Sales Agreement" [Dkt. 28, 4 n.4] - - a July 11, 2016 SOC for "Aviva Strips"[9] (the "Aviva SOC"), the Unfilled Abbott SOC, a 2016 customer form that was never signed by H&H, invoices issued by HTG, and HTG's general terms and conditions. *Id*. 10-12.[10] However, the Strips Contract expressly provides that it cannot be modified, altered, and/or waived "unless accepted in writing and signed by an authorized representative of H&H." [Dkt. 22-1, ¶1p].[11] As alleged in the

---

[9] These are entirely different products than the Strips at issue in this case and are not referenced in the complaint or this suit.

[10] The Court cannot consider the Aviva SOC, HTG's General Terms and Conditions, or the 2016 Customer Form because they were not pleaded or referred to in the Second Amended Complaint. *See Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011) (noting that "Rule 12(b)(6) scrutiny is limited to the pleadings ... exhibits attached to the complaint, as well as exhibits attached to defendants' motion to dismiss that are referred to in the complaint"). If a court considers documents outside of the pleadings, as HTG evidently would like the Court to do, "the motion to dismiss must be treated as a motion for summary judgment under Rule 56 and all parties must be given a reasonable opportunity to present all material pertinent to the motion." *Id*.

[11] Provisions restricting the manner in which an agreement can be modified are

Second Amended Complaint (¶¶30-40), no such writing exists between H&H and HTG with respect to the Strips H&H actually purchased. Specifically, not a single one of the documents HTG claims were signed by H&H has anything to do with the <u>Strips</u> H&H actually purchased and that are at issue in this suit. The only HTG documents pertaining to the Strips, the invoices, are not signed. HTG's documents are summarized as:

| Document Upon Which HTG Relies | Document Reference | Reason it Does Not Terminate or Supersede the Strips Contract |
|---|---|---|
| Aviva SOC | Dkt. 15-2-App D | Concerns Aviva strips, an entirely different product that is not at issue in this case. |
| Unfilled Abbott SOC | Dkt 15-2-App E | This order was never filled, the products contemplated therein were never sold by HTG or purchased by H&H, and, accordingly, these products are not at issue in this case. |
| HTG's Invoices | | These invoices were unilaterally issued by HTG, were never signed by H&H, and cannot supersede the fully executed Vendor Agreement as a matter of law. |
| HTG's General Terms and Conditions[12] | Dkt. 15-1-Apps 2 & 3 | This document was never executed or accepted by H&H and cannot supersede |

enforceable under Michigan law. *See, e.g., Harper Woods Retirees Ass'n. v. City of Harper Woods*, 312 Mich. App. 500 (2015) ("As a matter of law, the presence of a modification clause in a written contract also raises a presumption that a contract may not be modified absent mutual assent.") (citing *Quality Prod. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362 (2003)).

[12] HTG defines these as "Kamstra's GTCs" and represents to the court that "On February 24, Gulas completed and returned Kamstra's standard new customer form to Haiijer, which expressly rejected the application of H&H's terms and conditions and incorporated Kamstra's General Terms and Conditions." [Dkt. 28, 1]. This representation is misleading for two reasons. First, this form was never actually signed by H&H or any of its representatives. The only agreement that relates to the

| | | the fully executed Vendor Agreement as a matter of law. |
| 2016 Customer Form | Dkt. 15-2-App C | This form was never executed or accepted by H&H and cannot supersede the fully executed Vendor Agreement. |

These documents are nullities.[13] The Aviva SOC and/or the Unfilled Abbott

SOC governed only those specific sales, not the sales of the Strips that are the subject

of this lawsuit. *See supra*, pages 3-4. In fact, HTG even <u>admits</u> in its Second Motion

to Dismiss that the Aviva SOC and the Unfilled Abbott SOC were "<u>separate</u>

<u>agreement[s]</u>" and thus concedes that each such document governs only the specific

product and order for which it was issued. [Dkt. 28, 2 (emphasis added)].[14]

The only documents that govern the claims in this suit are those pertaining to

purchases of Strips which Plaintiffs have claimed for in this action. H&H did not

_____

Strips and was accepted and signed is H&H's Vendor Agreement. Second, HTG omits the year in which it claims the terms were accepted – it was in 2014 the same year the Vendor Agreement was accepted and executed by HTG and which HTG now claims was "abandoned" because no orders were consummated until several years later. *Id*. 9-10. HTG cannot have it both ways.

[13] In relying on these documents, HTG attempts to assert the very same theory that it argues H&H cannot [Dkt. 28, 8-9] - - that subsequently issued invoices supply a quantity term for HTG's standard terms and conditions. This theory does not work for HTG because H&H never signed or accepted HTG's general terms and conditions. Moreover, HTG's advancement of this theory undermines its argument that the Vendor Agreement is unenforceable because it lacks a quantity term. The Vendor Agreement was accepted and signed by H&H and the subsequent purchase orders supply the quantity term.

[14] In fact, as alleged in the Second Amended Complaint, Erents' January 16, 2017 e-mail makes this clear and admits that HTG was looking for a signed SOC for each individual order, which it never got. [Dkt. 22, ¶38].

sign any document pertaining to Strips it actually purchased and thus never agreed to any blanket modification of the Vendor Agreement. Simply, since there was no signed SOC with respect to Strips, there was no amendment or supersession of the Strips Contract.

Even if the Unfilled Abbott SOC could apply to the sales between the parties, it does not supersede the Vendor Agreement by its own terms. Indeed, Paragraphs 1.2 and 1.3 of HTG's terms and conditions provide only that "[t]he applicability of the Customer's <u>general terms and conditions</u> is hereby explicitly rejected" and "Any stipulations deviating from these General Terms and Conditions shall only apply in the event that and insofar as they <u>have been accepted by the company in writing</u>." [Dkt. 15-1-6, ¶¶1.2, 1.3]. The Vendor Agreement is not "standard terms and conditions," but rather an expressly written and accepted agreement and is not implicated by this purported language of rejection.

### D.   The Language on HTG's Invoices is Irrelevant

HTG also argues that the Strips Contract, specifically the Vendor Agreement portion, was superseded by small print on the bottom of its invoices, which says, "To all agreements whereby we act as seller our general terms and conditions of sale, delivery and payment apply … which are published at [website]. We expressly reject the applicability of your terms and conditions." [Dkt. 28-3]. HTG contends that this language replaced the terms of the Vendor Agreement when H&H completed its

11

orders. *Id*. Such a "replacement" could only occur if this were a "battle of the forms" situation, which it is not.

A "battle of the forms" arises only where the parties exchange forms with different and/or conflicting terms, and no party ever expressly accepts the others' terms. *See, e.g., Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308 (6th Cir. 1998). Michigan courts have long recognized that the battle of the forms does not apply to a case like this where the parties have a signed and accepted agreement, like the Strips Contract. *Id*. Indeed, "by signing" there is express assent to additional terms, and the battle of the forms is irrelevant. *Id. See also Chainworks, Inc. v. Webco Indus., Inc.*, 2006 WL 461251, *5 (W.D. Mich. 2006) (holding that the vendor's invoice containing the vendor's terms and conditions was "irrelevant and [could] not modify the parties' existing contract.").

This case is nearly identical to *Anderson*. HTG affirmatively agreed to H&H's terms and conditions by signing and returning the Strips Contract, but H&H never signed anything of HTG's with respect to the Strips. Accordingly, there is no "battle of the forms" and the Strips Contract was unaffected by HTG's unsigned invoices.[15]

---

[15] Even assuming *arguendo* that the battle of the forms comes into play here, the language contained on HTG's invoices does not bind H&H. The Vendor Agreement constitutes an offer to HTG. Under HTG's version of the facts, it accepted by sending invoices, which state: "To all agreements whereby we act as seller our general terms and conditions of sale, delivery and payment apply … which you have received from us, and which are published at [website]." [Dkt. 28-3]. This was not a conditional acceptance, but amounts to an acceptance of H&H's terms because:

E.   **HTG's Claimed "Disclaimer" of the Warranty of Title and Against Infringement is Meaningless**

HTG argues that H&H agreed to waive the implied warranty of title and against infringement contained in M.C.L. § 400.2321(3) because of disclaimer language contained on its SOCs. [Dkt. 28, 17-18]. However, this argument fails because H&H never "agreed" to this waiver. As explained more fully *supra* (I-B), H&H did not accept or sign any SOC as it relates to the Strips it actually purchased and there was no agreement to disclaim the warranty.

## II.   The Court Has Jurisdiction Over HTG

A plaintiff need only make a prima facie showing of jurisdiction to defeat a motion to dismiss." *Fisher v. Blackmore*, 325 F. Supp. 2d 810, 813 (E.D. Mich. 2004). When an evidentiary hearing is not conducted, a court should "not consider facts proffered by the defendant that conflict with those offered by the plaintiff." *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). Instead, the court should

---

"[w]hether [HTG's] acceptance was conditional turns on whether the acceptance ... clearly revealed that [HTG] was unwilling to proceed unless assured of [H&H's] assent to the different or additional terms … Here, there was no such indication. Although the PO stated that acceptance was limited to its terms, it did not clearly indicate that failure to do so voided the transaction." *Robert Bosch Corp. v. ASC Inc.*, 195 F. App'x 503, 506 (6th Cir. 2006) (internal citations and quotations omitted). HTG's invoices do not limit acceptance to their terms and HTG is accordingly bound by H&H's terms in the Vendor Agreement. At the very least, there are conflicting terms, which by Rule in Michigan are both "knocked out." *See, e.g., Challenge Mach. Comp. v. Mattison Mach. Works.*, 138 Mich. App. 15 (1984) (knocking out conflicting terms).

13

"construe the facts in a light most favorable to the nonmoving party." *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991). The plaintiff's burden, therefore, is "relatively slight." *Fisher*, at 813.

## A. Even if Other Provisions of the Strips Contract are not Binding on HTG, the Forum Selection Clause is[16]

A party seeking to avoid a contractual forum-selection clause bears a heavy burden of showing that the clause should not be enforced and must prove that one of the statutory exceptions to enforceability applies.[17] *Robert A. Hansen Family Tr. v. FGH Indus., LLC*, 279 Mich. App. 468 (2008). HTG does not argue in its Second Motion to Dismiss that any of the statutory elements is unsatisfied or that any exception applies, only that the Vendor Agreement is unenforceable. [Dkt. 28, 6-9].

---

[16] First and foremost, the Court has jurisdiction over HTG because HTG expressly consented to the Court's jurisdiction when it signed the Vendor Agreement. "It has been recognized by both this Court and by the United States Supreme Court that parties may agree, even in advance of litigation, to submit to the personal jurisdiction of a particular forum." *Lease Acceptance Corp. v. Adams*, 272 Mich. App. 209, 219–20 (2006) (quoting *Potomac Leasing Co. v. French Connection Shops, Inc.*, 172 Mich. App. 108 (1988). "It is undisputed that Michigan's public policy favors the enforcement of contractual forum-selection clauses and choice-of-law provisions. *Turcheck v. Amerifund Fin., Inc.*, 272 Mich. App. 341, 345-46 (2006). "Michigan courts will enforce an express forum-selection clause as written." *Turcheck, supra,* at 346.

[17] Pursuant to M.C.L. § 600.745(2), a written agreement that an action may be brought in the State of Michigan shall be entertained in Michigan if "(a) The court has power under the law of this state to entertain the action. (b) This state is a reasonably convenient place for the trial of the action. (c) The agreement as to the place of the action is not obtained by misrepresentation, duress, the abuse of economic power, or other unconscionable means. (d) The defendant is served with process as provided by court rules." M.C.L. § 600.745(2).

But pursuant to Michigan law, even where a contract is unenforceable a forum selection clause still is, unless the clause itself was procured by fraud, and HTG is accordingly wrong.

In *Langley v. Prudential Mortg. Capital Co., LLC*, 546 F.3d 365 (6th Cir. 2008), the plaintiff argued that the parties' agreements were not valid, and therefore, the forum selection clauses contained therein were ineffectual. The Court of Appeals reversed the district court's holding invalidating the clauses, reasoning that the agreements were "fully executed by the parties who then proceeded to act in reliance on them." *Id*. 368. Therefore, even if the parties disagreed over certain terms, the forum selection clause was valid and binding. *See also Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 375 (6th Cir. 1999) (enforcing forum selection clause over dealer's objection that the agreements were adhesion contracts because the "agreements were negotiated between sophisticated business entities … and the district court was fully justified in determining that the Forum–Selection Clause was enforceable…").[18]

---

[18] Neither of the cases upon which HTG relies involve a contract signed by the parties and, are therefore inapposite. In *Traton News, LLC v. Traton Corp.*, 914 F. Supp. 2d 901 (S.D. Ohio 2012), the plaintiff argued that the defendant conceded to personal jurisdiction by visiting the plaintiff's website, where the plaintiff's terms and conditions, including a forum selection clause, were posted. *Id*. at 909-910. The Court refused to bind the defendant to the plaintiff's "browsewrap agreement" because the defendant received no benefit therefrom - - the parties did not have a signed contract. *Id*. at 910. In *Offerdahl v. Silverstein*, 224 Mich. App. 417 (1997), the plaintiff commenced an action to determine whether it could claim any rights

This law compels the same result in this case and even if HTG were correct that the Vendor Agreement is not enforceable, HTG is still wrong when it claims that would deprive this Court of jurisdiction. Just like in *Langley*, H&H here acted in reliance upon the Vendor Agreement in placing orders for Strips. Because no exception applies to enforceability of the forum selection clause in the Strips Contract, the forum selection clause must be enforced and the Court has general personal jurisdiction over HTG.

**B.     Even Absent the Vendor Agreement's Forum Selection Clause, The Court has Personal Jurisdiction Over HTG**

**1.     HTG's Contacts Satisfy Michigan's Long-Arm Statute**

Michigan's long-arm statute "extend[s] the state's jurisdiction to the farthest limits permitted by due process" and courts have noted that it is "extraordinarily easy to meet." *Par. v. Mertes*, 84 Mich. App. 336 (1978); *Fisher*, 325 F. Supp. 2d at 813; *Viches v. MLT, Inc.*, 127 F. Supp. 2d 828, 830 (E.D. Mich. 2000). M.C.L. § 600.715 permits a Michigan court to exercise specific personal jurisdiction over a corporation when that corporation has any of five relationships to Michigan. M.C.L. § 600.715(1) applies to HTG because it transacted business within Michigan.

The phrase "transaction of any business" in M.C.L. § 600.715(1) is broadly interpreted. *See, e.g., Salom Enterprises, LLC v. TS Trim Indus., Inc.*, 464 F. Supp.

---

under a contract between the defendant and a third party; the plaintiff was not a party to the contract in question. *Id*. at 418.

2d 676, 682 (E.D. Mich. 2006). The word "any" "'means just what it says. It includes 'each' and every.' … It comprehends 'the slightest.'" *Sifers v. Horen*, 385 Mich. 195, 199 n.2 (1971).

The defendant in *Salom* was an Ohio corporation that did not regularly conduct business in Michigan. The plaintiff filed suit against the defendant in the Eastern District of Michigan and the defendant moved to dismiss, arguing lack of personal jurisdiction. The Court denied motion, holding, in part, that

> [according to plaintiff, defendant] sent orders to the plaintiff in Oakland County, Michigan, forwarded payments to the plaintiff in Oakland County, Michigan, and made payments by wire transfer into the plaintiff's Comerica Bank account in Detroit. With respect to the agreement that forms the basis for the breach of contract action, the plaintiff alleges the defendant telephonically negotiated the terms of the contract and consummated the deal with the plaintiff's agents, all the while knowing that the plaintiff's agents were located in Michigan. The plaintiff has satisfied the statutory component of the exercise of limited personal jurisdiction. [*Salom Enterprises, LLC*, 464 F. Supp. 2d at 684.]

Just like in *Salom,* as alleged in the Second Amended Complaint and as explained more fully in the Affidavit of David Gulas (**Exhibit 2**), HTG (1) entered into the Strips Contract with H&H, a Michigan company [Dkt. 22, ¶17; Ex. 2, ¶7]; (2) offered goods for sale in Michigan [Dkt. 22, ¶43; Ex. 2, ¶¶29-30]; (3) sold Strips and numerous other products to H&H in Michigan [Dkt. 22, ¶¶23-43]; (4) accepted payment from Michigan [Dkt. 22, ¶43]; (5) shipped goods to Michigan [Ex. 2, ¶22]; (6) sent invoices to Michigan [Ex. 2, ¶43]; (7) engaged in a constant stream of communications with H&H and its employees in Michigan [Ex. 2, ¶¶23-25]; (8)

17

continuously and systematically conducted business in Michigan [*Id.*]; and (9) even traveled to Michigan from the Netherlands at least twice to expand the parties' business relationship. [Dkt. 22, ¶43, Ex. 2, ¶¶9-27].

It was not just Strips; HTG also sold H&H numerous other health and beauty products to H&H and/or its affiliates, and these contacts are more than sufficient pursuant to applicable law. [Dkt. 22, ¶45; Ex. 2, ¶26]. *See, e.g. Parish*, *supra* (long-arm statute satisfied where there had been several telephone calls between plaintiff's home in Michigan and defendants' office in Illinois, through an intermediary, and where loan agreement and promissory note stated that the place of payment was at plaintiff's home in Michigan); *Flint Ink Corp. v. Brower*, 845 F. Supp. 404 (E.D. Mich. 1994) (Patentee's traveling to Michigan to seek out business relationship with firm was sufficient "transaction of business" in Michigan within meaning of long-arm statute providing specific jurisdiction over patentee in action arising out of her agreement.).[19]

---

[19] Again, the cases upon which HTG relies are inapposite. In *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147 (6th Cir. 1997), there was "no showing that any [Defendant] employee has ever been in Michigan for the purpose of conducting business there." *Id.* at 151. In *Calphalon Corp. v. Rowlette*, 228 F.3d 718 (6th Cir. 2000), the Court found that the defendant was not subject to jurisdiction in Ohio because it "was not focused on exploiting any market … in the state of Ohio." *Id.* at 723. In *Rice v. Karsch*, 154 F. App'x 454 (6th Cir. 2005), the plaintiff did "not allege a single physical visit by [Defendant] to Tennessee." *Id.* at 463. Here, as outlined in the Second Amended Complaint and Gulas' affidavit, HTG's employees visited Michigan for the express purpose of furthering its business in Michigan and expanding its relationship with H&H. [Dkt. 22, ¶28; Ex. 2, ¶¶9-22].

**2.      HTG's Contacts Satisfy the Due Process Clause**

"The Due Process Clause requires Plaintiff to show that Defendant has

'minimum contacts' with Michigan 'such that the maintenance of the suit does not

offend traditional notions of fair play and substantial justice.'" *Fisher*, 325 F. Supp.

2d at 815. "Minimum contacts" exist when a defendant's conduct and connection

with Michigan are such that defendant should reasonably anticipate being hauled

into court there. *Id*. 815.

All that the "minimum contacts" test requires are: (1) the defendant must have

purposefully availed himself of the privilege of acting in the forum state or causing

consequences to occur there, (2) the cause of action arises out of the defendant's

activities there; and (3) the acts of the defendant or the consequences caused by the

defendant must have a substantial enough connection with the forum state to make

the exercise of jurisdiction over the defendant reasonable. *Id.*; *Aaronson v. Lindsay*

*& Hauer Int'l Ltd.*, 235 Mich. App. 259, 265 (1999). When analyzing this due

process requirement, courts should be mindful that "in personam jurisdiction is not

to be determined by any rigid guidelines but should be evaluated on a case-by-case

basis, considering the traditional notions of fair play that define the parameters of

due process." *Chrysler Corp. v. Traveleze Indus., Inc.*, 527 F. Supp. 246, 249 (E.D.

Mich. 1981).

The Michigan Court of Appeals has reasoned that "[a] single transaction may

be sufficient to meet the "minimum contacts" test," *Parish*, at 339–340. Michigan case law has consistently held the slightest contact sufficient to exercise jurisdiction—including over parties who never even set foot in Michigan, unlike HTG.

### a.   HTG Purposefully Availed Itself of the Privilege of Acting in Michigan

"This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). Courts have routinely recognized that a single contact may be sufficient to meet the minimum contacts test even in the absence of the physical presence of the defendant. *Chrysler Corp.*, at 250 ("a single contact with the forum state, not involving the physical presence of the defendant, can be enough to give jurisdiction over the defendant"); *Parish*, at 339, 593; *FFOC Co. v. Invent A.G.*, 882 F. Supp. 642, 652 (E.D. Mich. 1994) (a single act can be sufficient to constitute "personal availment"). Indeed, even "[a] letter or telephone call may, in a particular situation, be as indicative of substantial involvement with the forum state as a personal visit by the defendant's agents." *Chrysler Corp.*, at 250; *Parish* (telephone calls were sufficient to confer jurisdiction); *MCNIC Oil & Gas Co. v. IBEX Res. Co.*, 23 F. Supp. 2d 729, 735 (E.D. Mich. 1998) (the "constant stream" of paper and telephone calls between defendant's and plaintiff's offices

located in Michigan was sufficient to satisfy the requirement that defendant purposefully availed itself of the privilege of conducting activities within Michigan).

Here, as set forth above (Section II-B-1) and explained more fully in Gulas' Affidavit (**Exhibit 2**), HTG engaged in significant contacts with the State of Michigan and personally availed itself of the privilege of acting in Michigan.

**b.** **Plaintiffs' Causes of Action "Arise From" HTG's Activities in Michigan**

Regarding the second element, "[t]he arising from requirement is satisfied if the cause of action is related to or connected with the defendant's forum contacts." *Fisher*, at 816. *See also*, *Kmart Corp. v. Key Indus., Inc.*, 877 F. Supp. 1048, 1052 (E.D. Mich. 1994) ("the 'arising out of' requirement is satisfied if the cause of action was 'made possible by' or 'lies in the wake of' defendant's contacts with the forum"); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996).

Plaintiffs' claims against HTG directly relate to and are intimately connected to H&H's contacts with Michigan. Specifically, HTG breached the Strips Contract, which has directly impacted H&H in Michigan. Moreover, HTG fraudulently induced Plaintiffs into entering into the Strips Contract via emails sent to Michigan. Thus, there is no question that this case arises out of HTG's contacts with the State of Michigan.

**c.** **HTG's Conduct is Substantially Connected with Michigan to Make the Exercise of Jurisdiction Reasonable**

21

"Once the first two criteria for jurisdiction have been satisfied, it is only the unusual case where that interest does not exist." *Widger Chem. Corp. v. Chemfil Corp.*, 601 F. Supp. 845, 850 (E.D. Mich. 1985). The facts of this case do not present that unusual case; HTG executed the Strips Contract with H&H, a Michigan company, accepted payment from H&H, and breached said contract. Under these circumstances, HTG's contacts are substantial enough to make the Court's exercise of jurisdiction over HTG reasonable and consistent with due process.

**C.    Under No Circumstance is HTG's Forum Selection Clause Enforceable**

Even assuming *arguendo* that the Strips Contract is not enforceable, the forum selection clause contained therein is not enforceable, and Michigan cannot exercise either general or limited personal jurisdiction over HTG (that is a lot of assumption), there is no circumstance under which the forum selection clause in HTG's terms and conditions (which requires that disputes be submitted to a court in the Netherlands) applies as HTG claims in its Response. [Dkt. 28, 12]. In fact, the Eastern District of Michigan addressed this issue in a nearly identical situation in *Compass Automotive Group, LLC v. Denso Mfg. Tennessee, Inc.*, 2013 WL 655112 (E.D. Mich. 2013).

In that case, the parties were engaged in a true "battle of the forms." The defendant argued that its forum selection clause was part of the parties' agreement, but "the forum selection clause … was not expressly contained anywhere in [the defendant's orders]. Instead, the Orders contained a boilerplate reference to [the

defendant's] Terms and Conditions," which contained the clause. *Id.* *4. The Court held that this incorporation was far too attenuated, that the forum selection clause was a material alteration, and was not part of the parties' agreement:

> Thus, the additional terms contained in the acceptance do not become part of the contract if they materially alter it. Denso's boilerplate provision—which incorporates the forum selection clause by reference—constitutes a material alteration to the parties' Agreement. Courts have confirmed that, under a battle of the forms analysis, a forum selection clause is not part of the parties' contract because it materially alters the contract. [ *Id.* *4].

In this case there was not even a battle of the forms, but just like in *Compass*, HTG's forum selection clause is not expressly contained on the invoices for the Strips, but its general terms and conditions are incorporated by reference. [Dkt. 15-2-D & E]. This connection is far too attenuated and is the very definition of a material alteration. Accordingly, H&H is not and cannot be bound by HTG's forum selection clause.

## III. Fraud in the Inducement is an Exception to the Economic Loss Doctrine and H&H's Fraudulent Inducement Claim is Permitted

Pursuant to Michigan law, the economic loss doctrine does not preclude a plaintiff from claiming fraud induced the agreement in the first place. In *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich. App. 365, 370–73 (1995), the Michigan Court of Appeals recognized fraud in the inducement as an exception to the economic loss doctrine because it "is based on pre-contractual conduct which is, under the law, a recognized tort," reasoning:

23

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely - which normally would constitute grounds for invoking the economic loss doctrine- but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior.

*See also Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760 (E.D. Mich. 2014) ("[f]raudulent inducement involves a general duty to avoid wrongful conduct that induces a party to enter into a contract" and "pre-contractual misconduct is a recognized tort under the law."). Thus, HTG's argument [Dkt. 28, 18] that the economic loss doctrine bars H&H's claim for fraudulent inducement is legally wrong.

## IV.   There is no Basis for Dismissal of Goldman and/or Gulas as Plaintiffs

HTG also argues that Goldman and Gulas must be dismissed as parties to this case because they are not third party beneficiaries of the Strips Contract. [Dkt. 28, 21-24]. However, whether they are third party beneficiaries is a question of intent and, therefore, an issue of fact. *See Jones Family Tr. v. Saginaw Co. Land Bank Auth.*, 2017 WL 1422838, *6 (Mich. Ct. App. 2017) ("we conclude that a question of fact remained as to whether the Trust, as an owner of an abutting property, was an intended third-party beneficiary."); *Vanguard Ins. Co. v. Bolt*, 204 Mich. App. 271, 276 ("The granting of a motion for summary disposition is especially suspect where motive and intent are at issue …"); *Keyes v. Scharer*, 14 Mich. App. 68, 74-75 (1968). Goldman and Gulas were named individually and hauled into court in the

24

Abbott Action because of their roles with H&H and the indemnity provisions of the Vendor Agreement were clearly meant to flow to them in those roles.

## V.     There is No Basis for Dismissal of Plaintiffs' Declaratory Judgment Claim

In this case, there is an actual and substantial controversy between H&H and HTG regarding whether HTG is obligated to indemnify, right now, on a going forward basis, H&H in connection with the costs and damages in the Abbott Action. Indeed, in its request for declaratory relief, H&H has alleged that "HTG is at fault for and responsible to indemnify and make H&H whole for the damage inflicted upon it in the Abbott Action." [Dkt. 22, ¶109]. This is relief separate and apart from H&H's damages requested in Count I and in any event, further contemplates and includes H&H's rights to common law indemnification from HTG and is thus not redundant or duplicative as HTG contends. [Dkt. 28, 24]. *See Skinner v. D-M-E Corp.,* 124 Mich. App. 580 (1983).

> Respectfully Submitted,
> JAFFE, RAITT, HEUER & WEISS, P.C.
>
> By: /s/ Ethan R. Holtz
>      Ethan R. Holtz (P71884)
>      27777 Franklin Road, Suite 2500
>      Southfield, Michigan 48034
>      (248) 351-3000
>      Attorneys for Plaintiffs

Dated: May 4, 2018

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 4th day of May 2018, this document was electronically filed with Clerk of the Court using CM/ECF. I also certify that on this day, the foregoing document is being served on all counsel of record via transmission of Notices of Electronic Filing.

Respectfully Submitted,
JAFFE, RAITT, HEUER & WEISS, P.C.

By: /s/ Ethan R. Holtz
      Ethan R. Holtz (P71884)
      27777 Franklin Road, Suite 2500
      Southfield, Michigan 48034
      (248) 351-3000
      Attorneys for Plaintiffs

Dated: May 4, 2018

1