UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

H&H WHOLESALE SERVICES, INC.,
HOWARD GOLDMAN, and
DAVID GULAS,

        Plaintiffs,

v.

KAMSTRA INTERNATIONAL, B.V. d/b/a
HOLLAND TRADING GROUP,

        Defendant.

Case No. 2:17-cv-13422-LJM-APP
Honorable Laurie J. Michelson

---

**OPINION AND ORDER**
**GRANTING IN PART DEFENDANT'S MOTION TO DISMISS [28]**

---

In late 2016 and through April 2017, Kamstra International, B.V. sold H&H Wholesale Services, Inc. around 24,000 boxes of blood-glucose test strips made by Abbott. As it turned out, not all of them were completely genuine. The test strips were authentic, but the box and some of the internal packaging were not. Abbott caught the problem and sued H&H in federal court in New York. That suit is ongoing, but H&H says it is racking up attorney fees and that its exposure is in the millions of dollars.

H&H believes that Kamstra's sales of the mis-packaged strips were covered by H&H's vendor agreement. And, under that agreement, Kamstra warrantied that any goods it sold to H&H would be genuine and that if there were problems with the goods, Kamstra would indemnify H&H. So H&H filed this lawsuit seeking to, among other things, enforce the indemnity provision of the vendor agreement and have Kamstra cover its attorney's fees and any forthcoming damages in the Abbott action.

Kamstra moves to dismiss this case. Although the vendor agreement has a forum-selection clause stating that related litigation would take place in Michigan, Kamstra says that clause—indeed, the entire vendor agreement—is a nullity. In fact, says Kamstra, its own terms and conditions governed the sale of the strips, and its terms and conditions provide for a forum in its backyard, the Netherlands. So Kamstra asks this Court to dismiss for lack personal jurisdiction. Failing that, Kamstra says that H&H's claims should be dismissed as implausible.

For the reasons the follow, the Court finds that H&H has made a *prima facie* showing that the vendor agreement, and its forum-selection clause, are enforceable. But the Court does agree that some of H&H's claims should be dismissed as implausible.

**I.**

**A.**

Both H&H Wholesale Services, Inc. and Kamstra International, B.V. are in the chain of distribution for health and other products. For the transactions underlying this case, Kamstra sourced blood-glucose test strips from another company, sold them to H&H, and H&H resold them to pharmacies and the like. H&H is a Michigan company; Kamstra a Dutch company.

In 2012, sales people from the two companies met at a medical-equipment expo in Florida. (ECF No. 22, PageID.378.) In particular, David Gulas from H&H and Harmen Haaijer from Kamstra discussed forming a business relationship. (ECF No. 22, PageID.378.) But nothing came to fruition at that time.

Over a year-and-half later, in February 2014, Haaijer and Gulas were discussing the possibility of Kamstra selling H&H some test strips made by Abbott Laboratories (or one of its related companies). (ECF No. 15, PageID.178–179.) Gulas asked Haaijer to sign H&H's Vendor

Application and Agreement. (*Id.*) Haaijer complied, certifying that he was "authorized to execute th[e] Agreement of behalf of [Kamstra]." (ECF No. 40, PageID.829.)

Under the Vendor Agreement, Kamstra "agree[d]" to warranties, indemnification, a Michigan forum, and other terms "in consideration of being considered a Vendor for H&H, sales to H&H and other good and valuable consideration." (ECF No. 40, PageID.827.) Regarding warranties, Kamstra agreed that any product it sold or offered to H&H would be "genuine and authentic," "comply with all federal, state, and local laws," and would be "in original manufacturer's packaging that [would] not have (or at any time have had) any alterations of any kind." (ECF No. 40, PageID.828.) Kamstra further agreed that it would "indemnify and hold H&H harmless from and against any and all claims . . . expenses and losses of any nature whatsoever relating to or arising out of [Kamstra's] breach, violation or failure to comply with the provisions of" the Vendor Agreement. (ECF No. 40, PageID.828.) Kamstra also agreed that "any dispute or enforcement action relating to [the Vendor] Agreement or the transactions contemplated" under the Vendor Agreement would take place in a Michigan court or this Court, the U.S. District Court for the Eastern District of Michigan. (ECF No. 40, PageID.829.)

In addition to the warranty, indemnification, and forum-selection provisions just recited, the Vendor Agreement also specified that its terms would "supersede any terms contained in [Kamstra] emails, invoices, shipping documents or other documents related to the Products." (ECF No. 40, PageID.827.) And it stated, "These terms and conditions shall control with respect to any purchase order or sale of Products. No waiver, alteration or modification of these terms and conditions whether on Buyer's purchase order or otherwise shall be valid unless accepted in writing and signed by an authorized representative of H&H." (ECF No. 40, PageID.829.)

When Haaijer emailed Gulas a signed copy of the Vendor Agreement, Haaijer asked Gulas to complete Kamstra's new-customer form. (ECF No. 15, PageID.177.) Fine print at the bottom of that form read, "To all agreements whereby we act as seller our general terms and conditions of sale, delivery and payment apply, and to all agreements whereby we act as buyer our general terms and conditions of purchase apply, which you have received from us, and which are also deposited at the commercial register and published at www.hollandtradinggroup.com. We expressly reject the applicability of your terms and conditions." (ECF No. 15, PageID.180.) Throughout this opinion the Court will refer to this quoted language (and materially-identical variants) as "Kamstra's Terms." Gulas (or his assistant) completed the form and emailed it back to Haaijer. But it appears that the form did not ask for, and Gulas did not provide, his signature. (*See* ECF No. 15, PageID.181.)

Although Kamstra signed H&H's Vendor Agreement in February 2014, the two companies did not complete any transactions for a while. Indeed, over the next two years, H&H placed orders for products but Kamstra was unable to fill the orders. (ECF No. 22, PageID.380; *see also* ECF No. 15, PageID.207–208.)

**B.**

By 2016, Jeroen Erents (rather than Haaijer) had become H&H's contact person at Kamstra. (*See* ECF No. 15, PageID.196, 207.)

In July 2016, Erents sent Gulas an email, asking if H&H was interested in ordering some blood-glucose test strips made by Aviva. (ECF No. 15, PageID.196.) After a bit of back and forth, Gulas indicated that H&H was interested. (ECF No. 15, PageID.206.) With the order in process, Erents wrote Gulas: "In order to set you up in [Kamstra's] system I would need the attached document completed. Can you please do so for me?" (ECF No. 15, PageID.206.) The attached

document was Kamstra's new-customer form. At the bottom of the new-customer form, in fine print, were Kamstra's Terms. (ECF No. 15, PageID.210.) Gulas partly completed the form but did not comply with the form's request for a signature. (ECF No. 15, PageID.212.) In connection with the Aviva order, Kamstra also sent H&H a sales order confirmation. (ECF No. 15, PageID.214.) The sales order confirmation also contained Kamstra's Terms. (*Id.*) Unlike the new-customer form, Gulas signed the sales order confirmation.

Around the time of the Aviva order (July 2016), H&H also ordered from Kamstra some blood-glucose test strips made by Abbott. (ECF No. 15, PageID.217.) In connection with that order, Kamstra sent H&H a sales order confirmation. (*Id.*) Like the one for the Aviva strips, the Abbott sales order confirmation contained Kamstra's Terms. And like the one for the Aviva strips, Gulas signed the sales order confirmation. Unlike the Aviva order, however, the order for the Abbott strips was never completed: Kamstra never shipped H&H the strips and, apparently, H&H never paid for them. (*See* ECF No. 22, PageID.381.)

## C.

Between November 2016 and April 2017, Kamstra and H&H completed six transactions for the sale of Abbott Freestyle Lite blood-glucose test strips. Here are the details.

In November 2016, Kamstra sent H&H two invoices for Abbott strips. (ECF No. 22, PageID.381.) The invoices provided that Kamstra would sell H&H about 1,400 boxes of strips at $55 per box. (ECF No. 23, PageID.452, 453) In response to the two invoices, H&H sent two purchase orders. (ECF No. 22, PageID.381.) Kamstra then shipped the Abbott strips to H&H and H&H paid Kamstra. (*See id.*) Included on the two Kamstra invoices, in fine print, were Kamstra's Terms. (ECF No. 23, PageID.452, 453.)

The next month, December 2016, Kamstra sold H&H 2,500 more boxes of Abbott strips at a lower price, $53 per box. (ECF No. 22, PageID.381–382.) According to H&H, the lower price prompted Erents to send H&H a sales order confirmation. (ECF No. 22, PageID.381.) As with Kamstra's other documents, the sales order confirmation contained Kamstra's Terms. But Gulas did not sign the confirmation. (ECF No. 22, PageID.382.) And apart from the sales order confirmation, the December transaction went like the November one: Kamstra sent an invoice with Kamstra's Terms, H&H responded with a purchase order, Kamstra shipped the strips, and H&H paid for them. (*See* ECF No. 22, PageID.382.)

In January and February 2017, Kamstra and H&H completed two more orders for Abbott strips. The first was for about 5,000 boxes at the same price as before, $53 per box. (ECF No. 22, PageID.382.) And, as before, Kamstra sent an invoice with Kamstra's Terms, H&H sent a responsive purchase order, and the strips were shipped and paid for. (*See* ECF No. 22, PageID.382; ECF No. 23, PageID.455.) On January 16, 2017, Erents asked, "from now on can you sign my sales confirmations or send me your PO? We received the request from the Auditors that prices always need to be confirmed." (ECF No. 22, PageID.382.) Apparently because Kamstra was able to offer the Abbott strips at a lower price, $52 per box, Erents sent another sales order confirmation. Gulas did not sign the confirmation. Instead, an order for 5,000 boxes at $52 per box was completed like the others: a Kamstra invoice (with Kamstra's Terms), an H&H purchase order, shipment, payment. (*See* ECF No. 22, PageID.382; ECF No. 23, PageID.457.)

The last transaction relevant to this case occurred in April 2017. Kamstra offered 10,000 boxes of Abbott strips at a still-lower $51 per box price. (ECF No. 22, PageID.383.) The lower price prompted Erents to send Gulas a sales order confirmation; Gulas did not sign the

confirmation. (ECF No. 22, PageID.383.) Instead, the transaction was completed via invoice, purchase order, shipment, payment.

All told, the six transactions amounted to Kamstra selling H&H about 24,000 boxes of Abbott strips for about $1.25 million. (ECF No. 29, PageID.566.) H&H planned to, and to some extent did, resell them. The total resale value was only $1.43 million, meaning that had H&H resold all 24,000 boxes it bought from Kamstra, it would have profited a modest $180,000. (*See* ECF No. 22, PageID.384.)

### D.

Unfortunately, at least some of the boxes containing the Abbott strips that Kamstra sold H&H were not completely genuine.

Abbott discovered the packaging change and in May 2017, it sued H&H, Gulas, and H&H's president and founder, Howard Goldman, in a federal district court in New York. (ECF No. 22, PageID.385.) Apparently, Abbott's investigators had repurchased boxes of Abbott strips that H&H had sold to pharmacies and nursing homes. (ECF No. 22, PageID.385.) And, according to Abbott, the packaging was "counterfeit" and the boxes contained a "counterfeit instructional insert and counterfeit vial label." (ECF No. 22, PageID.386.) Based on affidavits from Abbott's investigators, the federal court in New York issued a temporary restraining order preventing H&H from selling Abbott strips. (ECF No. 22, PageID.386.) Further, H&H was required to inform pharmacies that the strips they bought may not be fit for resale and should be quarantined. (ECF No. 22, PageID.390.)

H&H, Goldman, and Gulas say that the 2017 Abbott lawsuit has damaged them. According to H&H, its letter to the pharmacies resulted in "severe and irreparable damage to [its] reputation." (ECF No. 22, PageID.390.) Further, H&H, Gulas, and Goldman have incurred "hundreds of

thousands of dollars in legal fees (still accumulating)" defending the Abbott action. (ECF No. 22, PageID.377.) And should Abbott prevail, the damages might be "millions of dollars." (ECF No. 22, PageID.377.)

## E.

In H&H, Gulas, and Goldman's view, the 2017 Abbott suit is Kamstra's fault. They thus filed suit in this Court asserting that Kamstra breached provisions of the Vendor Agreement, including that the strips would be "genuine and authentic and comply with all federal, state, and local laws, ordinances, rules and regulations," that the strips would be "in original manufacturer's packaging that [would] not have (or at any time have had) any alterations of any kind," and that Kamstra would "indemnify and hold H&H harmless from and against any and all claims" arising out of a breach of those and other provisions of the Vendor Agreement.

Kamstra has moved to dismiss H&H's lawsuit. (Although there are three plaintiffs, when it is not necessary to address them separately, the Court uses the simpler "H&H.") For one, Kamstra says that it would be improper for this Court to exercise personal jurisdiction over it. In Kamstra's view, the Vendor Agreement is not enforceable (or otherwise abandoned, terminated, or superseded) and so the clause providing for a Michigan forum has no effect. And being a Dutch company, Kamstra says that it lacks minimum contacts with Michigan. So Kamstra seeks dismissal under Rule 12(b)(2). It also asks the Court to dismiss H&H's claims under Rule 12(b)(6).

## II.

The law is clear; jurisdiction before merits. *See Steel Co. v. Citizens for a Better Envt*, 523 U.S. 83, 94 (1998) (rejecting the doctrine of "hypothetical jurisdiction" and requiring that jurisdiction be established "as a threshold matter").

**A.**

In deciding a Rule 12(b)(2) motion, a court can choose from three "procedural alternatives": decide the motion upon the pleadings and affidavits, permit jurisdictional discovery, or conduct an evidentiary hearing to resolve fact disputes. *Theunissen v. Matthews*, 935 F.2d 1454, 1458–59 (6th Cir. 1991). Here, H&H and Kamstra have attached some documentary evidence to affidavits. But the parties did not engage in jurisdictional discovery nor did the Court hold an evidentiary hearing. So the parties and the Court have proceeded down the first route—decision via affidavit.

And when that is the case, the plaintiff's burden of establishing personal jurisdiction is "relatively slight": it need only make a "*prima facie* showing that jurisdiction exists." *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (internal quotation marks omitted). Moreover, the pleadings and affidavits must be viewed in the light most favorable to H&H. *Theunissen*, 935 F.2d at 1459. Further, if Kamstra's factual assertions controvert those in H&H's pleadings and affidavits, the Court does not accept those assertions. *See id.*

**B.**

So should this case be litigated in Michigan or the Netherlands? H&H says the former; Kamstra the latter.

In addition to arguing that its claims arise out of Kamstra's contacts with Michigan, H&H relies on the forum-selection clause in the Vendor Agreement. That clause provides, "In any dispute or enforcement action relating to this Agreement or the transactions contemplated hereunder," Kamstra "agrees and consents to the exclusive jurisdiction of [Michigan courts] and the U.S. District Court of the Eastern District of Michigan." (ECF No. 40, PageID.829.) It also says, "Vendor hereby waives all objections to venue." (ECF No. 40, PageID.829.) So H&H's

position is straightforward: Kamstra agreed to litigate a dispute arising out of the sale of Abbott strips in this Court.

Kamstra says personal jurisdiction is not so straightforward. In its view, the entire Vendor Agreement is unenforceable. It says that the agreement fails the Uniform Commercial Code's statute-of-frauds provision. And, says Kamstra, if the Vendor Agreement does not fail for that reason, then (1) H&H abandoned it, (2) Kamstra terminated it, or (3) the parties entered into a subsequent contract that supersedes it.

And Kamstra goes a step beyond claiming that the Vendor Agreement is a legal nullity. In its view, the contract or contracts that governed the sales of Abbott strips consisted of its general terms and conditions. And, says Kamstra, those terms provide that disputes arising from its sale of goods must be litigated in the Netherlands. (*See* ECF No. 15, PageID.193.) In other words, not only does Kamstra argue that H&H's forum-selection clause is not enforceable (or terminated or abandoned or superseded), it argues that this Court must enforce its forum-selection clause in favor of the Netherlands. (ECF No. 28, PageID.536–537.)

Thus, the answer to the Michigan-or-Netherlands question turns on whether H&H has made a *prima facie* showing that its Vendor Agreement is enforceable. If not, then it might be true that Kamstra's general terms and conditions, including Kamstra's forum-selection clause, governed the sales of Abbott strips. And if that is true, it would seem that Kamstra's contacts with Michigan (minimum or otherwise) would be irrelevant. So the Court starts with the enforceability of the Vendor Agreement.

## 1.

Kamstra first claims that the Vendor Agreement is unenforceable because it lacks a quantity term.

Kamstra's argument relies on Michigan's implementation of the Uniform Commercial Code. Under § 440.2201, "a contract for the sale of goods . . . is not enforceable . . . unless there is a writing sufficient to indicate that a contract for sale has been made between the parties[.]" The text of § 440.2201 does not say that a quantity term must be included for the contract to be enforceable. But Comment 1 provides, "The only term which must appear is the quantity term. The price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted." Based on this comment and interpretations by commentators, the Michigan Supreme Court has stated, "Section 2-201 does not require that the terms of a contract for the sale of goods, other than the quantity term, be expressed in writing." *Lorenz Supply Co. v. Am. Standard, Inc.*, 358 N.W.2d 845, 846–47 n.3, 4 (Mich. 1984). And, at least in unpublished decisions, the Michigan Court of Appeals has stated, "Under UCC § 2-201(1), the quantity term of a contract for the sale of goods must be in writing before the contract is enforceable." *Dedoes Indus., Inc. v. Target Steel, Inc.*, No. 254413, 2005 WL 1224700, at *1 (Mich. Ct. App. May 24, 2005); *accord Acemco, Inc. v. Olympic Steel Lafayette, Inc.*, No. 256638, 2005 WL 2810716, at *3 (Mich. Ct. App. Oct. 27, 2005).

It is not disputed that the Vendor Agreement lacks a quantity term. But the Vendor Agreement was not "a contract for the sale of goods" as that phrase is used in § 440.2201. The Court is well aware that a "[c]ontract for sale" "includes both a present sale of goods and a contract to sell goods at a future time," Mich. Comp. Laws § 440.2106, and that the Vendor Agreement undoubtedly contemplated future sales of goods from Kamstra to H&H. But the Vendor Agreement did not say what goods. It did not say for how much. It did not say how many. It did not say when the goods should be delivered. And while referencing delivery to H&H's "warehouse," the Vendor Agreement does not give an address. The product, the product's price,

the quantity of the product, the time of delivery, and the place of delivery all seem to be key—if not *the* key—terms of "a contract for the sale of goods." Yet the Vendor Agreement contains none of that.

And the reason that the Vendor Agreement does not contain any of these key terms is not because it was "a contract for the sale of goods" with gaps left for the UCC to fill. *See e.g.*, Mich. Comp. Laws § 440.2205 (price gap filler). The reason the Vendor Agreement does not specify product, quantity, price (and the like) is because its purpose was not to set the terms of any particular sales transaction. *Cf.* Mich. Comp. Laws § 440.2106 (explaining that "[a] 'sale' consists in the passing of title from the seller to the buyer for a price"). The Vendor Agreement contemplated that there would be subsequent purchase orders and invoices specifying the product, quantity, and price. (*See* ECF No. 40, PageID.827 ¶ 2.) Or viewed slightly differently, no one could claim the Vendor Agreement was breached for failure to deliver a particular quantity of product or for failing to accept payment for an agreed-upon price. Indeed, under the Vendor Agreement, Kamstra was not obligated to sell anything to H&H and H&H was not obligated to buy anything from Kamstra. *See Lorenz Supply Co. v. Am. Standard, Inc.*, 300 N.W.2d 335, 338 (Mich. Ct. App. 1980) (finding contract was not one for the sale of goods under § 440.2201 where it did not require the plaintiff "to buy a certain quantity of goods or, indeed, to buy *any* goods from the defendant in the future").

But if the Vendor Agreement was not a contract for sale of goods, what was it? The apparent purpose of the Vendor Agreement was to allow vendors to obtain a spot on H&H's list of approved vendors. The agreement says as much: "the Vendor agrees to all of the following *in consideration of being considered a Vendor for H&H*, sales to H&H[,] and other good and valuable consideration." (ECF No. 40, PageID.827 (emphasis added).) That language (not to mention a

provision authorizing a background check on Kamstra (ECF No. 40, PageID.827)), suggests that H&H maintains a list of pre-approved vendors, i.e., those who have agreed to the terms of the Vendor Agreement. That way, when H&H is looking to source a product, it need not haggle over warranties and other legal matters (such as forum). H&H's inquiry is streamlined to, "Can you get me 5,000 boxes of Abbott FreeStyle Lite strips at $52 per box?" This approach is entirely sensible: Why would H&H go through the trouble of contacting a vendor (or entertaining a vendor's offer) when that vendor has not agreed to the representations and warranties that H&H requires?

Consider, too, the rationale for requiring a contract to contain a written quantity term. The purpose is to prevent, for example, the buyer claiming that the parties orally agreed to 5,000 units with the seller claiming that the parties orally agreed to 4,000 units. *See* 1 White, Summers, & Hillman, Uniform Commercial Code § 3:11 (6th ed.) ("[T]he primary theory of statutes of frauds, past and present, is that they are the means to the end of preventing successful courtroom perjury."). But here, if H&H claimed the sale was for 5,000 boxes and Kamstra claimed it was for only 4,000, neither judge nor juror would expect the Vendor Agreement to resolve that dispute. And that is because quantity was not the office of the Vendor Agreement; that was the office of the invoice and purchase order governing the particular sale. And if H&H (or Kamstra) ever asserted breach of the Vendor Agreement, it would be able to point to a written provision of that agreement—the very thing that the statute of frauds is meant to ensure.

And even assuming that the Vendor Agreement is "a contract for the sale of goods" as that phrase is used in § 440.2201, it would not be unenforceable under that provision. The Vendor Agreement anticipated that there would be future purchase orders and invoices setting forth products, prices, and quantities. (ECF No. 40, PageID.827.) Thus, those purchase orders and invoices supplied the quantity term missing from the Vendor Agreement. *See Advent Sys. Ltd. v.*

*Unisys Corp.*, 925 F.2d 670, 678 (3d Cir. 1991) ("To deny enforceability through a rigid reading of the quantity term in the statute of frauds would run contrary to the basi[c] thrust of the Code—to conform the law to business reality and practices.").

In short, the Vendor Agreement is not a "contract for the sale of goods" as that phrase is used in Michigan Compiled Laws § 440.2201 or, if it is such a contract, it is not one that is unenforceable for lack of a quantity term.

## 2.

As one of three alternative arguments, Kamstra asserts that after it signed the Vendor Agreement, the parties entered into a "Sales Agreement" that "superseded" the Vendor Agreement. (ECF No. 28, PageID.534–536; ECF No. 30, PageID.636–637.)

In particular, Kamstra says the new-customer form (the one in 2016), the many invoices it sent to H&H, the two sales order confirmations that Gulas signed, and Kamstra's general terms and conditions collectively amount to a "Sales Agreement." And, as noted, most (if not all) of these documents contain Kamstra's Terms. And, says Kamstra, those terms were inconsistent with the terms of the Vendor Agreement (including, for example, competing forum-selection clauses). (ECF No. 28, PageID.534–535.) Building on these two premises—a later-in-time contract for the strips inconsistent with the Vendor Agreement—Kamstra invokes this law: "entering a superseding, inconsistent agreement covering the same subject matter rescinds an earlier contract and operates as a waiver of any claim for breach of the earlier contract not expressly reserved." *Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp.*, 749 F. Supp. 794, 796 (E.D. Mich. 1990); *see also CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. Ct. App. 2002) ("When two agreements cover the same subject matter and include inconsistent terms, the later agreement supersedes the earlier agreement.").

Kamstra's argument can be analyzed in two parts.

Start with the documents that did not include Gulas' or H&H's signature—primarily Kamstra's invoices, H&H's responsive purchase orders, and the sales order confirmations relating to the six completed sales of Abbott strips. In Kamstra's view, when it issued invoices for Abbott strips, it made offers to H&H; and by sending responsive purchase orders, H&H accepted those offers. (ECF No. 30, PageID.636–637.) And, notably, the invoices contained Kamstra's Terms. Thus, in Kamstra's view, by sending responsive purchase orders, H&H manifested its assent to Kamstra's Terms and those terms supersede the terms of the Vendor Agreement.

Kamstra's interpretation of H&H's conduct is not the best one. Recall that the Vendor Agreement provides, "All terms contained herein shall supersede any terms contained in [Kamstra's] emails, invoices, shipping documents, or other documents related to" goods sold or offered to H&H. (ECF No. 40, PageID.827.) And it says, "No waiver, alteration or modification of these terms and conditions whether on Buyer's purchase order *or otherwise* shall be valid *unless accepted in writing and signed by an authorized representative of H&H*." (ECF No. 40, PageID.829 (emphasis added).) So in sending purchase orders in response to Kamstra's invoices, it seems likely that H&H was relying on those two provisions of the Vendor Agreement: the terms of the Vendor Agreement would supersede any on Kamstra's invoices and, given that it did not sign the invoices or purchase orders, it was not agreeing to waive or modify the Vendor Agreement's terms. So as to the documents that Gulas and H&H did not sign, the Court finds that it is doubtful that H&H manifested its intent to enter into a subsequent contract with terms contrary to the Vendor Agreement.

Now consider the documents that Gulas did sign. In July 2016, Kamstra sent one sales order confirmation to H&H for Aviva strips and another for Abbott strips. The two documents

contained Kamstra's Terms; Gulas signed them. Those two facts open the door to a claim that H&H agreed to "waive[], alter[] or modif[y]" the terms of the Vendor Agreement.

And H&H has not completely closed it. H&H correctly points out that Aviva strips have nothing to do with this lawsuit. And H&H correctly points out that the Abbott strips covered by the signed sales order confirmation were never shipped and never paid for. In other words, H&H correctly asserts that the transactions covered by the two sales order confirmations that Gulas signed did not give rise to this case. But H&H overlooks the fact that Kamstra's Terms might not be limited to the Aviva transaction and the unfilled-Abbott transaction. Kamstra's Terms state, "To *all* agreements whereby we act as seller our general terms and conditions of sale, delivery and payment apply . . . . We expressly reject the applicability of your terms and conditions." (ECF No. 15, PageID.214, 218 (emphasis added).) "[A]ll" usually means "all."

Even so, a reasonable fact-finder might well resolve the issue of mutual assent in H&H's favor. *See Magna Elecs. Tech. Inc. v. Dynacast Inc.*, No. 17-CV-11941, 2018 WL 3436791, at *3 (E.D. Mich. July 17, 2018) (explaining that while Michigan case law is not entirely in harmony, it appears that "the question of mutual assent is generally a question of fact for a jury"). Kamstra's Terms appeared on virtually every (if not every) piece of paper Kamstra sent to H&H. If Kamstra genuinely wanted H&H to agree to its terms and forever waive the terms of the Vendor Agreement for all transactions and not just the ones that had a signed writing to support waiver (like a sales order confirmation), it seems that Kamstra would have more explicitly asked H&H to do that. And if Kamstra had explicitly asked, the intent behind Gulas' signature would be manifest. But instead, Kamstra would have the Court find (as a matter of law) that H&H agreed to permanently forego the protections of the Vendor Agreement because H&H signed only two of the many documents that included Kamstra's Terms. Notably too, H&H indicates that the reason Erents asked Gulas to

sign sales order confirmations was not to obtain H&H's assent to Kamstra's Terms, but so that Kamstra could comply with its auditors' demands: "from now on can you sign my sales confirmations or send me your PO? We received the request from the Auditors that prices always need to be confirmed." (ECF No. 22, PageID.382.) In short, when Gulas signed the two sales orders confirmations, it is doubtful that H&H was manifesting its intent to forever forgo the terms of the Vendor Agreement and assent to Kamstra's Terms for all subsequent transactions. And given the procedural posture, H&H gets the benefit of debated questions of fact. *See Serras v. First Tennessee Bank Nat. Ass'n*, 875 F.2d 1212, 1215 (6th Cir. 1989) ("[W]here the disputed jurisdictional facts are intimately intertwined with the parties' dispute on the merits, a trial court should not require plaintiffs to mount 'proof which would, in effect, establish the validity of their claims and their right to the relief sought.'"); *Theunissen*, 935 F.2d at 1459 (providing that when a court decides a Rule 12(b)(2) motion on affidavits and pleadings, the plaintiff need only demonstrate a "prima facie" case of personal jurisdiction).

The foregoing also addresses Kamstra's integration-clause argument. Kamstra claims that its general terms and conditions included an integration clause. And, says Kamstra, an integration clause unmistakably shows that H&H manifested its assent to Kamstra's Terms. In support, Kamstra relies on the following:

> [W]here the later contract contains an integration clause, it cannot be said that the later contract does not supersede the earlier contract on the basis that that is not what the parties intended. Obviously, in such a situation, the integration clause provides clear evidence to the contrary, i.e., that the parties *did* intend the later contract to supersede the earlier contract. Therefore, the existence of an integration clause in the later contract necessarily indicates that the parties intended the later contract to supersede the earlier contract, and thus provides dispositive evidence with regard to which contract is controlling.

*Archambo v. Lawyers Title Ins. Corp.*, 646 N.W.2d 170, 177 n.16 (Mich. 2002). But here, the integration clause comes by way of Kamstra's Terms and, as just stated, it is at least debatable

whether H&H ever assented to that language. In other words, only if it were clear that the parties had agreed to Kamstra's Terms would the integration clause be "clear evidence" that Kamstra's Terms—and not earlier agreed-upon terms—governed the sale of strips.

In sum, whether based on signed or unsigned documents, it is not apparent that H&H ever manifested its intent to agree to a subsequent contract with terms contrary to those of the Vendor Agreement. As H&H's intent is a question of fact not answerable on this record, Kamstra has not overcome the *prima facie* validity of the Vendor Agreement. *See Theunissen*, 935 F.2d at 1459.

### 3.

As yet another ground for arguing that the Vendor Agreement is a legal nullity, Kamstra says that it terminated the Vendor Agreement. Under Michigan law, if a contract does not provide "the term, duration, or manner of termination," then "it is generally deemed to be terminable at the will of either party because they have not agreed otherwise." *Lichnovsky v. Ziebart Int'l Corp.*, 324 N.W.2d 732, 738–39 (Mich. 1982). It appears that the Vendor Agreement does not provide a "term, duration, or manner of termination." So, says Kamstra, it had the right to terminate the Vendor Agreement at will. And Kamstra says it exercised that right when it sent H&H a new-customer form, sales order confirmations, and invoices all containing Kamstra's Terms. (ECF No. 28, PageID.534.)

Kamstra's termination argument is not without some merit. Unlike its "supersedes" argument, this argument appears to avoid the Vendor Agreement's written-modification clause: that clause requires H&H's signature for "waiver, alteration or modification"—not "termination." And, as discussed, the documents Kamstra sent to H&H said, "We expressly reject the applicability of your terms and conditions." And, by saying that, Kamstra could have been exercising its option to terminate the Vendor Agreement at will.

But the Court is far from certain. Kamstra's "[w]e expressly reject" language refers to a buyer's "terms and conditions" generally, not H&H's Vendor Agreement specifically. It is reasonable to think that to terminate the Vendor Agreement, a statement more tailored to the Vendor Agreement was necessary. This is especially true where the Vendor Agreement anticipated that sellers would try to apply their own terms and conditions by providing that its terms would "supersede any terms contained in [Kamstra] emails, invoices, shipping documents or other documents related to the Products." Notably too, rather than garnering attention, Kamstra's Terms tended to avoid notice: they typically appeared as boilerplate fine print. And Kamstra's Terms were sent in documents seeking to consummate sales with H&H. But if the Vendor Agreement was terminated, it is unlikely H&H would have been conducting business with Kamstra. So it is not clear that Kamstra's Terms gave adequate notice to H&H that it was exercising its right to terminate the Vendor Agreement. *See Garavaglia v. Centra, Inc.*, No. 196203, 1998 WL 1991630, at *4 (Mich. Ct. App. June 2, 1998) ("[G]eneral contract principles of good faith and fair dealing required defendants to inform plaintiff that the contract was terminated"); Mich. Comp. Laws § 440.2309 ("Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party[.]"); 5 Corbin on Contracts § 24.29 (2018) ("In a large proportion of cases, when the parties did not specify the duration of their contracts, the courts have concluded that these contracts should be terminable at the will of either party, *often upon reasonable notice*." (emphasis added)). Given that a reasonable fact finder could find that Kamstra did not give adequate notice that it was terminating the Vendor Agreement, H&H is not precluded from relying on the agreement to establish personal jurisdiction at this stage of the case. *See Theunissen*, 935 F.2d at 1459; *Serras*, 875 F.2d at 1215.

**4.**

As still another ground for asserting that the Vendor Agreement's terms did not apply to the sales of Abbott strips leading to this case, Kamstra argues that H&H abandoned the Vendor Agreement. Kamstra points out that the Vendor Agreement was signed in February 2014. (ECF No. 28, PageID.525.) Yet no sale was completed until July 2016. (ECF No. 15-2, PageID.214.) So, says Kamstra, H&H abandoned the Vendor Agreement by not exercising its rights under the agreement for over two years. (ECF No. 28, PageID.533–534.)

The Court questions whether two years of inactivity—as opposed to say, 20—could amount to abandonment of an umbrella-style agreement like the Vendor Agreement. But even if that relatively short time could amount to abandonment, it is not even clear that there was two years of inactivity. H&H has pled that after Kamstra executed the Vendor Agreement, it "placed several purchase orders with HTG [Kamstra] over the course of the next 2 years." Taking the factual assertions in the light most favorable to H&H, *see Theunissen*, 935 F.2d at 1459, it appears that H&H placed several orders under the Vendor Agreement before July 2016. And that reasonable inference is sufficient for H&H to rely on the Vendor Agreement's forum-selection clause to establish personal jurisdiction.

\* \* \*

In sum, the Vendor Agreement was signed by Haaijer who indicated that he had authorization from Kamstra to do so. The Vendor Agreement offered Kamstra the opportunity to be "considered a Vendor for H&H" and to sell to H&H. In exchange for that sales opportunity, Kamstra agreed to a number of terms, including that litigation arising out of the Vendor Agreement would take place in Michigan. The Vendor Agreement was thus *prima facie* valid. *See AFT Mich. v. Michigan*, 866 N.W.2d 782 (Mich. 2015) (providing elements for a valid contract). The

agreement is not unenforceable for lack of a quantity term. And a reasonable fact finder could conclude that the Vendor Agreement was not terminated, abandoned, or superseded. Thus, at this stage of the case, H&H may rely on the Vendor Agreement to establish personal jurisdiction. *See Theunissen*, 935 F.2d at 1459; *Serras*, 875 F.2d at 1215.

## III.

As this Court appears to be a proper forum to litigate the merits, the Court turns to the merits.

## A.

Kamstra's motion to dismiss under Rule 12(b)(6) invokes the plausibility framework set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Under that framework, the Court asks whether the factual allegations of H&H's complaint permit "the reasonable inference that [Kamstra] is liable[.]" *Id.* at 678. Although this plausibility threshold is more than a "sheer possibility" that Kamstra is liable, it is not a "'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Whether H&H has presented enough factual matter to "'nudg[e]'" its claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 683 (quoting *Twombly*, 550 U.S. at 570).

## B.

### 1.

The Court's prior analysis addresses Kamstra's motion to dismiss Count I. Kamstra asserts that H&H's breach-of-contract claims fail because the Vendor Agreement "is not valid or enforceable." (ECF No. 28, PageID.541.) In support, Kamstra makes the same arguments as it did under Rule 12(b)(2). (*See* ECF No. 28, PageID.541.) So for the reasons stated, the Court finds that

it is at least plausible that the Vendor Agreement is enforceable, that H&H did not abandon that agreement, Kamstra did not terminate it, and the parties did not mutually agree to terms that supersede it. *See Iqbal*, 556 U.S. at 678.

## 2.

In Count II, H&H asserts that Kamstra violated Michigan Compiled Laws § 440.2312. Under that statute, a seller warrants that the title to products it sells is good. *See* Mich. Comp. Laws § 440.2312(1). And subsection (3) specifically addresses intellectual-property encumbrances on title. Paraphrasing, if a product is part of the seller's "normal stock and [is] sold in his normal course of business, it is his duty to see that no claim of infringement of a patent or trademark by a third party will mar the buyer's title" to the product. *See* Mich. Comp. Laws § 440.2312 cmt. 2. But the statute permits the seller and buyer to reach a different agreement, i.e., to do away with the no-infringement warranty. *See* Mich. Comp. Laws § 440.2312(3).

Kamstra says that is just what happened here, as its sales order confirmations, invoices, and new customer form included Kamstra's Terms. And, says Kamstra, those terms disclaimed infringement warranties.

This argument has also been addressed. As stated, it is debatable whether, objectively speaking, H&H ever manifested assent to Kamstra's Terms (at least for the transactions giving rise to this case). As it is plausible that H&H did not, Kamstra is not entitled to dismissal of Count II. *See Iqbal*, 556 U.S. at 678.

## 3.

Count III is a claim of fraudulent inducement. Kamstra sourced the Abbott strips that it sold to H&H from another supplier. (*See* ECF No. 22, PageID.394.) And, allegedly, around the time Kamstra was selling the Abbott strips to H&H, Kamstra learned, or at least suspected, that its

supplier was providing repackaged strips. (*See id.*) H&H says that Kamstra never relayed its knowledge or suspicion to it. (*See id.*) H&H asserts that had Kamstra done so, it would have never bought the Abbott strips. (*Id.*) So H&H claims that Kamstra fraudulently induced the purchases. (*Id.*)

Kamstra argues that this tort claim must be dismissed under the economic-loss doctrine. Kamstra is correct.

To see why, it helps to understand the rationale animating the doctrine. When a consumer is injured from a faulty product, the duty that the manufacturer breached does not originate from a contract between the consumer and manufacturer but "derives either from a duty imposed by law or from policy considerations which allocate the risk of dangerous and unsafe products to the manufacturer and seller rather than the consumer." *Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612, 616 (Mich. 1992). After all, allocating the risk to the manufacturer or seller encourages the design and production of safer products. *Id.* So a consumer's claim about faulty products sensibly falls under the umbrella of tort law.

But a sale of goods between two businesses is different. "In a commercial transaction, the parties to a sale of goods have the opportunity to negotiate the terms and specifications, including warranties, disclaimers, and limitation of remedies." *Neibarger*, 486 N.W.2d at 616. So in a commercial transaction, placing the risk of a faulty product on the manufacturer upsets the bargained-for allocation of that risk. *See id.*; *Consumers Power Co. v. Mississippi Valley Structural Steel Co.*, 636 F. Supp. 1100, 1105 (E.D. Mich. 1986) ("Placing the burden of the loss [from a faulty product] on any particular business will only result in that business raising its prices . . . . The courts should have no role in deciding which business should raise its prices, especially in light of the parties' ability to allocate those risks among themselves."); *A.C. Hoyle Co. v. Sperry*

*Rand Corp.*, 340 N.W.2d 326, 329 (Mich. Ct. App. 1983) ("Since the manufacturer and buyer have bargained in a commercial setting not only for the product but also for the measure and mode of reimbursement for defects in the product, any societal interest in loss shifting is absent." (internal quotation marks omitted)). Further, for those contracts covered by the UCC, permitting a commercial buyer "to sue in tort to recover economic loss" would allow the buyer to avoid "the UCC provisions designed to govern such disputes." *Neibarger*, 486 N.W.2d at 618. And those provisions "allow limitation or elimination of warranties and consequential damages, require notice to the seller, and limit the time in which such a suit must be filed." *Id.*

In short then, the economic-loss doctrine serves to place a commercial buyer's claim that it suffered economic loss from the seller's faulty product under the contract-law umbrella. *See Neibarger*, 486 N.W.2d at 618 ("[W]e hold that where a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC.").

And here, H&H and Kamstra are both commercial entities. They are sophisticated parties who were capable of—and in fact did—decide who would bear the risk of a faulty product. And it appears that H&H, Gulas, and Goldman have only pled economic losses. Indeed, there are no allegations of physical or emotional injury to anyone—even downstream consumers. (H&H does allege harm to its reputation from having to send letters to the pharmacies that it sold faulty product. But harm to business (as opposed to personal) reputation strikes the Court as an economic loss. *See* 1 White, Summers, & Hillman, Uniform Commercial Code § 12:9 (6th ed.).)

H&H says not so fast. Relying on *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.*, 532 N.W.2d 541 (Mich. Ct. App. 1995), H&H points out that the economic-loss doctrine does not bar claims of fraudulent inducement. And H&H points out that is precisely what

it pled in Count III: it would have never bought the strips had it known that there were issues with the packaging.

H&H is correct that *Huron Tool* states that "fraud in the inducement is an exception to the [economic-loss] doctrine." 532 N.W.2d at 543. But the rationale underlying this statement is important. As explained, the economic-loss doctrine is built on the assumption that a commercial seller and buyer have fairly allocated the risk of a faulty product during contract negotiations. And so when the bargained-for event comes to pass (a faulty product) courts have no warrant to assign the loss under the guise of tort law. *See Consumers Power*, 636 F. Supp. at 1105. Further, for those contracts governed by the UCC, permitting a tort claim not only upsets the parties' bargain but also undermines the legislature's selection of remedies. *See Neibarger*, 486 N.W.2d at 618. But the assumption that two businesses fairly allocated the risk of a faulty product during bargaining is not a good one when, for example, the seller makes a misrepresentation that compromises the buyer's ability to bargain on a level playing field. *See Huron Tool*, 532 N.W.2d at 545. So in that scenario, the economic-loss doctrine does not bar the buyer from bringing a tort claim.

This case falls in a gray area.

On the one hand, at the time of the six transactions that gave rise to this case, H&H did not have the opportunity to bargain for the risk that the strips might be faulty. If H&H is correct that Kamstra suspected that the packaging was faulty in late 2016 and early 2017, Kamstra's failure to disclose that information deprived H&H of the ability to, for example, negotiate a lower price to accept the possibility that the products were not genuine. So in that sense, there was not a fair, bargained-for contract justifying the application of the economic-loss doctrine.

On the other hand, H&H was able to fairly bargain for warranties that would protect it against the risk of an improperly-packaged product. Indeed, H&H had already secured those

warranties in the Vendor Agreement. And that agreement was signed well before Kamstra had any knowledge that the strips might be improperly-packaged. In other words, Kamstra's alleged fraud did not affect the terms of the Vendor Agreement or H&H's ability to protect itself from improperly-packaged products. And it is those terms—not the terms of the invoices and purchase orders—that H&H seeks to enforce in this case.

In the end then, the Court finds that this case falls outside the fraud-in-the-inducement exception to the economic-loss doctrine. *See Huron Tool*, 532 N.W.2d at 545 ("[W]here the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods."); *Huber v. Crop Prod. Servs., Inc.*, No. 06-14564-BC, 2007 WL 2746625, at *6 (E.D. Mich. Sept. 19, 2007) ("Plaintiffs allege that Defendants knowingly and intentionally misrepresented the amount of nutrients in the fertilizer. Assuming that Plaintiffs' allegations are true, Plaintiffs were free to negotiate warranties to protect themselves from a deficient blend of fertilizer."); *TIBCO Software, Inc. v. Gordon Food Serv., Inc.*, No. 1:03-CV-25, 2003 WL 21683850, at *4 (W.D. Mich. July 3, 2003) ("[N]ot all claims for fraud in the inducement are immune from the economic loss doctrine. If the fraud in the inducement claim involves the actual subject matter of the contract, then the claim is nonetheless barred.").

**4.**

Next, Kamstra argues that Goldman and Gulas' claims for breach-of-contract and under § 440.2312 (the statute ensuring good title), fail because they are not third-party beneficiaries of the Vendor Agreement. (*See* ECF No. 28, PageID.545–546.)

Michigan has a statute that says who is a third-party beneficiary of a contract: "A promise shall be construed to have been made for the benefit of a person whenever the promisor . . . had

undertaken to give or to do or refrain from doing something directly to or for said person." Mich. Comp. Laws § 600.1405. And because the statute uses the word "directly," the Michigan Supreme Court says that "[a] person is a third-party beneficiary of a contract only when that contract establishes that a promisor has undertaken a promise directly to or for that person." *Schmalfeldt v. N. Pointe Ins. Co.*, N.W.2d 651, 654 (2003). And in deciding whether "a promisor has undertaken a promise directly to or for" the alleged third-party beneficiary, the court should focus on the words of the contract. *Id.*

Here, the Vendor Agreement does not mention Goldman or Gulas. Nor does it more-generally refer to H&H's officers or employees. And the indemnification provision refers to H&H only: "Vendor shall indemnity and hold *H&H* harmless . . . ." (ECF No. 40, PageID.828.) True, the two warranty provisions at the center of this case do not really say who falls within their scope: "Vendor represents and warrants [to whom?] that all Products offered for sale and/or sold to H&H by Vendor shall be . . . ." and "None . . . of the Products [will] be a product or article that under any of the Laws may not be introduced into commerce . . . ." But examining the contract as a whole, it is not plausible that in signing the Vendor Agreement, Kamstra intended to promise Goldman and Gulas, personally, that it would not sell faulty product. This was a transaction between two businesses. It was H&H's business Kamstra wanted. It was H&H that would pay Kamstra.

Goldman and Gulas' rebuttals are not convincing. For one, they say that whether a promisor intended someone to be a third-party beneficiary is a question of fact. (ECF No. 29, PageID.587.) That seems to be right. But that does not relieve Goldman and Gulas of alleging facts that make it at least plausible that they are third-party beneficiaries of the Vendor Agreement. Yet all they plead is that they "are intended third-party beneficiaries of the indemnity obligations

contained in the" Vendor Agreement. (ECF No. 22, PageID.392, 393.) That legal conclusion "will

not do." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

At oral argument, Goldman and Gulas took a different tack. The two H&H employees

pointed to the warranty provisions of the Vendor Agreement. And they argued that in those

provisions, Kamstra represented that any goods sold would comply with the Lanham Act and that,

under the Lanham Act, employees of a company can be held personally liable. (ECF No. 38,

PageID.804–806.) This is the very reason, Goldman and Gulas explained, that they are defendants

in the Abbott action in New York. So, in their view, by promising that the goods sold to H&H

would not violate the Lanham Act, Kamstra made that promise to them too.

The reference to the Lanham Act (and other statutes permitting employees to be held

personally liable) are too oblique to render Goldman and Gulas third-party beneficiaries. In

seeking H&H's business, maybe Kamstra intended to make promises to H&H's employees. But

the Vendor Agreement certainly does not make that clear. And that dooms Goldman and Gulas'

third-party beneficiary argument. *See Schmalfeldt*, 670 N.W.2d at 654 ("[T]he Legislature

intended to assure that contracting parties are clearly aware that the scope of their contractual

undertakings encompasses a third party, directly referred to in the contract, before the third party

is able to enforce the contract."); *Brunsell v. City of Zeeland*, 651 N.W.2d 388, 390 (Mich. 2002)

("[T]he plain language of [Michigan's third-party-beneficiary] statute reflects that not every

person incidentally benefitted by a contractual promise has a right to sue for breach of that promise,

but rather only if the promisor has 'undertaken to give or to do or refrain from doing something

*directly* to or for said person.'" (quoting Mich. Comp. Laws § 600.1405)); *cf. Dynamic Const. Co.

v. Barton Malow Co.*, 543 N.W.2d 31, 33 (Mich. Ct. App. 1995) ("Contractors, subcontractors,

and their employees are generally held not to be the third-party beneficiaries of the contract between the general or supervisory contractor and the project owner.").

In short, the Court finds it implausible that Goldman and Gulas were third-party beneficiaries of the Vendor Agreement. That means their breach-of-contract claim will be dismissed. And, based on the complaint, it appears that their good-title claim under § 400.2312 is premised on their third-party beneficiary status. (*See* ECF No. 22, PageID.393.) So their claim under that statute will also be dismissed.

**5.**

Lastly, Kamstra seeks to dismiss H&H's declaratory-judgment count. (It appears that Goldman and Gulas do not seek declaratory relief. (*See* ECF No. 22, PageID.396.)) There, H&H asks this Court to declare that "HTG is the party at fault for the sale of the Strips as alleged in the Abbott Action and is required to fully indemnify H&H as a result thereof." (ECF No. 22, PageID.396.) Kamstra says this claim "is redundant to H&H's claim for indemnification." (ECF No. 28, PageID.549.)

As an initial matter, it is not clear that Kamstra's premise is correct. H&H asserts (albeit for the first time in its response brief) that its declaratory-judgment count is based, at least in part, on common-law indemnity. (ECF No. 29, PageID.588.) And common-law indemnity "exists independently of statute, and whether or not contractual relations exist between the parties, and whether or not the negligent person owed the other a special or particular legal duty not to be negligent." *Botsford Continuing Care Corp. v. Intelistaf Healthcare, Inc.*, 807 N.W.2d 354, 361 (Mich. Ct. App. 2011).

But even granting Kamstra its premise, Kamstra's redundancy claim cuts both ways. If H&H's declaratory-judgment claim is redundant, why does Kamstra need it dismissed when H&H's breach-of-contract and good-title claims remain in the case?

The Court essentially asked Kamstra this question at oral argument. (ECF No. 38, PageID.795, 797.) Kamstra responded that it wanted to narrow discovery and trim down H&H's "damages model." (*See* ECF No. 38, PageID.794–776.)

Those are sensible goals for a defendant. But given the Court's rulings, it is not clear how dismissing the declaratory-judgment claim now helps Kamstra reach them. H&H's fraud claim is out (eliminating tort damages) and Goldman and Gulas' claims are out (eliminating their damages). The declaratory-judgment claim seeks no damages and it seems highly likely that discovery on H&H's breach-of-contract and good-title claims will overlap significantly with discovery on H&H's declaratory-judgment claim.

So the Court will decline for now Kamstra's invitation to dismiss H&H's declaratory-judgment claim.

## IV.

For the reasons given, the Court finds that H&H has made a *prima facie* showing that this Court may exercise personal jurisdiction over Kamstra. But Kamstra has shown that H&H's claim of fraud in the inducement is not plausible and that Goldman and Gulas' claims are not plausible. Count III is DISMISSED. Goldman and Gulas, and their claims, are DISMISSED. Kamstra's motion is GRANTED IN PART and DENIED IN PART.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: January 2, 2019

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 2, 2019.

s/William Barkholz
Case Manager to
Honorable Laurie J. Michelson