UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| H&H WHOLESALE SERVICES, INC., HOWARD GOLDMAN, and DAVID GULAS,<br><br>Plaintiffs,<br><br>v.<br><br>KAMSTRA INTERNATIONAL, B.V. d/b/a HOLLAND TRADING GROUP,<br><br>Defendant. | Case No. 2:17-cv-13422-LJM-APP<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER
DENYING DEFENDANT'S MOTION FOR RECONSIDERATION [51]**

The old saying, "if at first you don't succeed, try, try, try again," William Edward Hickson, *The Singing Master* (1836), is not always the best way to proceed in litigation. Here, Kamstra International filed a motion to dismiss on a host of grounds. Although H&H Wholesale Services' Vendor Agreement explicitly stated that this Court was an appropriate forum for H&H to sue Kamstra, Kamstra argued that the Vendor Agreement was not enforceable, and, if that were not the case, then H&H abandoned the Vendor Agreement, and, if that were not the case, then Kamstra terminated the Vendor Agreement, and, if that were not the case, then the parties reached a later agreement that superseded the Vendor Agreement. This Court thoroughly studied and explicitly addressed those and other issues. *H&H Wholesale Servs., Inc. v. Kamstra Int'l, B.V.*, — F. Supp. 3d —, No. 217CV13422, 2019 WL 78892 (E.D. Mich. Jan. 2, 2019). As relevant for present purposes, the Court found that H&H had made a *prima facie* showing that the Vendor Agreement permitted this Court to exercise personal jurisdiction over Kamstra and that it was plausible that the Vendor Agreement was enforceable. Now Kamstra asks this Court to reconsider

those determinations and, in doing so, again makes a host of arguments. As is detailed below, Kamstra has not only failed to show that that this Court's prior decision rests on an indisputable mistake that, if corrected, would result in a different outcome, *see* E.D. Mich. LR 7.1(h)(3), many of Kamstra's arguments for reconsideration are mistaken.

Start with Kamstra's claim that this Court "erred in finding that the Vendor Agreement is a distribution/distributorship agreement that is not 'a contract for the sale of goods.'" (ECF No. 51, PageID.1048.) This argument relates to Kamstra's belief that the Vendor Agreement is "a contract for the sale of goods" as that phrase is used in the statute-of-frauds provision, Mich. Comp. Laws § 440.2201, yet does not meet that statute's demand for a written quantity term. In support of this basis for reconsideration, Kamstra distinguishes the Vendor Agreement from the distribution agreements in *Wolverine World Wide, Inc. v. Wolverine Canada, Inc.*, 653 F. Supp. 2d 747 (W.D. Mich. 2009), and *Lorenz Supply Co. v. Am. Standard, Inc.*, 300 N.W.2d 335 (Mich. Ct. App. 1980). (*See* ECF No. 51, PageID.1048–1049.)

This argument does not warrant altering this Court's prior opinion and order. Contrary to Kamstra's characterization of this Court's opinion (ECF No. 51, PageID.1048), the Court never held that the Vendor Agreement was (or was not) a "distribution/distributorship agreement." And this Court did not cite *Wolverine*. And this Court never claimed that the Vendor Agreement made Kamstra a "preferred" distributor like the contract in *Lorenz*. This Court cited *Lorenz* to show that absence of an obligation to sell or buy suggests that an agreement is not "a contract for the sale of goods" under § 440.2201. *See Lorenz Supply Co. v. Am. Standard, Inc.*, 300 N.W.2d 335, 338 (Mich. Ct. App. 1980) (finding contract was not one for the sale of goods under § 440.2201 where it did not require the plaintiff "to buy a certain quantity of goods or, indeed, to buy any goods from the defendant in the future").

2

Moreover, this Court explained the nature of the Vendor Agreement. As indicated from the text of the agreement (e.g., "in consideration of being considered a Vendor for H&H"), H&H wanted to ensure that if it bought goods from one of its vendors, the goods would be accompanied by certain warranties (e.g., "in original manufacturer's packaging"). For each vendor that agreed to the terms of the Vendor Agreement, H&H could add that vendor to its "rolodex" assured that the vendor had agreed to all representations and warranties in the Vendor Agreement. That way when H&H was looking to source a product, it only needed to flip through its rolodex and ask about availability and price. H&H could make that streamlined inquiry knowing that any vendor it chose from its rolodex had already agreed to, for example, sell products "in original manufacturer's packaging" and litigate disputes in Michigan.

As another grounds for reconsideration, Kamstra says that in finding that the Vendor Agreement was not "a contract for the sale of goods" under § 440.2201, this Court failed to "distinguish between the 'transaction in goods' criteria for the general of Article 2 and the more specific finding of a 'contract for the sale of goods.'" (ECF No. 51, PageID.1053–1054.) Kamstra's argument proceeds this way: Article 2 of the UCC "applies to transactions in goods," the Vendor Agreement was a "transaction in goods," the Vendor Agreement was thus subject to the provisions of Article 2, one of the provisions of Article 2 is the statute-of-frauds provision, and so the Vendor Agreement was subject to the statute-of-frauds provision.

This argument is flawed. Article 2 of the UCC broadly applies to "transactions in goods" while Article 2's statute-of-frauds provision more narrowly applies to "a contract for the sale of goods." Kamstra acknowledges as much. (*See* ECF No. 51, PageID.1054 (citing *Great Lakes Exteriors, Inc. v. Dryvit Sys. Canada Ltd.*, No. 01-73173, 2002 WL 34381134, at *3 (E.D. Mich. Sept. 12, 2002)).) Because "a contract for the sale of goods" is a subset of those contracts that are

"transactions in goods," a contract may fall within the latter but without the former. *See Monetti, S.P.A. v. Anchor Hocking Corp.*, 931 F.2d 1178, 1185 (7th Cir. 1991) ("The fact that Article 2 . . . [applies] to 'transactions in goods,' § 2–102, while its statute of frauds is limited to 'contract[s] for the sale of goods,' § 2–201(1), could be thought to imply that the statute of frauds does not cover every transaction that is otherwise within the scope of Article 2."). Indeed, the Michigan Supreme Court has expressly acknowledged this possibility. In *Lorenz*, the Michigan Supreme Court found that the agreement at issue was not "a contract for the sale of goods" as that phrase is used in the statute-of-frauds provision while noting that the "agreement may fall within the broader category of 'transactions in goods.'" *Lorenz Supply Co. v. Am. Standard, Inc.*, 358 N.W.2d 845, 847 n.8 (Mich. 1984); *see also Lorenz*, 358 N.W.2d at 853 (Brickely, J.) ("I have no difficulty in finding the distributorship agreement in question to be subject to Article 2 of the UCC. The more difficult and separate question is the applicability of the Statute of Frauds . . . . I see it as a separate question because the term 'contract for the sale of goods' is clearly more restrictive than the term 'transaction in goods'."). Thus, it might follow that all "contract[s] for the sale of goods" are "transactions in goods"; but it does not follow that all contracts that are "transactions in goods" are "contract[s] for the sale of goods." The Court's logic was based on the former. Indeed, the Court never said one way or the other whether Article 2 provisions other than the statute of frauds might apply to the Vendor Agreement.

In resisting this relationship between "transaction in goods" and "a contract for the sale of goods," Kamstra cites *Imaging Fin. Servs., Inc. v. Lettergraphics/Detroit, Inc.*, 178 F.3d 1294 (table), 1999 WL 115473 (6th Cir. Feb. 9, 1999). While *Imaging* could be read to say that if a contract concerns a "transaction in goods" it is also a "contract for sale" (Kamstra's desired relationship), it appears that the appellant in *Imaging* argued that Article 2—in its entirety—did

4

not apply to the lease agreement at issue. *See* 1999 WL 115473, at *4 ("Lettergraphics claims that the transaction at issue is a lease and not a sale, *thus removing it from the ambit of the U.C.C.* and allowing application of the longer statute of limitations under Michigan general contract law." (emphasis added)). It is thus unclear whether the Court of Appeals was forced to draw a distinction between "transactions in goods" and a "contract for sale"—it only had to decide whether the lease was a "transaction in goods" to address the appellant's argument. In any event, *Imaging* is non-binding precedent so it cannot possibly show a "palpable defect" in this Court's opinion. *Carhartt, Inc. v. Innovative Textiles, Inc.*, 356 F. Supp. 3d 657, 661 (E.D. Mich. 2018) ("A 'palpable defect' is a defect that is obvious, clear, unmistakable, manifest or plain.").

Kamstra next claims that "[t]his case is not any different than *Acemco, Inc. v. Olympic Steel Lafayette, Inc.*, 2005 WL 2810716, at *3 (Mich. Ct. App. Oct. 27, 2005) which the Court acknowledges, but does not distinguish." (ECF No. 51, PageID.1051.)

But, again, a non-binding decision cannot possibly show that this Court's decision rested on unmistakable error that, if corrected, would result in a different outcome. More importantly, the contract at issue in *Acemco* specified the products that would be purchased, the price at which they would be sold, and provided that the seller would sell to buyer whatever quantities the buyer specified. 2005 WL 2810716, at *1. As explained, the Vendor Agreement mentioned no products, mentioned no prices, and did not obligate Kamstra to sell H&H anything. Thus, the fact that the agreement in *Acemco* was "a contract for the sale of goods" subject to § 440.2201 does nothing to undermine this Court's decision that the Vendor Agreement was not such a contract.

Before turning to Kamstra's other arguments for reconsideration, the Court notes that not one of the above arguments addresses this Court's alternate holding. In particular, this Court found that "the Vendor Agreement is not a 'contract for the sale of goods' as that phrase is used in

5

Michigan Compiled Laws § 440.2201 *or, if it is such a contract, it is not one that is unenforceable for lack of a quantity term.*" 2019 WL 78892, at *7 (emphasis added). So even if the above arguments were persuasive, none would justify changing the outcome.

Kamstra next claims that the Vendor Agreement is not enforceable because H&H never signed it. (ECF No. 51, PageID.1058.) According to Kamstra, *Hamilton Foundry & Mach. Co. v. Int'l Molders & Foundry Workers Union of N. Am.*, 193 F.2d 209 (6th Cir. 1951), says "'the general rule is settled that an unsigned contract can not be enforced by either of the parties.'" (ECF No. 51, PageID.1058 (quoting *Hamilton Foundry*, 193 F.2d at 213–14).)

Kamstra misquotes *Hamilton Foundry*. More completely, it says, "the general rule is settled that an unsigned contract can not be enforced by either of the parties, however completely it may express their mutual agreement, *if it was also agreed that the contract should not be binding until signed by both of them*[.]" 193 F.2d at 213–14 (emphasis added). Or, restated, the general rule is that if the parties agree that there will not be a binding contract until the contract is signed by both of them, the unsigned contract cannot be enforced by either of the parties. *See Laurence C. Smith & Laura C. Smith v. Onyx Oil & Chem. Co.*, 218 F.2d 104, 108 (3d Cir. 1955); *Loloee v. Ali*, No. 284881, 2010 WL 1330663, at *5 (Mich. Ct. App. Apr. 6, 2010).

Indeed, it is well settled that a contract merely requires offer and acceptance (and consideration) and thus can be formed without signatures—indeed, a contract can be formed without any writing at all.

And here, H&H made a *prima facie* showing of offer and acceptance. Gulas sent a copy of H&H's Vendor Agreement to Haaijer, the Kamstra sales manager with whom he had been working. The Vendor Agreement was not a draft. And no evidence suggests that Gulas invited negotiation of the Vendor Agreement's terms. The first line of the Vendor Agreement states, "By

6

signing below, the Vendor [Kamstra] agrees to all of the following in consideration of being a Vendor for H&H, sales to H&H and other good and valuable consideration . . . ." (ECF No. 40, PageID.827.) And the Vendor Agreement is bookended with a similar statement:

> Vendor certifies that the undersigned is authorized to execute this Agreement on behalf of Vendor and that the foregoing statements are true and correct, accepted and agreeable to the undersigned Vendor and all of the Terms and Conditions contained herein are accepted and affirmed this 20 day of *[February]*, 20*[0]*4.
>
> By: Harmen Haaijer
> Title: area Sales manager
>
> Accepted,
>
> _____
> H&H Wholesale Services, Inc.
> By:
> Its:

(ECF No. 40, PageID.829.) So a reasonable fact finder could find that the Vendor Agreement was an offer. *See Kloian v. Domino's Pizza L.L.C.*, 733 N.W.2d 766, 770 (Mich. Ct. App. 2006) ("An offer is defined as the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." (internal quotation marks omitted)).

And a reasonable fact finder could find acceptance. *See Brown Mtg. Co. v. Ziomek*, 692 N.W.2d 388 (Mich. Ct. App. 2004) ("[A]n acceptance sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose."). Haaijer wrote his name under the "all of the Terms and Conditions contained herein are accepted and affirmed" language and then emailed a copy of the agreement back to Gulas. (ECF No. 15, PageID.177.) Kamstra makes much of the fact that Haaijer name is printed rather than cursive. But Haaijer printed his name on the very line asking for his assent.

This case is analogous to *Remark, LLC v. Adell Broadcasting Corporation*. There, Adell drafted a settlement agreement and Remark signed and returned it to Adell; Adell never signed the agreement; but Adell's draft was an offer and Remark's signature and return an acceptance; so there was a binding contract. *See Remark, LLC v. Adell Broad. Corp.*, 702 F.3d 280, 284 (6th Cir. 2012); *see also Loloee*, 2010 WL 1330663, at *5.

As a related basis for reconsideration, Kamstra argues that the Vendor Agreement was not an offer that could be accepted but a mere "invitation to deal." (ECF No. 51, PageID.1043, 1057.) The prior paragraph on offer and acceptance addresses this argument. And, in any event, just about the only thing Kamstra does to develop its mere-invitation-to-deal argument is cite *Compass Auto. Grp., LLC v. Denso Mfg. Tennessee, Inc.*, No. 12-10919, 2013 WL 655112 (E.D. Mich. Feb. 22, 2013). But again, non-binding decisions cannot establish a palpable defect—and that is doubly true for non-binding decisions that are readily distinguishable. In *Compass*, the document in question was labeled "request for quotation" and explicitly stated "inquiry only" and "not an order." *Id.* at *1. Here, the document in question was labeled "Vendor Agreement" and, as discussed, starts and ends with the language expressly asking for Kamstra's assent.

Kamstra next argues that even if the parties at one point agreed to the terms and conditions of H&H's Vendor Agreement, the parties later agreed to Kamstra's terms and conditions. (*See* ECF No. 51, PageID.1059–1063.) Kamstra acknowledges that H&H's Vendor Agreement states, "No waiver, alteration or modification of these terms and conditions . . . shall be valid unless accepted *in writing and signed by an authorized representative of H&H*." (ECF No. 40, PageID.829 (emphasis added).) But, Kamstra argues, Gulas, as H&H's authorized representative, signed three documents containing a reference to Kamstra's terms and conditions: "To all agreements whereby we [Kamstra] act as seller our general terms and conditions of sale, delivery

8

and payment apply, and to all agreements whereby we act as buyer our general terms and conditions of purchase apply, which you have received from us, and which are also deposited at the commercial register and published at www.hollandtradinggroup.com. We expressly reject the applicability of your [H&H's] terms and conditions." The three signed documents to which Kamstra refers are (1) a 2014 customer form, (2) a 2016 customer form, and (3) a sales order confirmation.

Start with the sales order confirmation. Kamstra is correct that the sales order confirmation was for an order of Abbott strips and that mispackaged Abbott strips are at the root of this case. And Kamstra is correct that Gulas signed the sales order confirmation. And Kamstra is correct that the document contained the two-sentence boilerplate quoted in the prior paragraph, i.e., "Kamstra's Terms."

But, as this Court already explained in its prior opinion, the order reflected in the signed sales order confirmation was never fulfilled. In particular, H&H explicitly pled that the Abbott strips referenced in the signed sales order confirmation were never delivered. (ECF No. 22, PageID.380–381, ¶¶ 26, 27.) Relying on H&H's unequivocal factual assertion, this Court stated, "H&H correctly points out that the Abbott strips covered by the signed sales order confirmation were never shipped and never paid for. In other words, H&H correctly asserts that the transactions covered by the two sales order confirmations that Gulas signed did not give rise to this case," 2019 WL 78892, at *8.

Kamstra says (no less than three times) this was error. In particular, it stresses that it submitted an affidavit in connection with its Rule 12(b)(2) motion and the affidavit stated that the order reflected in the signed sales order confirmation had been completed. (*See* ECF No. 51, PageID.1045.)

But Kamstra has confused the date format on the signed sales order confirmation. The sales order confirmation for Abbott strips that Gulas signed bears the date "11-07-2016." (ECF No. 15, PageID.217.) Consistent with other sales order confirmations and invoices prepared by Kamstra (*see* ECF No. 15, PageID.185 ("21-02-2014"), ECF No. 23, PageID.457 ("21-1-2017"), ECF No. 23, PageID.458 ("26-1-2017")), "11-07-2016" was in day-month-year format. That format is common outside the U.S. and, notably, Kamstra is a Dutch company. So the signed sales order confirmation for Abbott stirps was dated July 11, 2016 (and not November 7, 2016). And it is this July 2016 order that the Court stated was not fulfilled. Kamstra's argument for reconsideration appears to stem from the fact that there are invoices for Abbott strips bearing "7/11/2016" and those orders *were* fulfilled. (*See* ECF No. 22, PageID.381 ¶ 30; ECF No. 23, PageID.452, 453.) But those invoices were again in day-month-year format and thus were dated November 7, 2016. As such, while Kamstra fulfilled those orders, that was not fulfillment of the "11-07-2016" sales order confirmation that Gulas signed. So this Court's statement that "the transactions covered by the two sales order confirmations that Gulas signed did not give rise to this case," 2019 WL 78892, at *8, was not error.[1]

That leaves the two customer forms—one from 2014 and one from 2016—as Kamstra's grounds for asserting that after the parties agreed to H&H's terms and conditions, the parties agreed to Kamstra's terms and conditions. The problem with this argument is that neither Gulas nor anyone else at H&H ever signed the 2014 or 2016 customer form. Kamstra disagrees and points

---

[1] Even if Kamstra understandably confused "7/11/2016" with "11-07-2016," that there were separate July 2016 and November 2016 orders is evidenced by the fact that the orders are for different quantities and for different total cost. In November 2016, H&H ordered and Kamstra delivered 1,445 boxes of Abbott strips for a total of $79,475; in contrast, the signed July 2016 sales order confirmation was for 10,000 boxes of Abbott strips for a total of $550,000. (*Compare* ECF No. 23, PageID.452, 453, *with* ECF No. 15, PageID.217, 218.)

10

to Gulas' printed or typed his name on these forms. (*See* ECF No. 51, PageID.1044, 1061–1063.) After all, says Kamstra, Haaijer's name on the Vendor Agreement was merely printed just like Gulas' on the two customer forms. (*See* ECF No. 51, PageID.1043.)

This argument overlooks significant, material differences in H&H's Vendor Agreement and Kamstra's customer forms. The 2014 customer form was just that—a form. True, at the bottom, in fine print, it contained Kamstra's Terms. But it was still much more a form than an agreement. (*See* ECF No. 15, PageID.179–180.) The 2014 customer form asked for H&H's address, its email, its bank, a contact in the purchase department, and a contact in the financial department. (*See id.*) Gulas' hand-printed name appears in the box for the purchase-department contact. (*See id.*) In contrast, Haaijer's hand-printed name was under a block of text stating that "Vendor [Kamstra] certifies that the undersigned is authorized to execute this Agreement on behalf of Vendor and that the foregoing statements are true and correct, accepted and agreeable to the undersigned Vendor and all of the Terms and Conditions contained herein are accepted and affirmed." (ECF No. 40, PageID.829.) Haaijer's printed name on the Vendor Agreement is thus very different than Gulas' printed name on the 2014 customer form.

The 2016 customer form is an even weaker grounds for reconsideration. True, as Kamstra asserts, Gulas typed his name in response to the field "Operational contact person, name." (ECF No. 15, PageID.211.) But the end of the 2016 customer form looks like this:

> With undersigning of this Form, the Company accepts applicability of the general terms and conditions of sale, delivery and payment of Kamstra International B.V. and its subsidiaries, to all transactions.
>
> I, as authorized representative of the company: _____, declare to have filled out all of the above correctly and truthfully:
>
> Name: _____
> Title: _____
> Place: _____
> Date: _____
> Signature: [        ]          Company Stamp: [        ]

(ECF No. 15, PageID.212.) As is apparent, Gulas left the portion of the form asking for his and H&H's assent to Kamstra's "terms and conditions of sale" completely blank. And given that Gulas completed other portions of the 2016 customer form, the omission was likely intentional. So it is more reasonable to infer that Gulas was rejecting, rather than accepting, any offer that Kamstra was making. Just the opposite is true of Haaijer and the Vendor Agreement.

In sum, none of the three documents that Kamstra claims Gulas signed—the 2014 customer form, the 2016 customer form, or the sales order confirmation—show that this Court made an "incorrect assumption," was "incorrect," or was "not correct." (ECF No. 51, PageID.1043–1046.)

Having considered another round of extensive arguments by Kamstra, the Court adheres to its prior determination that "at this stage of the case, H&H may rely on the Vendor Agreement to establish personal jurisdiction," *H&H Wholesale*, 2019 WL 78892, at *10. And, insofar as Kamstra has sought reconsideration of this Court's Rule 12(b)(6) ruling, the Court adheres to its prior determination "that it is at least plausible that the Vendor Agreement is enforceable, that H & H

did not abandon that agreement, Kamstra did not terminate it, and the parties did not mutually agree to terms that supersede it," *id.* at *10.

Kamstra's motion for reconsideration is DENIED.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: May 21, 2019

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, May 21, 2019, using the Electronic Court Filing system.

s/William Barkholz
Case Manager