UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

H&H WHOLESALE SERVICES, INC.,

      Plaintiff,

v.

KAMSTRA INTERNATIONAL, B.V.,
B&S INTERNATIONAL B.V.,
CLASS HAIR CARE (C.H.C.) B.V, and
KAFA B.V.,

      Defendants.

Case No. 2:17-cv-13422-LJM-APP
Honorable Laurie J. Michelson

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART B&S INTERNATIONAL, KAFA, AND CLASS HAIR CARE'S MOTION TO DISMISS

This case arises out of the sale of blood-glucose test strips and one company's agreement to indemnify another for losses stemming from the sale. In late 2016 and early 2017, Kamstra International, B.V., a Dutch company, sold H&H Wholesale Services, Inc., a Michigan company, thousands of boxes of blood-glucose test strips. H&H then sold some of the boxes to pharmacies and other retailers. It turned out that the packaging and instructional inserts for these boxes were counterfeit. Abbott Laboratories, the manufacturer of the strips, discovered the issue and then sued H&H in a federal court in New York. Before selling the strips to H&H, Kamstra had signed H&H's vendor agreement. Under that agreement, Kamstra said it would sell H&H genuine products, indemnify H&H for losses arising out of the sale of products, and litigate disputes in Michigan. H&H filed this lawsuit in Michigan seeking to, among other things, enforce the vendor agreement's indemnity provisions.

Over two years after suing Kamstra, H&H amended its complaint to add as defendants three companies related to Kamstra: B&S International B.V., Kafa B.V., and Class Hair Care B.V.

Like Kamstra, these are Dutch companies. But unlike Kamstra, none of these three companies signed the vendor agreement consenting to litigate in Michigan. H&H insists that personal jurisdiction over these defendants is proper because B&S is Kamstra's alter ego and Kafa and CHC are Kamstra's successors. B&S, Kafa, and Class Hair Care disagree and seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6).

As explained in detail below, H&H has not shown that B&S is Kamstra's alter ego. So the Court will not exercise personal jurisdiction over H&H's claims against B&S. H&H has also not shown that it is proper to exercise personal jurisdiction over Class Hair Care under the law of successor liability. But H&H has made a prima facie showing that Kafa is Kamstra's successor. So the Court will exercise personal jurisdiction over Kafa. And Kafa has not shown that Kamstra's claims are implausible, so those claims will not be dismissed under Rule 12(b)(6).

## I.

### A.

Before describing the events that led to this lawsuit, the Court introduces the companies that participated in those events.

Plaintiff H&H Wholesale Services, Inc. is located and incorporated in Michigan. (ECF No. 77, PageID.1207.) H&H describes itself as a "specialty distribution company." (*Id.*) As it relates to this case, H&H bought blood-glucose test strips from Defendant Kamstra International B.V. and then resold those strips to pharmacies and the like.

The four defendants—Kamstra, B&S International B.V. (B&S), Kafa B.V. (Kafa), and Class Hair Care B.V. (CHC)—are all incorporated and principally located in the Netherlands. (ECF No. 77, PageID.1207–1208.) Although the Court does not have a full picture of these entities' lines of business, it appears that Kamstra, Kafa, and CHC were, like H&H, middlemen of

sorts: they bought products and resold them as part of the manufacturer-to-consumer supply chain.

Defendants have the following parent-subsidiary relationships:



(ECF No. 77, PageID.1212.)

Seven of the companies in the above depiction use the brand name "Holland Trading Group" or "HTG." (ECF No. 77, PageID.1211.) Among these companies are Kamstra, Kafa, and CHC. (ECF No. 77, PageID.1212.) Although seven companies operate under the Holland Trading Group brand, "all Holland Group companies represent themselves as one company and brand to the outside world." (ECF No. 77, PageID.1211.) Indeed, the Holland Trading Group companies share a website and social media accounts. (ECF No. 77, PageID.1214.) And when Kamstra's sales manager first solicited H&H's business, he told H&H that he was employed by "Holland Trading Group" and that the entity was a 100-year-old, €1 billion company. (ECF No. 77, PageID.1209.)

As also shown in the corporate hierarchy, B&S is the corporate "great grandfather" of Kamstra, Kafa, and CHC. In particular, B&S is the majority shareholder of B&S Holland Trading Group B.V., which, in turn, is the sole owner of Holland Trading Group Health & Beauty B.V.,

which, in further turn, is the sole owner of Kamstra, Kafa, and CHC. (ECF No. 83, PageID.1308.) More simply, B&S, through two other companies, owns a majority share of its great-grandchildren, Kamstra, Kafa, and CHC. B&S' CEO is Bert Meulman; he also is the CEO of the Holland Trading Group. (ECF No. 77, PageID.1210, 1214.) At least during the events giving rise to this suit, Annette Enter served as B&S' legal counsel. (*See* ECF No. 88, PageID.1742–1743.)

According to H&H, the seven companies operating under the Holland Trading Group brand share resources. H&H says that B&S shares the following with Kamstra, Kafa, and CHC: a building address, office space, enterprise resource planning software, and IT, legal, and financial departments. (ECF No. 77, PageID.1213, 1234, 1238.) B&S' "audit and risk committee" also oversees Kamstra, Kafa, and CHC. (ECF No. 77, PageID.1237.) Further, B&S, Kamstra, Kafa, and CHC file consolidated tax returns. (ECF No. 83, PageID.1311.)

Kamstra only employed two or three people during times relevant to this suit. (*See* ECF No. 77, PageID.1230–1232.) One of these employees was Jeoren Erents, Kamstra's Area Sales Manager. (ECF No. 77, PageID.1217; ECF No. 15, PageID.196.) Erents' supervisor was Pieter Bottenberg. (ECF No. 77, PageID.1213.) Oddly though, Bottenberg did not work for Kamstra; instead, Bottenberg was an employee of Class International B.V., one of Kamstra's sister companies. (ECF No. 77, PageID.1213.)

**B.**

With that background on the parties, the Court turns to the events culminating in this lawsuit.

In February 2014, one of Kamstra's area sales manager at the time (not Erents) signed H&H's Vendor Application and Agreement. (ECF No. 77, PageID.1214.) Under the Vendor Agreement, Kamstra promised several things, including that products it sold to H&H would be

"genuine and authentic," that it would indemnify H&H for losses arising out of a breach of the Vendor Agreement (including not selling H&H genuine products), and that disputes relating to the Vendor Agreement would be litigated in Michigan. (ECF No. 77, PageID.1249–1252.)

It took a while for Kamstra to actually sell any goods to H&H, but from November 2016 to April 2017, Kamstra sold H&H about 24,000 boxes of blood-glucose test strips made by Abbott. (ECF No. 77, PageID.1217–1221.) Erents handled the sales for Kamstra. (*Id.*)

Problems soon followed. While the Abbott test strips Kamstra sold H&H were genuine, the packaging and instructions for the strips were not. (ECF No. 77, PageID.1223.) Abbott got wind of the issue and, in late May 2017, sued H&H in federal court in New York. (*Id.*) (This was not the first time Abbott had sued H&H over the sale of blood-glucose test strips. *See Abbott Labs. v. H&H Wholesale Servs., Inc.*, No. 17CV3095, 2018 WL 2459271, at *1 (E.D.N.Y. Mar. 9, 2018) (briefly describing litigation history).) The federal court in New York issued an order permitting Abbott to seize several hundred thousand dollars' worth of Abbott strips from H&H. (ECF No. 77, PageID.1243.) Abbott executed the seizure order on May 24, 2017. (*Id.*)

Throughout June 2017, B&S and Kamstra employees, perhaps concerned that Abbott may soon turn its eye toward them, discussed Abbott's suit against H&H. These discussions were primarily among Erents (Kamstra's Area Sales Manager who sold the strips to H&H), Bottenberg (Erents' supervisor who worked at Kamstra's sister company), Enter (B&S' legal counsel), and Meulman (B&S' CEO). For instance, on June 5, 2017, Enter discussed Abbott's seizure of the strips with H&H's then-counsel. (ECF No. 123, PageID.6288.) Two days later, Meulman apparently got notice that Abbott had subpoenaed the company that Kamstra had used to deliver the strips to H&H. (*See* ECF No. 128, PageID.6322–6323.) He emailed Bottenberg, "What is this?," which prompted Bottenberg to explain the seizure. (*Id.*) Meulman responded, "Seriously?"

5

(*See* ECF No. 128, PageID.6322.) Bottenberg also told Meulman that "Things are suddenly happening pretty fast now. We'll keep you posted." (*Id.*) At one point in the June 2017 discussions, Meulman instructed Bottenberg, "Do not provide data without my consent." (ECF No. 128, PageID.6322.) And in late June 2017, Enter, B&S' counsel, had some discussions with an attorney for the delivery company. Enter asked the attorney, "If you speak to Abbot[t]'s lawyer, can you (strictly anonymous, not our behalf) try to find out whether it would be possible to close the case if we provide all information about our supplier to Abbott?" (ECF No. 128, PageID.6329.)

B&S' and Kamstra's efforts to close the case did not work. To the contrary: Abbott sued Kamstra in the Netherlands "shortly after" Abbott seized the strips from H&H in May 2017. (ECF No. 77, PageID.1243.)

In July 2017, Kamstra sold all of its inventory to one of its sister companies, Kafa, and, effectively, closed up shop. Under the inventory-purchase agreement, Kamstra and Kafa acknowledged that two other Kamstra companies (Kamstra Export and Kamstra Liquors) were known in the alcoholic-beverage market, that it was desirable to have the "Kamstra" name be associated only with alcoholic beverages, and that Kamstra's activities related to pharmaceutical products would thus continue within Kafa. (ECF No. 83, PageID.1328.) Kamstra agreed to sell all its unsold inventory to Kafa. (*See id.*) Kafa paid "book value" to Kamstra, which was €1.9 million. (ECF No. 83, PageID.1312.) (This Court understands "book value" to be what Kamstra paid for the goods, less depreciation.) Under the agreement, Kafa would sell all the inventory it bought from Kamstra and provide Kamstra with the profits. (ECF No. 83, PageID.1313, 1330.) When Kamstra stopped operating, Meulman gave Erents a new job at Kafa; Kamstra's only other employee also went to work for Kafa. (ECF No. 77, PageID.1235–1236.)

After Kafa sold off the inventory it bought from Kamstra, and gave the profits from those sales to Kamstra, Kamstra had €2.9 million (about $3.4 million) in its bank account. (ECF No. 83, PageID.1313–1314.) But with no inventory and no employees, it appears that is all Kamstra was— a bank account. It retains that status today, but now there is only €835,000 (approximately $1 million) in the account. (ECF No. 83, PageID.1349.)

Although Kamstra was winding down, Erents continued to work on a sale to H&H. On July 5, 2017, Erents emailed H&H that "goods are ready to be loaded, but . . . we will do all cosmetics through Kafa B.V." and "because you have to send the money to Kamstra we need to have the attached statement signed so we can internally transfer the funds." (ECF No. 77, PageID.1232.) Erents' email signature included the name of his new company, "Kafa." (ECF No. 77, PageID.1232.)

About a year later, Erents and the person who joined Kafa with Erents both went to work for Class Hair Care. (ECF No. 77, PageID.1207, 1234, 1245.) Like Kamstra, Kafa may no longer be an operating business. (*See* ECF No. 77, PageID.1234.)

## C.

With Abbott's suit against H&H ongoing in New York, H&H was incurring large legal fees and potentially facing millions in damages. So H&H asked Kamstra to indemnify it; Kamstra refused. Thus, in October 2017, H&H filed this lawsuit against Kamstra here, in the Eastern District of Michigan. H&H claimed, among other things, that Kamstra breached the Vendor Agreement by not selling it completely genuine test strips and refusing to indemnify it.

Over the next two-and-half-years, H&H and Kamstra actively litigated the case. This Court refereed many disputes, including a motion to dismiss by Kamstra and a variety of discovery skirmishes. As relevant here, the Court previously found that H&H had made a prima facie

showing that the Vendor Agreement applied to Kamstra's sale of test strips to H&H, and thus the forum-selection clause in the Vendor Agreement permitted this Court to exercise personal jurisdiction over Kamstra. *See H&H Wholesale Servs., Inc. v. Kamstra Int'l, B.V.*, 373 F. Supp. 3d 826, 840 (E.D. Mich. 2019); *H&H Wholesale Servs., Inc. v. Kamstra Int'l, B.V.*, No. 17-13422, 2019 WL 2183127, at *6 (E.D. Mich. May 21, 2019). The two companies continue to spar, and in a separate opinion entered today, the Court addresses Kamstra's second motion to dismiss.

But this opinion does not address H&H's disagreement with Kamstra, it instead addresses H&H's disagreement with B&S, Kafa, and CHC. In April 2020, H&H filed its third amended complaint and added B&S, Kafa, and CHC as defendants. (ECF No. 77.) Although it was Kamstra that signed the Vendor Agreement and sold H&H the test strips that have caused all the trouble, H&H alleges that B&S is Kamstra's alter ego. (*Id.* at PageID.1208, 1239–1240.) As for Kafa and CHC, H&H alleges that they are simply Kamstra reincarnate, and so Kafa and CHC can be held liable under the law of successor liability. (*Id.* at PageID.1208, 1236, 1244.)

B&S, Kafa, and CHC now seek dismissal. (ECF No. 83.) They point out that they have not themselves done any business in Michigan. (*Id.* at PageID.1276.) So, they argue, this Court can exercise personal jurisdiction over H&H's claims against them only if the forum-selection clause in the Vendor Agreement also extends to them. But, they say, that would only be true if B&S is Kamstra's alter ego and if Kafa and CHC are Kamstra's successors. Yet neither is true, they argue. (*Id.* at PageID.1281–1292.) So B&S, Kafa, and CHC seek dismissal for lack of personal jurisdiction under Rule 12(b)(2). And, to the extent the Court can exercise personal jurisdiction, B&S, Kafa, and CHC say H&H's claims are not adequately pled and thus must be dismissed under Rule 12(b)(6).

## II.

As this Court said earlier in this case, "jurisdiction before merits." *H&H Wholesale Servs., Inc. v. Kamstra Int'l, B.V.*, 373 F. Supp. 3d 826, 833 (E.D. Mich. 2019).

## A.

A district court resolving a Rule 12(b)(2) motion can choose one of three procedural routes. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). The chosen route affects the plaintiff's burden of establishing personal jurisdiction and the deference owed to the plaintiff's portrayal of the facts. *Id.*

One route is to proceed on the papers. When the determination is based on only the complaint and the parties' affidavits, the plaintiff need only make out a prima facie showing of personal jurisdiction. *Theunissen*, 935 F.2d at 1458. And along this procedural route, the Court "must consider the pleadings and affidavits in the light most favorable to the plaintiff." *Serras v. First Tennessee Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). Also, "[w]here a motion to . . . dismiss is filed, supported by affidavits, the non-moving party may not rest upon allegations or denials in his pleadings but his response by affidavit or otherwise must set forth specific facts showing that the court has jurisdiction." *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929–30 (6th Cir. 1974); *accord Serras*, 875 F.2d at 1214; *Theunissen*, 935 F.2d at 1458. That means that if the defendant submits an affidavit that contradicts allegations in the complaint, the Court need not accept the contradicted allegations in the complaint as true. *See Weller*, 504 F.2d at 929–30; *Theunissen*, 935 F.2d at 1458. But what if the plaintiff does not merely "stand on [its] pleadings" and does "by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction"? In that case, "the court disposing of a 12(b)(2) motion does not weigh the controverting assertions of the" defendant. *Id.* at 1459; *see also Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280,

9

1285 (9th Cir. 1977) (providing that a defendant should not be able to "obtain a dismissal simply by controverting the facts established by a plaintiff through his own affidavits and supporting materials"), *cited with approval in Serras*, 875 F.2d at 1214. So, in short, the Court accepts the non-conclusory factual allegations in the complaint unless the allegations are contradicted by the defendant's affidavit; but the plaintiff's affidavit is the ultimate trump card—the facts asserted in the plaintiff's affidavit are accepted as true for purposes of resolving the motion even if they contradict facts asserted in the defendant's affidavit.

Another route to resolving a Rule 12(b)(2) motion is to hold an evidentiary hearing. This procedure allows the Court to make credibility determinations to resolve competing factual allegations. Under this approach, the plaintiff's burden goes up; it must establish personal jurisdiction by a preponderance of the evidence. *Serras*, 875 F.2d at 1214.

There is a middle road too: the Court can permit discovery of the jurisdictional facts. If discovery is undertaken but the facts remain disputed, that does not heighten the plaintiff's burden—it is still just a prima facie showing of personal jurisdiction. *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998). But if no facts remain in dispute after discovery, the Sixth Circuit has indicated, but arguably not held, that the plaintiff's burden is a preponderance of the evidence. *See Schneider v. Hardesty*, 669 F.3d 693, 699 (6th Cir. 2012).

The Court elects to proceed on the papers. The parties have not asked for an evidentiary hearing. And while the parties have attached some discovery to their briefs, no one says that no more jurisdictional discovery is needed and that there are no jurisdictional facts in dispute. *See Schneider*, 669 F.3d at 699. So, the Court will decide the motion on the pleadings and affidavits. That means that H&H need establish only a prima facie case of personal jurisdiction, and the Court

10

accepts plaintiff's account of the jurisdictional facts—unless the factual allegation appears only in the third amended complaint and is contradicted by Defendants' affidavit.

Two more points about the legal standard. "'[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court.'" *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002)). And, as this Court's subject-matter jurisdiction is premised on diversity of citizenship, this Court applies the alter-ego and successor-liability law of the forum state, here Michigan. *See Estate of Thomson*, 545 F.3d at 361.

**B.**

With the legal standard in place, the Court turns to H&H's claim that B&S is the alter ego of Kamstra.

"Michigan courts will not disregard the separate corporate existence of a subsidiary unless it is 'a mere instrumentality' of the parent corporation." *United Ins. Grp. Agency, Inc. v. Patterson*, No. 299631, 2011 WL 5067251, at *2 (Mich. Ct. App. Oct. 25, 2011). The following facts tend to show that a parent and subsidiary are alter egos:

- the parent and subsidiary share principal offices,
- they share board members or executives,
- all of the parent's revenue comes from the subsidiary's sales,
- all capital for the subsidiary is provided by the parent,
- the subsidiary purchases supplies exclusively from the parent,
- the subsidiary is seriously undercapitalized,
- the parent regularly provided gratuitous services to the subsidiary,
- the parent handled the subsidiary's payroll, and
- the parent directed the policies and decisions of the subsidiary.

11

*Id.* at *2 (paragraphing altered); *accord Anwar v. Dow Chem. Co.*, 876 F.3d 841, 851 (6th Cir. 2017) (applying Michigan law).

But as is often true with multi-factor tests, the listed factors are not exhaustive, no one factor is dispositive, and not all factors apply in every case. *See Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798–99 (6th Cir. 2007) (providing that the alter ego "inquiry tends to be intensively fact-driven."); *Police & Fire Ret. Sys. of the City of Detroit v. Leibowitz*, No. 329048, 2017 WL 603551, at *2 (Mich. Ct. App. Feb. 14, 2017) ("There is no single rule delineating when the corporate entity may be disregarded." (internal quotation marks omitted)). Indeed, at bottom, disregarding corporate formalities comes down to fairness. *See Servo*, 475 F.3d at 798–99 ("The propriety of piercing the corporate veil is highly dependent on the equities of the situation."); *Dep't of Consumer Indus. Servs. v. Shah*, 600 N.W.2d 406, 411–12 (Mich. Ct. App. 1999) ("A court's treatment of a corporate entity clearly rests on notions of equity.").

Here, B&S did not abuse corporate formalities to an extent that it is fair to hold B&S liable for Kamstra's actions.

That is not to say that B&S and Kamstra do not satisfy some of the factors. As H&H points out, Kamstra and B&S shared an address and office space. (ECF No. 77, PageID.1213.) Further, it appears that Kamstra did not have its own IT, financial, or legal department and thus used B&S'. (ECF No. 77, PageID.1213, 1238.) And B&S' "audit and risk committee" oversaw all the companies that operated under the Holland Trading Group brand, including Kamstra. (ECF No. 77, PageID.1237.) B&S and Kamstra filed consolidated tax returns too. (ECF No. 83, PageID.1311.) Kamstra used the same enterprise resource planning system as B&S, which apparently allowed Kamstra, Kafa, and CHC to look up the inventory across the three sister

companies. (ECF No. 77, PageID.1234–1235.) Further, employee relationships extended from Kamstra to B&S: Erents (Kamstra) reported to Bottenberg, and Bottenberg reported to Meulman (B&S). (ECF No. 77, PageID.1213–1214.) So H&H's claim that B&S and Kamstra are alter egos is not out of left field.

But despite some overlap between B&S and its corporate great-grandchild, the companies were separate in many important ways. Kamstra did not buy its supplies or inventory from B&S, and while the HTG companies bought some things as a group (e.g., office supplies, computers), each HTG company paid its share. (ECF No. 83, PageID.1310–1311.) B&S and Kamstra kept separate financial records and bank accounts, and while tax returns were consolidated, Kamstra paid its own share of the taxes. (ECF No. 83, PageID.1311.) B&S and Kamstra had separate inventory and assets. (ECF No. 83, PageID.1309.) Kamstra was not wholly capitalized by B&S either; Kamstra generated its own revenue by selling its own inventory. (ECF No. 83, PageID.1310.) And H&H does not allege that B&S derived almost all of its revenue from Kamstra, and given that B&S has at least 11 direct or indirect subsidiaries (ECF No. 77, PageID.1212), it seems highly unlikely that was the case. Further, B&S did not manage Kamstra's payroll or pay Kamstra's payroll expenses. (ECF No. 83, PageID.1311.) Collectively, these factors favor a finding that B&S and Kamstra were not and are not alter egos. *See Anwar v. Dow Chem. Co.*, 876 F.3d 841, 851 (6th Cir. 2017) (finding that "uncle" and "nephew" corporations were not alter egos where plaintiff failed to allege that the corporate uncle received revenue from the corporate nephew, that the corporate nephew was undercapitalized, or that the corporate uncle handled the corporate nephew's payroll).

In addition to the factors so far discussed, courts have examined whether the parent manages the day-to-day operations of the subsidiary in answering the alter ego question.

13

In *Wang v. Gen. Motors, LLC*, for instance, the subsidiary received no financial assistance from its parent, and the two companies had separate offices, bank accounts, records, boards of directors, and human resources departments. No. CV 18-10347, 2020 WL 4474163, at *3, 7 (E.D. Mich. Aug. 4, 2020). Despite a great deal of corporate separateness, the court found a prima facie case of personal jurisdiction under an alter ego theory. It was significant to the court that the individuals who controlled the subsidiary were in fact employees of the parent, and the chain-of-command and organizational structure reflected that the parent had "operational control" over the subsidiary. *See id.* at *7.

*United Ins. Grp. Agency, Inc. v. Patterson*, No. 299631, 2011 WL 5067251 (Mich. Ct. App. Oct. 25, 2011), presents the other side of the coin: the parent shared considerable resources with the subsidiary, but the parent did not control the subsidiary's day-to-day operations. The parent corporation paid rent for some of its subsidiary's offices, paid the subsidiary's payroll, and provided administrative and financial support for the subsidiary. *Id.* at *1, 3. But the subsidiary had its own offices, the parent was not alleged to have derived a substantial portion of its revenue from the subsidiary, and, significantly, the parent did not treat the subsidiary's project as its project. *See id.* at *3. Although the parent had the power to shut down the subsidiary at any time, the plaintiff could point to no evidence that the parent "had an active role in the day-to-day decision-making" of the subsidiary. *Id.* at *3. In all, the plaintiff had not made a prima facie showing of personal jurisdiction over the subsidiary under an alter ego theory.

Here, H&H has not adequately alleged or evidenced that B&S controlled the day-to-day operations of Kamstra. Erents, who worked for Kamstra, was the person who sold H&H the test strips that gave rise to this case. True, Erents testified that he used a sales-order-confirmation template created by B&S and that when he received a contract from a new customer, he needed

B&S' legal department to approve the contract. (ECF No. 77, PageID.1238.) But it appears that Erents had authority to sell H&H products on Kamstra's behalf. (ECF No. 15, PageID.206–208, 214, 218.) As for the chain of command, while Erents reported to Bottenberg who reported to Meulman, Defendants aver that the buck stopped with Bottenberg; they say he handled the day-to-day operations of Kamstra. (ECF No. 83, PageID.1310.) And Bottenberg "was not an employee, officer, or director of B&S." (*Id.*) Thus, it appears that B&S did not have the type of control over Kamstra's operations that would warrant finding that the two companies are, in fact, one and the same.

All things considered then, H&H has not made a prima facie showing that B&S and Kamstra are alter egos.

Resisting this conclusion, H&H makes much of the fact that when Kamstra got in hot water, B&S stepped in. Recall that shortly after Abbott seized the strips from H&H and shortly after Abbott sued Kamstra, Kamstra sold its inventory to Kafa, and Kamstra's only two employees went to work for Kafa. And H&H points out that B&S' CEO, Meulman, gave Erents the job at Kafa. (ECF No. 77, PageID.1235–1236.) In H&H's view, B&S "orchestrated the shutdown of Kamstra and transferred its employees to Kafa." (ECF No. 88, PageID.1756.)

In this Court's view, that Kamstra turned to its corporate great-grandparent for help when trouble with Abbott was brewing does not show that B&S was Kamstra's alter ego. In fact, whether a subsidiary should continue to exist is the type of macromanagement that is expected of a corporate parent. *See United Ins. Grp. Agency, Inc. v. Patterson*, No. 299631, 2011 WL 5067251 (Mich. Ct. App. Oct. 25, 2011) (providing that parent's ability to "shut down" its subsidiary did not justify a finding that parent and subsidiary are alter egos); *cf. Anwar v. Dow Chem. Co.*, 876 F.3d 841, 850 (6th Cir. 2017) ("Anwar did not allege facts, aside from those demonstrating

possible *macromanagement*, that MEG International is the alter ego of MEG Americas under federal law." (emphasis added)). And Meulman's reaction in Bottenberg's emails relating to the seizure—"What is this?" and "Seriously?"—only underscores that Meulman was not privy to Kamstra's day-to-day happenings.

* * *

Having considered the totality of the circumstances, this is not a case where equity dictates that corporate formalities be set aside and that a parent be held liable for the acts of its subsidiary (or, more accurately, its sub-sub-subsidiary). Kamstra generated its own revenue, had its own inventory, kept its own bank account, and managed its own daily operations. B&S and Kamstra were separate enough for purposes of deciding whether to exercise personal jurisdiction over B&S. *See United Ins. Grp.*, 2011 WL 5067251, at *3 ("[I]t is not clear that observing the corporate form of Amerilife Group's subsidiaries will subvert justice. [Plaintiff] will merely be required to file suit against Amerilife Group in another jurisdiction."). This Court will not exercise personal jurisdiction over B&S.

## C.

Having settled the personal-jurisdiction dispute between B&S and H&H, the Court turns to the like dispute between H&H and Kamstra's corporate sisters, Kafa and CHC. H&H says that the law of successor liability permits this Court to exercise personal jurisdiction over its claims against Kafa and CHC.

H&H is correct that if it establishes a prima facie case of personal jurisdiction over Kamstra, and if Kafa and CHC assumed Kamstra's liabilities, then this Court may exercise personal jurisdiction over Kafa and CHC. *See Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008). In two prior opinions and in a

16

third entered today, the Court found that H&H has established a prima facie case of personal jurisdiction over Kamstra. Thus, the question that needs to be answered here is whether Kafa and CHC assumed Kamstra's liabilities under the law of successor liability. If so, the Court may exercise personal jurisdiction over H&H's claims against Kafa and CHC. In answering that question, the Court again applies Michigan law. *See Estate of Thomson*, 545 F.3d at 362.

Under Michigan law, when a company pays cash for another company's assets, the purchaser is generally not responsible for the seller's liabilities. *Foster v. Cone-Blanchard Mach. Co.*, 597 N.W.2d 506, 509 (Mich. 1999). But general rules often have exceptions, and in fact, there are five situations where a company buying another company's assets will inherit the seller's liabilities. *Id.* H&H says that the facts of this case fit three of the exceptions: (1) the transaction between Kamstra and Kafa was fraudulent, (2) "elements of a purchase in good faith were lacking" or "the transfer was without consideration and the creditors of the transferor were not provided for," and (3) Kafa and CHC are "a mere continuation or reincarnation" of Kamstra, *id.* at 509–10. (ECF No. 88, PageID.1761–1762.)

The question of whether a company is a "mere continuation" of another, is similar to the question of whether two companies are alter egos: "Michigan courts examine the totality of the circumstances and engage in a multi-factor analysis." *Stramaglia v. United States*, 377 F. App'x 472, 475 (6th Cir. 2010). Two factors function like requirements: the predecessor and successor companies must have a common owner and the predecessor must have sold substantially all of its assets to the successor. *Id.*; *see also Retail Works Funding LLC v. Tubby's Sub Shops Inc.*, No. 332453, 2017 WL 3798500, at *6 (Mich. Ct. App. Aug. 31, 2017). Besides those two quasi-requirements, "the most important consideration appears to be the nature of the business performed by the successor corporation—that is, whether its main corporate purpose was to conduct the same

business as its predecessor." *Stramaglia*, 377 F. App'x at 475. Courts also consider whether the successor retained the predecessor's employees, whether the successor occupies the predecessor's place of business, and whether the successor paid some of the predecessor's debts. *Id.*

Gauged by these factors, H&H has made a prima facie showing that Kafa was a "mere continuation" of Kamstra.

The two prerequisites are met. HTG Health and Beauty B.V. was (or, perhaps, still is) the sole shareholder of both Kamstra and Kafa. (ECF No. 83, PageID.1308.) Further, Kamstra sold virtually all of its inventory to Kafa. As for other assets, the Court is not aware of anything significant retained by Kamstra. Indeed, Kamstra admits its inventory was its "primary asset" and that the equity in Kamstra was sold to a company that handles wind-downs for €1. (ECF No. 83, PageID.1312, 1314.)

Turning to the next most important consideration, Kafa argues it did not continue Kamstra's business, and, in support, points to a snippet of Erents' testimony. Erents stated that he left Kamstra because "[w]e wanted to focus more on dermo-cosmetics and not so much on medical disposables." (ECF No. 77, PageID.1236.) From this, Kafa argues that Kamstra's business was medical disposables while its own was cosmetics—two different lines of business. But Erents did not say that Kamstra *only* sold medical disposables or that Kafa *only* sold cosmetics.

And other evidence strongly suggests that Kafa continued—at least for a time—the business of Kamstra. For one, take the inventory-purchase agreement. It states that both Kafa and Kamstra "have a history . . . of . . . wholesale . . . of pharmaceutical products." (ECF No. 83, PageID.1327.) And even stronger, the agreement states, "it was decided in the spring of 2017 to associate the Kamstra label exclusively with selling and distributing alcoholic beverages, and therefore *to continue the remaining activities relating to pharmaceutical products with Kafa.*"

18

(ECF No. 83, PageID.1327 (emphasis added).) And, for a time at least, Kafa literally continued Kamstra's business: it purchased Kamstra's inventory and then sold that very inventory to third parties. Moreover, Erents, as an employee of Kafa, continued to work on a sale to H&H that he had started when he was an employee of Kamstra. In a July 2017 email to H&H, Erents stated, "goods are ready to be loaded, but . . . we will do all cosmetics through Kafa B.V." and "because you have to send the money to Kamstra we need to have the attached statement signed so we can internally transfer the funds." (ECF No. 77, PageID.1232.) Add to all this that Kamstra and Kafa both use the "Holland Trading Group" or "HTG" brand, including the brand's website and social media. (ECF No. 77, PageID.1214.) So, reading the papers under the light most favorable to H&H, it is reasonable to infer that Kafa continued Kamstra's business.

As for the other considerations bearing on the mere-continuation inquiry, Kamstra's only two employees immediately went to work for Kafa, and Kafa's office is on the same property as Kamstra's (if not the very same office space).

In all then, the papers suggest that Kafa was a "mere continuation" of Kamstra. And that is enough at this stage of the case. *See Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) ("[T]he plaintiff must make only a prima facie showing that personal jurisdiction exists in order to defeat dismissal.").

Kafa and Kamstra make much of the fact that Kafa bought all of Kamstra's inventory at book value (what Kamstra paid for it, less depreciation) and, when Kafa later sold that inventory to third parties, it gave the gross profits to Kamstra. (ECF No. 83, PageID.1278, 1312–1313.) The result was that Kamstra received market value for its inventory.

Point taken; but the point does not show that Kafa was not a mere continuation of Kamstra. The fact that Kamstra ended up getting market value for its inventory is more relevant to the

fraudulent transaction or inadequate consideration means of proving successor liability than it is the mere continuation means. Moreover, the manner in which Kamstra received market value for its inventory cuts against Kafa and Kamstra's position rather than in favor of it. Kamstra could have wound down by not purchasing new inventory and selling off its existing inventory over time. Instead, Kamstra sold all its inventory to Kafa at once, immediately stopped operations, had Kafa sell its inventory, and then received the profits from Kafa. This was a more convoluted way of accomplishing what Kamstra could have done itself. Why go through all the trouble? On this record, it appears that it was because Abbott Laboratories had dropped the hammer. So while Kamstra may have ultimately received market value for its inventory, the manner and timing of its sale to Kafa suggests something short of an arms-length transaction.

Before concluding, the Court notes that deeming Kafa to be Kamstra's successor is consistent with the principle underlying the "mere continuation" doctrine. Essentially, the doctrine aims to prevent a company from selling off its assets to avoid liability while, at the same time, allowing shareholders to benefit from the sale. *See Stramaglia*, 377 F. App'x at 475. True, Kamstra sold its assets at market value and received about $3.4 million to cover its liabilities. But had Kamstra continued operating, the pot would likely be larger—in addition to existing inventory, Kamstra would have earned profits from all the inventory sold between July 2017 and today. And the value of the inventory Kamstra sold to Kafa is not enough to cover Kamstra's potential liabilities. If the Vendor Agreement controls, Kamstra may well have to indemnify H&H; and, according to H&H, its legal fees for the Abbott case—let alone liability—are in the millions. (ECF No. 77, PageID.1205.) Thus, when Kamstra sold its inventory and closed up, it arguably sought to become judgment proof beyond the market value of its inventory while having some idea that its

liabilities could exceed that amount. So viewed, the purpose of the mere continuation doctrine is forwarded by finding Kafa to be Kamstra's successor.

So far, the Court has not said a word about CHC. But the Court need not say much. H&H says that the two employees who left Kamstra for Kafa have since left Kafa for CHC. (ECF No. 77, PageID.1245.) And H&H says that Kafa is now shut down. (*Id.*) But H&H says little else. As there is no evidence that CHC—which apparently sells haircare products (ECF No. 83, PageID.1343)—purchased substantially all of Kafa's assets or has continued Kafa's line of business, it is not reasonable to infer that CHC is a mere continuation of Kamstra. Nor is there a basis to conclude that any asset purchase by CHC was fraudulent or without adequate consideration from Kafa. So, on this record, this Court will not exercise personal jurisdiction over CHC under the doctrine of successor liability.

\* \* \*

To sum up, H&H has established a prima facie case that Kafa assumed Kamstra's liabilities under the "mere continuation" doctrine. In prior opinions and in another entered today, the Court has found that H&H established a prima facie case of personal jurisdiction over Kamstra. So the Court will exercise personal jurisdiction over H&H's claims against Kafa. H&H has not made the required showing as to CHC, so CHC will be dismissed.

## III.

Because the Court will not exercise personal jurisdiction over B&S and CHC, the Court need only address Kafa's assertion that H&H's claims are subject to dismissal under Rule 12(b)(6).

## A.

In deciding a Rule 12(b)(6) motion, the Court construes the third amended complaint "in the light most favorable" to H&H and determines whether it "contain[s] sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012). What is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

B.

In Count IV of its complaint, H&H says that Kafa is liable under Michigan's Voidable Transactions Act. (ECF No. 77, PagID.1243–1245.) Under this Act, if certain conditions are met, a current or future creditor may void a debtor's transfer of its assets. *See* Mich. Comp. Laws §§ 566.34, 566.35. H&H alleges that "Kafa B.V. absorbed Kamstra's operations, employees, and assets" (*id.* at PageID.1208) and "any transfers that Kamstra made to Kafa should be voided, and H&H is entitled to judgment from . . . Kafa . . . in the amount of those transfers" (*id.* at 1245).

But H&H's complaint does not specify which of the Act's relief provisions applies. So Kafa assumed that H&H had sought relief under § 566.37(2). That provisions states, "If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds." *Id.* Because H&H has not yet obtained a judgment, Kafa argued that H&H's "claim for relief under Section 566.37(2) is premature, and fails as a matter of law." (ECF No. 83, PageID.1302.)

In its response, H&H clarifies that it does not seek relief under § 566.37(2), but, instead, under § 566.37(1)(a) and § 566.38(2)(a). (ECF No. 88, PageID.1765–1766.) These two provisions work together: if a court finds a transfer voidable to satisfy a creditor's claim under § 566.37(1)(a), then under § 566.38(2)(a) "the creditor may recover a judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less." As for

22

§ 566.37(2)—the provision that Kafa thought applied—H&H says that "§ 566.37(2) is simply not pertinent to H&H's claims under the [Act]." (ECF No. 88, PageID.1766.)

H&H's clarification *mostly* resolves the parties' dispute over the plausibility of H&H's Voidable Transactions Act claim. Although H&H is not permitted to amend its complaint via its response brief, dismissal with prejudice would be an overly harsh result for failing to specify a remedy provision. And so even if H&H's claim is inadequately pled for failing to specify § 566.37(1)(a) and § 566.38(2)(a), the Court would permit H&H to amend Count IV to identify those provisions of the Act.

The Court stated that H&H's clarification "mostly" resolves the parties' dispute because Kafa makes one other point worth exploring. In its complaint, H&H says that Kamstra transferred "assets, operations, and employees" to Kafa. (ECF No. 77, PageID.1206.) But, as Kafa points out, H&H never says which assets or operations. And while the employees are specified in the complaint, Kafa argues that employees are not "assets" that can be fraudulently transferred under the Act. (*Id.*)

In light of this argument, the Court will require H&H to specify the transferred assets or obligations it seeks to avoid under the Act. *See* Mich. Comp. Laws §§ 566.37(1)(a) (permitting "[a]voidance of the transfer or obligation"), 566.37(q) (defining "transfer" as "parting with an asset or interest in an asset"); 566.37(b) (defining "asset"). Leave to amend is limited to adding a sentence or two to Count IV to specify the transfer that H&H seeks to avoid.

## C.

Kafa also moves to dismiss the other counts in H&H's complaint. But in support, Kafa merely incorporates its arguments about personal jurisdiction. (ECF No. 83, PageID.1297.) The Court has already found that H&H has established a prima facie case of successor liability

sufficient for this Court to exercise personal jurisdiction over H&H's claims against Kafa. And to the extent that the Court relied on materials not referenced in and central to the complaint, *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008), in deciding personal jurisdiction, the Court believes that H&H could readily amend its complaint to include the additional factual matter. Accordingly, the Court will not dismiss H&H's other claims against Kafa for the same reasons that it will exercise personal jurisdiction over Kafa.

## IV.

For the reasons given, the Court GRANTS IN PART and DENIES IN PART B&S International, Kafa, and Class Hair Care's motion to dismiss (ECF No. 83). H&H's claims against B&S International and Class Hair Care are DISMISSED for lack of personal jurisdiction and B&S International and Class Hair Care are DISMISSED from this case. All of H&H's claims against Kafa remain part of this case. H&H is to file its fourth amended complaint, with changes limited to those described above, by December 19, 2020.

SO ORDERED.

Dated: December 14, 2020

s/Laurie J. Michelson_____
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE