UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| H&H WHOLESALE SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> KAMSTRA INTERNATIONAL, B.V., <br> B&S INTERNATIONAL B.V., <br> CLASS HAIR CARE (C.H.C.) B.V, and <br> KAFA B.V., <br><br> Defendants. | Case No. 2:17-cv-13422-LJM-APP <br> Honorable Laurie J. Michelson |

**OPINION AND ORDER
DENYING KAMSTRA'S SECOND MOTION TO DISMISS [84]**

In 2016 and 2017, H&H Wholesale Services, Inc. bought blood-glucose test strips from Kamstra International, B.V. While the strips were fine, the packaging and instructions for the strips were not completely genuine. The manufacturer of the test strips, Abbott Laboratories, caught the problem and sued H&H in a federal court in New York.

H&H turned around and sued Kamstra in this case. H&H alleges that Kamstra must indemnify it for legal fees incurred and any forthcoming damages in the New York action. H&H believes that Kamstra must do this because Kamstra signed H&H's vendor agreement.

Kamstra moves to dismiss H&H's third amended complaint, arguing that the vendor agreement did not cover the sales of Abbott strips, and so it has no indemnification duties under the vendor agreement. Kamstra has moved to dismiss one of H&H's complaints before, but the Court denied that motion. Kamstra sought reconsideration, but the Court denied that too. But Kamstra insists that the third time's a charm. For the reasons set out below, the Court disagrees.

**I.**

**A.**

As this is not the first time the Court has described the facts of this case, *see H&H Wholesale Servs., Inc. v. Kamstra Int'l, B.V.*, 373 F. Supp. 3d 826, 830 (E.D. Mich. 2019), the Court will only set out the facts most relevant to Kamstra's current motion to dismiss. As Kamstra seeks dismissal under Rule 12(b)(2) and 12(b)(6), where the parties disagree as to what occurred, the Court recounts H&H's version of the facts. *See Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991) (Rule 12(b)(2)); *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020) (Rule 12(b)(6)).

H&H and Kamstra are intermediaries in the manufacturer-to-consumer supply chain for certain products. (*See* ECF No. 77, PageID.1207.) H&H is in Michigan, Kamstra in the Netherlands. (*Id.*) As relevant to this case, Kamstra sourced blood-glucose test strips made by Abbott from Pramie Medical and sold them to H&H. (*See* ECF No. 77, PageID.1203.) H&H in turn sold those strips to pharmacies and other retailers. (ECF No. 77, PageID.1223–1224.)

In February 2014, Harmen Haaijer, then a sales manager for Kamstra, signed H&H's Vendor Application and Agreement. (ECF No. 77, PageID.1252.) In doing so, he certified that he was "authorized to execute th[e] Agreement of behalf of [Kamstra]." (*Id.*)

Under the Vendor Agreement, Kamstra "agree[d]" to warranties, indemnification, a Michigan forum, and other terms "in consideration of being considered a Vendor for H&H, sales to H&H and other good and valuable consideration." (ECF No. 77, PageID.1250.) Regarding warranties, Kamstra agreed that any product it sold or offered to H&H would be "genuine and authentic" and would be "in original manufacturer's packaging that [would] not have (or at any time have had) any alterations of any kind." (*Id.* at PageID.1251.) Kamstra further agreed that it

2

would "indemnify and hold H&H harmless from and against any and all claims . . . expenses and losses of any nature whatsoever relating to or arising out of [Kamstra's] breach, violation or failure to comply with the provisions of" the Vendor Agreement. (*Id.*) Kamstra also agreed that "any dispute or enforcement action relating to [the Vendor] Agreement or the transactions contemplated" under the Vendor Agreement would take place in a Michigan court or the U.S. District Court for the Eastern District of Michigan. (*Id.* at 1252.) The Vendor Agreement also included an anti-waiver clause: "No waiver, alteration or modification of these terms and conditions whether on Buyer's purchase order or otherwise shall be valid unless accepted in writing and signed by an authorized representative of H&H." (*Id.*)

Although Haaijer (on behalf of Kamstra) executed the Vendor Agreement in February 2014, Kamstra did not sell any products to H&H for over two years. (*See* ECF No. 77, PageID.1216–1217.) H&H says that during this time period it "attempted to place numerous purchase orders with Kamstra, but Kamstra was not able to fill any of them." (*Id.*)

Things changed in the fall of 2016. Starting in November 2016 and continuing through April 2017, Kamstra sold H&H a total of 24,000 boxes of Abbott blood-glucose test strips for about $1.2 million. (ECF No. 77, PageID.1218–1221.) The boxes were sold in six transactions. (*Id.*) Although the details of the six transactions varied slightly, for the most part, Kamstra and H&H would discuss price and quantity via email or phone, Kamstra would send an invoice for the strips, Kamstra would ship the strips to the United States, and H&H would wire Kamstra payment. (*See id.*) For the last three transactions, Kamstra also sent H&H sales order confirmations. (ECF No. 77, PageID.1219–1221.) In a prior version of its complaint, H&H alleged that it "sent" Kamstra purchase orders in response to Kamstra's invoices (ECF No. 22, PageID.383); but in the

3

latest iteration of its complaint, H&H states that its purchase orders were merely "internal" (ECF No. 77, PageID.1218–1221).

The six invoices that Kamstra sent for the completed sales included a disclaimer. (ECF No. 23, PageID.452–460.) (It appears the sales order confirmations for the last three orders also included the same disclaimer. (*See* ECF No. 15, PageID.185.)) Kamstra's disclaimer read, "To all agreements whereby we act as seller our general terms and conditions of sale, delivery and payment apply . . . . We expressly reject the applicability of your terms and conditions." (ECF No. 23, PageID.452–460.) In turn, Kamstra's general terms and conditions provided that the "Customer bears the risk of any and all direct and indirect damage that may be caused by the goods," that Kamstra would "never cover business damage or any other indirect damage," and that litigation arising out of the sale of goods would take place in the Netherlands. (*See* ECF No. 15, PageID.187–194.) H&H never signed any of the six invoices or three sales order confirmations. (*See* ECF No. 77, PageID.1218–1221; ECF No. 23, PageID.452–460.) (H&H did sign other sales order confirmations, but they were not for the strips at issue in this case.)

Unfortunately for both Kamstra and H&H, at least some of the boxes of Abbott strips that Kamstra sold to H&H were not completely genuine—the test strips were genuine, but the packaging and instructions were counterfeit. (ECF No. 77, PageID.1223.) Abbott caught the problem, sued H&H in a federal court in New York, and then obtained an order allowing it to seize the strips. (ECF No. 77, PageID.1224–1225.) H&H was also ordered to notify its customers (e.g., pharmacies) that the strips it sold them were not fit for sale. (ECF No. 77, PageID.1228.) The New York case is still ongoing, but H&H has already incurred millions in legal fees defending that action, and, in the end, it may have to pay Abbott millions more in damages. (ECF No. 77, PageID.1225.)

4

**B.**

In October 2017, H&H filed this case against Kamstra here, in the United States District Court for the Eastern District of Michigan. (ECF No. 1.) Among other claims, H&H sought to enforce the indemnity provision of the Vendor Agreement. It wants Kamstra to pay for the legal fees it has incurred in the New York lawsuit, any forthcoming damages, and its lost business from having to notify its customers that the boxes it sold were not completely genuine.

In 2018, Kamstra filed an extensive motion to dismiss that left few arguments unraised. Kamstra argued that the Vendor Agreement, along with its forum-selection clause, did not apply for several reasons. So, in Kamstra's view, this Court could not exercise personal jurisdiction over H&H's claims against it. (Recall, Kamstra is in the Netherlands.) Kamstra also argued that H&H had not stated a claim upon which relief could be granted.

In an opinion that addressed all of Kamstra's numerous arguments, this Court found that H&H had established a prima facie case of personal jurisdiction and that its breach-of-contract and warranty claims were plausible. *See generally H&H Wholesale Servs., Inc. v. Kamstra Int'l, B.V.*, 373 F. Supp. 3d 826 (E.D. Mich. 2019).

It is useful to recount one of the Court's holdings. Kamstra had argued that the Vendor Agreement was "a contract for the sale of goods" and thus subject to the Uniform Commercial Code's statute-of-frauds provision. Michigan courts have held that under that provision, a contract for the sale of goods must include a quantity term. Kamstra argued that the Vendor Agreement lacked a quantity term and thus was not enforceable under the statute of frauds provision, Michigan Complied Laws § 400.2201. But, in this Court's view, the Vendor Agreement was not "a contract for the sale of goods," so the provision did not apply. *H&H Wholesale*, 373 F. Supp. 3d at 835. The Court explained that a contract for the sale of goods would normally include the product,

quantity, price, time of delivery, and place of delivery; yet the Vendor Agreement included *none* of those terms. *Id.* Instead, "[t]he Vendor Agreement contemplated that there would be subsequent purchase orders and invoices specifying the product, quantity, and price." *Id.* Rather than "a contract for the sale of goods," the Court explained that the Vendor Agreement was an "umbrella-style" agreement, *id.* at 840, that put in place generally applicable terms (e.g., warranties and forum-selection) that would apply to subsequent transactions between the parties. "The apparent purpose of the Vendor Agreement," the Court reasoned, "was to allow vendors to obtain a spot on H&H's list of approved vendors. The agreement says as much: 'the Vendor agrees to all of the following *in consideration of being considered a Vendor for H&H*, sales to H&H[,] and other good and valuable consideration.'" *Id.* at 836 (emphasis added).

Kamstra sought reconsideration of this Court's determinations, again raising a slew of arguments. *See H&H Wholesale Servs., Inc. v. Kamstra Int'l, B.V.*, No. 17-13422, 2019 WL 2183127 (E.D. Mich. May 21, 2019). The Court denied Kamstra's motion for reconsideration, again explaining the nature of the Vendor Agreement: "As indicated from the text of the agreement (e.g., 'in consideration of being considered a Vendor for H&H'), H&H wanted to ensure that if it bought goods from one of its vendors, the goods would be accompanied by certain warranties (e.g., 'in original manufacturer's packaging'). For each vendor that agreed to the terms of the Vendor Agreement, H&H could add that vendor to its 'rolodex' assured that the vendor had agreed to all representations and warranties in the Vendor Agreement." *Id.* at *2. "That way," the Court continued, "when H&H was looking to source a product, it only needed to flip through its rolodex and ask about availability and price. H&H could make that streamlined inquiry knowing that any vendor it chose from its rolodex had already agreed to, for example, sell products 'in original manufacturer's packaging' and litigate disputes in Michigan." *Id.* The Court denied Kamstra's

6

motion for reconsideration, noting that "[t]he old saying, 'if at first you don't succeed, try, try, try again,' is not always the best way to proceed in litigation." *Id.* at *1.

### C.

But try again, Kamstra has. In fairness though, Kamstra's third effort to dismiss the complaint was prompted by H&H amending its complaint for a third time.

Two changes from the second amended complaint are worth highlighting. As noted, H&H no longer alleges that it sent Kamstra purchase orders when it bought the boxes of Abbott strips. (ECF No. 77, PageID.1218–1221.) Instead, it merely generated "internal" purchase orders. (*Id.*) Second, H&H named three more companies as defendants—each related in some way to Kamstra. (*See* ECF No. 77, PageID.1207–1208.)

These changes have prompted two more motions to dismiss. The three new defendants, all located in the Netherlands, argue that this Court lacks personal jurisdiction over the claims against them; they also argue that H&H's claims against them are not plausible. (*See* ECF No. 83.) The Court addresses that motion in a separate opinion, also entered today.

In this opinion, the Court addresses Kamstra's motion to dismiss H&H's complaint. (ECF No. 84.) Kamstra maintains that H&H's new allegation that H&H merely generated "internal" purchase orders for the six sales is a game changer.

### II.

Kamstra primarily seeks dismissal under Federal Rule of Civil Procedure 12(b)(6). (*See* ECF No. 84, PageID.1363–1364.) (Kamstra asserts lack of personal jurisdiction too, but Kamstra recites only the Rule 12(b)(6) standard and effectively says that its Rule 12(b)(6) arguments also warrant dismissal under Rule 12(b)(2). (*See* ECF No. 84, PageID.1354, 1363–1364.))

In deciding a Rule 12(b)(6) motion, the Court applies the plausibility framework set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Under that framework, the Court asks whether the factual allegations of H&H's third amended complaint permit "the reasonable inference that [Kamstra] is liable[.]" *Iqbal*, 556 U.S. at 678. Although this plausibility threshold is more than a "sheer possibility" that Kamstra is liable, it is not a "'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Whether H&H has presented enough factual matter to "'nudg[e]'" its claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Id.* (quoting *Twombly*, 550 U.S. at 570).

### III.

H&H's third amended complaint asserts claims for breach of contract, breach of warranty, and declaratory judgment against Kamstra. Kamstra's moves to dismiss them all.

### A.

Kamstra makes several arguments to dismiss Count I. There, H&H asserts breach of contract, namely that Kamstra breached the Vendor Agreement. (ECF No. 77, PageID.1239.) Kamstra says that the Vendor Agreement did not apply to the six sales of Abbott strips, and so it could not have breached that agreement. (*See* ECF No. 84, PageID.1364–1374; ECF No. 104, PageID.6081–6085.) None of Kamstra's arguments for dismissal are persuasive.

Kamstra's first theory couples paragraphs 47 and 48 of the complaint with H&H's admission that it did not send purchase orders for the six sales. Here is what paragraphs 47 and 48 of the complaint say:

> 47. Paragraph 19 of the Vendor Agreement incorporates and provides that the Vendor Agreement shall apply to and control any subsequent purchase orders for the sale of Products issued by H&H.

> 48. Accordingly, when H&H and Kamstra subsequently exchanged emails and/or discussed the terms of specific transactions between H&H and Kamstra, including products, quantity, and price terms, those details and the documents in which they were memorialized formed independent contracts subject to the terms of the Vendor Agreement.

(ECF No. 77, PageID.1216.) In Kamstra's view, these two paragraphs allege that "the terms of the Vendor Agreement . . . apply to a transaction only through H&H's issuance of a purchase order." (ECF No. 77, PageID.1365; *see also* ECF No. 104, PageID.6082.) Because H&H now admits that it never sent a purchase order, Kamstra asserts that the mechanism that applied the Vendor Agreement to the six sales never existed. It follows, says Kamstra, that the six sales of Abbott strips were not subject to the Vendor Agreement, and it did not breach that agreement. (ECF No. 104, PageID.6082.)

This argument fails to take the allegations of the complaint in the light most favorable to H&H. With some editing and some straining, perhaps paragraph 47 and 48 could be read to allege that the Vendor Agreement applied to the six sales only if H&H issued written purchase orders: "Paragraph 19 of the Vendor Agreement incorporates and provides that the Vendor Agreement shall apply to and control any *subsequent purchase orders . . . issued by H&H. Accordingly . . .* those details and the documents in which they were memorialized formed independent contracts subject to the terms of the Vendor Agreement." But that reads paragraph 47 and 48 under the wrong light and places undue weight on the word "accordingly." Under the light most favorable to H&H, "those details" in paragraph 48 refers to "products, quantity, and price terms" or the particulars of the transaction set out in "exchanged emails and/or discuss[ions]." So with an H&H-favorable reading, the complaint alleges that the "independent contracts" for the six sales were formed through emails, discussions, and documents memorializing the details of the transaction. And it was those contracts that were "subject to the terms of the Vendor Agreement."

9

Moreover, Kamstra's argument is premised on H&H's inartful paraphrasing of the Vendor Agreement. In paragraph 47 of the complaint, H&H says, "Paragraph 19 of the Vendor Agreement incorporates and provides that the Vendor Agreement shall apply to and control any subsequent purchase orders *for* the sale of Products *issued by H&H*." But H&H has mistaken "for" for "or" and had added "issued by H&H." Paragraph 19 of the Vendor Agreement, which is attached to the complaint, states, "These terms and conditions shall control with respect to any purchase order *or* sale of Products," period. (ECF No. 77, PageID.1252.) The Court can rely on the actual language of the Vendor Agreement instead of H&H's paraphrase. *See Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002) (referencing "the well-settled rule that when a written instrument contradicts allegations in a complaint to which it is attached, the exhibit trumps the allegations." (internal quotation marks omitted)); *Brooks Kushman P.C. v. Cont'l Cas. Co.*, 213 F. Supp. 3d 917, 926 (E.D. Mich. 2016); *Fed. Home Loan Mortg. Corp. v. Montague*, No. 1:13-CV-1162, 2014 WL 4313633, at *5 (W.D. Mich. Sept. 2, 2014). So even if H&H did not issue purchase orders, the Vendor Agreement says it controls "any purchase order *or sale of Products*." And no one disputes that Kamstra sold H&H test strips.

Before turning to Kamstra's next basis for dismissing H&H's breach-of-contract claim, the Court notes that H&H's failure to send purchase orders does not undermine the Court's characterization of the Vendor Agreement. This Court never reasoned that the Vendor Agreement governed the six sales "through" issued purchase orders. Instead, this Court explained that the Vendor Agreement was an "umbrella-style" agreement where the parties agreed to certain terms at the start of their relationship (e.g., warranties and litigation forum) so that those terms would not need to be negotiated when, in the future, H&H attempted to source products from Kamstra. *H&H Wholesale*, 373 F. Supp. 3d at 386, 840; *H&H Wholesale*, 2019 WL 2183127, at *2.

Although in the context of a rebuttal to one of H&H's arguments, Kamstra also argues that its emails, invoices, and sales order confirmations could not supply the product, price, and quantity terms for the six sales of Abbott strips. (ECF No. 104, PageID.6083–6084.) Kamstra refers to paragraph 2 of the Vendor Agreement; it states, "All terms contained herein shall supersede *any* terms contained in [Kamstra's] emails, invoices, shipping documents or other documents related to the Products." (ECF No. 77, PageID.1250 (emphasis added).) "Any" means any, Kamstra says. (ECF No. 104, PageID.6084.) And so the Vendor Agreement superseded any term in its invoices or emails—this includes any terms about the product, price, and quantity. (*Id.*)

It is not clear what to make of this argument. Perhaps Kamstra's point is that its documents did not supply product, price, and quantity and that H&H issued no purchase orders supplying those terms. But that would not make the Vendor Agreement unenforceable for lack of quantity term because, as explained, the Vendor Agreement was not a "contract for the sale of goods" that required a quantity term. And if it is Kamstra's point that there was no contract for the sales, that assertion is inconsistent with the allegations of the complaint. The parties somehow—whether by invoice, purchase order, email, phone, or otherwise—agreed on product, price, and quantity; Kamstra then delivered the goods and H&H then paid for them. That sure seems like a contract. And the Court fails to see how paragraph 2 means that the Vendor Agreement did not govern the six sales—again it was an umbrella agreement that governed the parties' future transactions.

Apparently as an alternative argument, Kamstra asserts that if, as H&H now pleads, the emails and discussions about the quantity and price created "independent contracts" for the six sales, then Kamstra's terms and conditions—not those of the Vendor Agreement—govern the sales. (ECF No. 84, PageID.1374; *see also* ECF No. 104, PageID.6085.) Essentially, Kamstra points out that the Vendor Agreement included no product, quantity, or price terms, and H&H now

11

admits it did not send purchase orders supplying those terms. (*See id.*) So, says Kamstra, the basis of any independent contract for each of the six sales was its invoices, emails, and sales order confirmations. (ECF No. 84, PageID.1373.) But Kamstra's invoices, emails, and sales order confirmations included Kamstra's disclaimer: "To all agreements whereby we act as seller our general terms and conditions of sale, delivery and payment apply . . . . We expressly reject the applicability of your terms and conditions." So, Kamstra concludes, its terms and conditions—and not the Vendor Agreement's—governed the six sales. (ECF No. 84, PageID.1373–1374.) And if the Vendor Agreement did not govern those sales, Kamstra did not breach that agreement.

But, as this Court said in its prior opinions, H&H never signed any of Kamstra's invoices or purchase orders relating to the six sales, *H&H Wholesale*, 373 F. Supp. 3d at 837–38, and the Vendor Agreement expressly states, "No waiver, alteration or modification of these terms and conditions . . . shall be valid *unless . . . signed by an authorized representative of H&H*" (ECF No. 77, PageID.1252 (emphasis added)).

Kamstra also makes an estoppel argument. (*See* ECF No. 84, PageID.1361; ECF No. 104, PageID.6086.) During oral argument on its first motion to dismiss, H&H's counsel addressed Kamstra's statute-of-frauds argument and attempted to explain why the Vendor Agreement did not need a quantity term. Here, precisely, is what counsel said:

> THE COURT: And isn't that part of why [Kamstra is] saying there's no conceivable quantity in this agreement?
>
> [H&H's COUNSEL]: No, I don't believe that that is correct because what are agreed and [the Vendor Agreement] also goes on to say is that H&H's purchase orders, subsequent purchase orders, are what is going to control, okay.
>
> THE COURT: How does that create a quantity?
>
> [H&H's COUNSEL]: The quantity is contained in the purchase orders. Judge, this is no—
>
> THE COURT: And what if it wasn't?

12

> [H&H's COUNSEL]: *Then there wouldn't be a contract*, but there is. And there wouldn't be an order. *If they didn't send a purchase order with a quantity and a price, there wouldn't be a contract, but they did. H&H did.* There were purchase orders with a definite quantity and a definite price.

(ECF No. 38, PageID.771 (emphases added).) Relying on the emphasized language, Kamstra says that H&H has admitted that without issued purchase orders, there was no contract. (ECF No. 84, PageID.1361.) And, says Kamstra, it is only fair to hold H&H to its word. (*See id.*)

The Court does find some equitable appeal to Kamstra's argument. H&H did plead in its second amended complaint that it "sent" purchase orders. (ECF No. 22, PageID.381–383.) And H&H's counsel not only made that claim during oral argument but took the further step of saying that without the purchase orders, "there wouldn't be a contract." (ECF No. 38, PageID.771.) H&H even went so far as to submit an affidavit suggesting that it sent purchase orders. (*See* ECF No. 29, PageID.596–597.) Now, after some discovery, H&H has backtracked from all of this. Parties should be careful in making representations in the Court—let alone two or three times over. *See* Fed. R. Civ. P. 11. Worse, this information (whether H&H sent purchase orders) was presumably in H&H's possession.

Still, the Court finds no basis to dismiss this case on account of H&H's mistake or misrepresentation. This Court's primary holding was (and is) that the Vendor Agreement is not a contact for the sale of goods, and thus, not subject to the statute of frauds. So there is no need for purchase orders to supply a missing quantity term in the Vendor Agreement. Moreover, H&H has since corrected its mistake in its third amended complaint and any prejudice to Kamstra has been minimized by this Court addressing in full Kamstra's motion to dismiss that complaint.

As yet another avenue to dismiss Count I, Kamstra asserts that H&H abandoned the Vendor Agreement. (ECF No. 84, PageID.1370–1371.) Kamstra made a similar argument previously. It claimed that because the Vendor Agreement was signed in February 2014, but there were no

13

completed transactions for over two years, H&H abandoned the Vendor Agreement. (ECF No. 28, PageID.533–534.) In addressing that argument, this Court stated, "The Court questions whether two years of inactivity—as opposed to say, 20—could amount to abandonment of an umbrella-style agreement like the Vendor Agreement. But even if that relatively short time could amount to abandonment, it is not even clear that there was two years of inactivity. H&H has pled that after Kamstra executed the Vendor Agreement, it '*placed* several purchase orders with HTG [Kamstra] over the course of the next 2 years.'" *H&H Wholesale*, 373 F. Supp. 3d at 840 (emphasis added). Kamstra, returning to its theme, says that H&H now admits it never placed purchase orders. So, says Kamstra, its abandonment theory works now even if it fell short before.

Kamstra's renewed abandonment argument fails to read the third amended complaint in the light most favorable to H&H. The complaint says, "After Kamstra executed the Vendor Agreement and almost continuously from the Fall of 2014 through the Fall of 2016, H&H attempted to place numerous purchase orders with Kamstra, but Kamstra was not able to fill any of them." (ECF No. 77, PageID.1216–1217.) So, true, H&H no longer alleges that it sent or placed purchase orders with Kamstra during the two years after the Vendor Agreement was signed. But H&H does say it tried to. And it is reasonable to infer that when H&H tried to place orders with Kamstra, it was relying on the terms of the Vendor Agreement. As such, it is reasonable to infer that H&H did not abandon the Vendor Agreement.

Kamstra makes one last argument about H&H's breach-of-contract claim. Although the Court primarily held that the Vendor Agreement was not "a contract for sales of goods" and thus not subject to the UCC's statute-of-frauds provision, the Court also provided an alternative holding. The Court reasoned, "even assuming that the Vendor Agreement is 'a contract for the sale of goods' as that phrase is used in § 440.2201, it would not be unenforceable under that provision.

14

The Vendor Agreement anticipated that there would be future purchase orders and invoices setting forth products, prices, and quantities. Thus, those purchase orders and invoices supplied the quantity term missing from the Vendor Agreement." *H&H Wholesale*, 373 F. Supp. 3d at 836 (internal citations omitted). Kamstra argues that because H&H now admits it never sent purchase orders, this alternate holding must fall by the wayside.

Not so. First, the Court expressly stated, "purchase orders *and invoices* supplied the quantity term." *Id.* (emphasis added). So Kamstra's argument improperly redacts the emphasized language from the Court's opinion. (And to the extent that Kamstra argues that if the quantity term was supplied by its invoices, then its terms and conditions must control, the Court has already explained that H&H never signed invoices or sales order confirmations relating to the six sales giving rise to this case.) Second, the Court's point was that the parties could fill the quantity term missing from the Vendor Agreement at a later time—specifically how that was done (by purchase orders, invoices, emails, or otherwise) was not essential to the Court's alternate holding.

* * *

In short, Kamstra has not persuaded the Court to dismiss Count I, H&H's claim that Kamstra breached the Vendor Agreement.

**B.**

As to Count II, H&H's claim that Kamstra violated one of the warranty provisions in Michigan's implementation of the UCC, Kamstra argues that H&H has denied a fact essential to the claim. (ECF No. 84, PageID.1375.) Kamstra, citing *White v. Medtronic, Inc.*, No. 18-11590, 2019 WL 1339613, at *10 (E.D. Mich. Feb. 20, 2019), also argues that H&H has impermissibly made inconsistent factual allegations in support of single claim. (*Id.*)

Kamstra again does not give the complaint the deference it is owed under Rule 12(b)(6). In relevant part, the complaint says, "Kamstra sold boxes of FreeStyle to H&H that are alleged by Abbott to infringe upon Abbott's trademark, and to violate the law in other ways. If Abbott's allegations are true, *which H&H denies*, Kamstra violated Michigan's Uniform Commercial Code, MCL § 440.2312." (ECF No. 77, PageID.1240 (emphasis added)). Kamstra thinks that via the emphasized language, H&H has denied a fact essential to its claim or somehow has pled inconsistent facts. But that hardly reads the allegations under the light most favorable to H&H. Properly illuminated, all H&H is saying is that if the New York court ultimately finds that it infringed Abbott's mark—which it hopes and believes will not happen—then it would follow that Kamstra breached the warranties in § 400.2312. The claim is contingent, not inconsistent. For that reason, *White* is readily distinguishable. *Cf.* 2019 WL 1339613, at *10 ("Plaintiffs simultaneously allege that Dr. Durrani both did, and did not, have knowledge of [the] risks [associated the medical device].").

## C.

Finally, Kamstra seeks to dismiss H&H's declaratory judgment count. But Kamstra's grounds for dismissing that count are the same arguments for dismissing H&H's breach-of-contract and warranty claims. And those arguments are unpersuasive for the reasons stated.

## IV.

For the reasons given, Kamstra's motion to dismiss under Rule 12(b)(6) (ECF No. 84) is DENIED. For the same reasons, Kamstra's motion to dismiss under Rule 12(b)(2) is DENIED.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE